David O'Mara (Nev. bar #8599)
The O'Mara Law Firm, P.C.
311 E. Liberty Street
Reno, NV 89501
Telephone: 775/323-1321
David@omaralaw.net
*Local Counsel for Plaintiffs*
James Bopp, Jr. (Ind. bar #2838-84)*
    jboppjr@aol.com
Richard E. Coleson (Ind. bar #11527-70)*
    rcoleson@bopplaww.com
Corrine L. Youngs (Ind. bar #32725-49)*
    cyoungs@bopplaw.com
Amanda L. Narog (Ind. bar #35118-84)*
    anarog@bopplaw.com
True the Vote, Inc.
 Voters' Rights Initiative
The Bopp Law Firm, PC
1 South Sixth St.
Terre Haute, IN 47807–3510
Telephone: 812/877-4745
*Pro hac vice application pending
*Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| **Stanley William Paher**, **Terresa Monroe-Hamilton**, and **Garry Hamilton**,<br><br>     Plaintiffs<br><br>v.<br><br>**Barbara Cegavske,** in her official capacity as Nevada Secretary of State, **Deanna Spikula**, in her official capacity as Registrar of Voters for Washoe County,<br><br>     Defendants | Case No.:   3:20-cv-00243<br><br>**Plaintiffs' Preliminary-Injunction Motion** |

Pursuant to Federal Rule of Procedure 65(a), Plaintiffs ("Voters") move for a preliminary injunction to prevent the Nevada Secretary of State ("Secretary") and Nevada county clerks and registrars of voters ("County Administrators") from conducting the June 9, 2020, Nevada state and federal primary election ("Primary") from proceeding under the "all-mail election" plan ("Plan") on the Secretary's website. *See* https://www.nvsos.gov/sos/Home/Compo-nents/News/News/2823/23 (Compl. Ex. A); *see also* https://www.nvsos.gov/sos/elections/vo-

ters/absentee-voting (Compl. Ex. B). Crucially, the Plan strips the Legislature's vote-fraud-prevention safeguards that are required to prevent illegal voting that dilutes Voters' votes and violates their right to vote. And it is not the "Manner . . . prescribed . . . by the Legislature," U.S. Const. art I, § 4, cl. 1, so it may not be used since federal candidates are on the ballot. Other constitutional flaws are established below.

Under the Plan, the Secretary and County Administrators intend to mail unrequested absentee ballots (herein "mail-in ballots") to *active* registered voters only: "All active registered voters in Nevada will be mailed an absentee ballot[1] for the primary election. No action or steps, such as submitting an absentee ballot request application, will be required by individual voters in order to receive a ballot in the mail." Compl. Ex. A. Qualified voters who are not "active" must apply for one: "Any registered voter may request to vote by mail. To request an absent ballot, you must complete and submit an Absent Ballot Request Form to the County Clerk/Registrar of Voters in the county where you are registered to vote." Compl. Ex. B. This mail-in-ballot Plan is *not* the Legislature's prescribed manner.

As set out in the Memorandum of Points and Authorities, the Plan violates Voters' (i) right to vote under the U.S. Constitution (including by vote dilution), (ii) right to vote in a federal election compliant with U.S. Constitution Article I, § 4, cl. 1, and (iii) right to a republican form of government under Article IV, § 4 of the U.S. Constitution.

As the issues involve fundamental First Amendment rights, Voters ask the Court to waive the security mentioned in Federal Rule of Civil Procedure 65(c) or provide for a nominal security of $1 payable to the Clerk. *See, e.g., Baca v. Moreno Valley Unified School District*, 936 F. Supp. 719, 738 (C.D. Cal. 1996 (waiving bond requirement for First Amendment case).

This Motion is based on the following Memorandum of Points and Authorities, pleadings and papers on record herein, and any argument presented at the hearing on this matter.

---

[1] The Secretary uses "absent*ee* ballot" synonymously with the Nevada term "absent ballot," Nevada Revised Statutes ("NRS") 293.013. Compl. Ex. A. But because the ballots are not sent per the legislatively required absent-ballot request procedure, they are actually like the *mail-in ballots* sent in statutory all-mail-voting plans, such as used in California.

Expedition is requested in a separate motion due to the nearness of the June 9 primary and the need for the Plan to be enjoined well before then to allow the Secretary and County Administrators to do what they lawfully may under the controlling statutes enacted by the Legislature.

April 21, 2020                                    Respectfully submitted,

/s/ David O'Mara
David O'Mara (Nev. bar #8599)
*Local Counsel for Plaintiffs*

## Memorandum of Points and Authorities

### I.

### The Plan Violates Controlling Legislation and Strips Vital Safeguard Against Voting Fraud.

Nevada's Primary is June 9, 2020. Compl. Ex. A. The Nevada Legislature has enacted detailed legislation governing how elections are to be conducted—with vital safeguards against voting fraud—in NRS Title 24, Chapter 293 (titled "Elections").[2] The Secretary of State intends to conduct the Primary with the Plan (an "all-mail election") on the Secretary's website. Compl. Exs. A and B.[3] As set out in the Motion, *supra*, the Plan is to mail a mail-in ballot to *active* registered voters without request, to require *other* registered voters to make a request, and to close down the usual polling places for in-person voting. As relevant to the legal challenges in the Complaint, the Plan (**A**) is not the *Legislature*'s prescribed manner, as required, and (**B**) strips necessary safeguards against vote fraud established by the Legislature.

**A.  The Plan is not the "Manner prescribed . . . by the Legislature."**

Though this election involves federal candidates, the Plan is not the "Manner" of election "prescribed . . . by the Legislature," as required by U.S. Constitution, Article I, § 4, cl. 1. *See* Part II.A.4. Some examples follow.

First, Chapter 293 requires the Secretary to enact implementing regulations, but limits that to those (i) consistent with legislation and (ii) in place by the last business day of February:

> The Secretary of State shall adopt regulations, *not inconsistent with the election laws* of this State, for the conduct of primary, general, special and district elections in all cities and counties. Permanent regulations of the Secretary of State that regulate the conduct of a

---

[2]  *Available at* https://www.leg.state.nv.us/NRS/NRS-293.html.

[3]  Some County Administrators have also released Plan details. *See* Compl. Exs. C-E, G.

primary, general, special or district election and are effective *on or before the last business day of February* immediately preceding a primary, general, special or district election govern the conduct of that election.

NRS 293.247 (emphasis added). The Plan is untimely because it was announced March 24, 2020, Compl. Ex. A, and it imposes new regulations for this election inconsistent with controlling law.

Second, the law mandates that county clerks "shall establish election precincts"[4] "on or before the third Wednesday in March of every even-numbered year." NRS 293.205. So precincts had to be established by March 18, 2020, though the Plan was put in place on March 24, 2020. Compl. Ex. A. Accordingly, though county clerks may establish "mailing precincts" (where all ballots are mailed, with certain exceptions) under certain guidelines, NRS 293.343, those like all precincts had to be established by March 18 under NRS 293.205. Moreover, "on or before the last day in March of every even-numbered year, the county clerk shall provide the Secretary of State and the Director of the Legislative Counsel Bureau with a copy or electronic file of a map showing the boundaries of all election precincts in the county," NRS 293.206, and the Plan is inconsistent with that. To the extent Defendants deem the Plan such a creation of mailing precincts, it was not done in the Legislature's prescribed manner.

Third, requiring that clerks establish and the Secretary approve maps of precincts, NRS 293.205 and .206, indicates the Legislature's intent for such precincts for in-person voting, not that the whole election be subsumed under an exception allowing mailing districts in certain circumstances, e.g., "whenever there were not more than 20 voters registered in a precinct for the last preceding general election, the county clerk may establish that precinct as a mailing precinct," NRS 293.213(1).[5] The Legislature's intent to have regular in-person voting and actual

---

[4] "[S]tatutes . . . that employ the term 'shall' are presumptively mandatory." *Nev. Pub. Emps. Ret. Bd. v. Smith*, 129 Nev. 618, 627, 310 P.3d 560, 566 (2013) (citation omitted).

[5] Defendants apparently believe County Administrators may substantially change the election process under NRS 293.213(4):"the county clerk may establish a mailing precinct or an absent ballot mailing precinct that does not meet the requirements of subsection 1, 2 or 4 if the county clerk obtains prior approval from the Secretary of State." But as noted in text doing this was untimely under NRS 293.205 and it was not intended to apply to the whole state. Statutes must be read *in pari materia*. *Farm Mut. v. Comm'r of Ins.*, 114 Nev. 535, 541, 958 P.2d 733, 737 (1998). And NRS 293.205(1) precludes county clerks from establishing, abolishing, altering,

(continued...)

4

absentee-ballot procedures as the controlling model, with certain exceptions, is evidenced throughout Chapter 293 in its provisions for regular voting. The Plan is not the Legislature's prescribed manner.

Fourth, where mailing precincts are created, "county clerk[s] shall, at least 14 days before establishing or designating a precinct as a mailing precinct . . . cause notice of such action to be: (a) Posted [as prescribed] . . . ; and (b) Mailed to each Assemblyman, [etc. as prescribed]. Apparently the Plan supplanted this, in contravention of the Legislature's prescribed manner.

**B. The Plan strips vital anti-vote-fraud safeguards established by the Legislature.**

The Plan strips vital safeguards against vote fraud established by the Legislature for in-person voting and actual absentee-ballot voting, which are abandoned with mail-in ballots.

Regarding in-person voting, Nevada requires that "a person who registered by mail or computer shall, for the first election in which the person votes at which that registration is valid, vote in person unless he or she has previously voted in the county in which he or she is registered to vote." NRS 293.272(1). And an individual who registers at the Department of Motor vehicles, by mail, or by computer must present valid identification and a document establishing residence. NRS.293.2725.[6] There are some exceptions, but those are the general rules, and they allow local poll workers and watchers to monitor who is voting and deny voting and issue challenges if appropriate—as does in-person voting in general. But that is all gone with the Plan, under which all active, registered voters get a mail-in ballot. The safeguards mandated for in-person voting are set out further below, along with penalties for violations. *See infra* Part II.A.1.

Regarding actual absentee-ballot voting, Nevada requires the safeguard that a voter must *request* the ballot (with limited exceptions): "Except as provided in NRS 293.272 and 293.502, a registered voter may request an absent ballot if, before 5 p.m. on the 14th calendar day preceding

---

[5] (...continued)
consolidated and designating election precincts after "the third Wednesday in March of every even-numbered year."

[6] Likewise, where mail voting has been authorized by law, individuals could only vote by mail if they provide the county clerk the same information required at the polling location. NRS 293.2725(1)(b)(1)-(2).

the election, the registered voter; (a) Provides sufficient written notice to the county clerk; and

(b) Has identified himself or herself to the satisfaction of the county clerk." NRS 293.313. The

Nevada Administrative Code provides that, "A clerk that receives a request for an absent ballot

shall: (1) Compare the address of the voter's residence in this State which is indicated on the re-

quest with the address which is indicated on the voter's application to register to vote." NAC

293.295. If the address is different on the voter registration and absent ballot applications, the

clerk will send a written notice including: "(a) A copy and explanation of the provisions set forth

in NRS 293.525; and (b) A postcard to be returned by the voter to the county clerk which in-

cludes verification of the address of the voter's residence in this State.  The county clerk shall use

a postcard that may not be forwarded to an address of the voter which is different from the ad-

dress to which the notice is mailed." NAC 293.295(2). As such, the safeguards in place when a

registered voter moved "from one precinct to another or from one congressional district to an-

other within the same county" require that the registered voter "must be allowed to vote in the

precinct where the elector previously resided" but only after "providing an oral or written affir-

mation before an election board officer attesting to his or her new address." NRS 293.525. Even

if the registered voter moved within the same precinct, that elector must only be "allowed to vote

after providing an oral or written affirmation before an election board officer attesting to his or

her new address." *Id.* By removing this requirement from the election process, a person who has

moved without providing a proper change of address, would be able to circumvent the Legisla-

tive safeguards and vote without providing the required affirmation before an election board offi-

cer if he or she receives the mailed ballot. *See also infra* Part II.A.1 (further discussion).

## II.
### Voters Satisfy the Requirements for a Preliminary Injunction.

In the Ninth Circuit, the sliding-scale preliminary-injunction test is as follows:

Plaintiffs seeking a preliminary injunction must establish that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The Ninth Circuit weighs these factors on a sliding scale, such that where there are only "serious questions going to the merits"—that is, less than a "likelihood of success" on the merits—a prelimi-nary injunction may still issue so long as "the balance of hardships tips *sharply* in the

plaintiff's favor" and the other two factors are satisfied. *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)).

*Short v. Brown*, 893 F.3d 671, 675 (9th Cir. 2018) (emphasis in original)

On the merits-success prong, "the burdens at the preliminary injunction stage track the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006); *see also id.* at 428 (citing *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004); *FEC v. Wisconsin Right to Life,*, 551 U.S. 449, 464 (2007); *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 816 (2000). So for example, where provisions burden free-speech rights, the burden is on the *government* to justify its provision under strict scrutiny. Finally, in First Amendment cases, success on the merits typically satisfies the other preliminary injunction elements. *See, e.g.*, *Sammartano v. First Judicial District Court, in and for County of Carson City*, 303 F.3d 959, 973-74 (9th Cir. 2002); *Bays v. City of Fairborn*, 668 F.3d 814, 819 (6th Cir. 2012).

**A.   Voters have likely success on the merits.**

**1.   The Plan violates the right to vote by removing safeguards against fraudulent votes that dilute legal votes.**

As established in Part I.B and further below, the Plan strips vital safeguard established by the Legislature designed to protect against fraudulent votes that dilute Voters' votes. This lack of mandatory safeguards is a severe burden on Voters' fundamental right to vote.

The federal right to vote is fundamental, *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 667 (1966), and well-established: "Undeniably the Constitution of the United States protects the right of all qualified citizens to vote, in state as  well as in federal elections" and to have that vote counted. *Reynolds v. Sims*, 377 U.S. 533, 554 (1964). "The right to vote can neither be denied outright, nor destroyed by alteration of ballots, nor diluted by ballot-box stuffing." *Id.* at 555 (internal citations omitted). "And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by  wholly prohibiting the free exercise of the franchise." *Id.* The right to vote inheres in, and is protected by, the First and Fourteenth Amendments of the U.S. Constitution.

Nevada also recognizes a right to vote: "All [qualified voters] shall be entitled to vote for all officers that now or hereafter may be elected by the people, and upon all questions submitted to the electors at such election." Nev. Const. art 2, § 1. Article 1, §§ 8 and 9 of the Nevada Constitution protect against violations of due process (including for "liberty" deprivation) and free speech rights and so provide protection for the right to vote. *See also State ex rel. McMillan v. Sadler*, 58 P. 284, 288 (1899) ("The right to vote . . . could not be given stronger or broader language."); *Buckner v. Lynip*, 41 P. 762, 764 (1895) ("right of voting, and, of course, of having the vote counted is one of most transcendent importance—the highest under our form of government.") And under Nevada's right to vote, restrictions on these rights are strictly scrutinized with restrictions causing disenfranchisement struck. *See id.* ("That one entitled to vote shall not be deprived of his privilege by action of the authorities is a fundamental principle."). Nevada courts "look to federal precedent for guidance" on due-process protections. *Hernandez v. Bennet-Haron*, 287 P.3d 305, 310 (2012).

The level of scrutiny to be applied to the Plan under the *federal* right to vote would be strict scrutiny if the *Anderson-Burdick* test applies because mandatory safeguards against vote fraud have been stripped, which dilutes votes and thus is a severe burden. That test requires "weighing 'the character and magnitude of the asserted injury to the rights . . . that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,'" considering "'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788–89 (1983)). Under this test, strict scrutiny applies to "burdens" deemed "severe" (at issue here) as follows, *id.* at 434:

> the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." *Norman v. Reed*, 502 U.S. 279, 289 (1992). But when a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions. *Anderson*, 460 U.S. at 788; see also *id.*, at 788-789, n. 9.

Because the burdens (described below) that the requested relief would impose on the Voters' right to vote are severe,[7] strict scrutiny applies.

But the *Anderson-Burdick* test should not apply to the Plan, even though it would typically govern actual challenges to Nevada's legislatively enacted election laws. This is so because the test by its terms applies to "[i] a challenge to [ii] a state election law," *id.*, and the present case involves no "challenge to" any "state election law." The Plan is not legislated "state election law," but rather it would *override* and *replace* legislated state election law. So the *Anderson-Burdick* test doesn't apply to evaluating the constitutional infirmities of the requested relief (though were it held to apply, it would require strict scrutiny due to the severe burden).

Rather, the applicable scrutiny where voter disenfranchisement is involved, such as by vote dilution, is found in the *Reynolds-Bush* case line. *Reynolds v. Sims*, 377 U.S. 533 (1964); *Bush v. Gore*, 531 U.S. 98 (2000) (per curiam).[8] In considering whether, under the federal Equal Protection Clause, "any constitutionally cognizable principles . . . would justify departures from the basic standard of equality among voters," *Reynolds*, 377 U.S. at 561, *Reynolds* held that the right to vote is "fundamental": "Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society." 377 U.S. at 561-62. So franchise impairments get careful, meticulous scrutiny: "Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Id.* at 562. After reviewing arguments that these were "complex" issues, the Court held that "[t]o the extent that a citizen's right to vote is debased, he is that much less a citizen," *id.* at 567, and "an individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State," *id.* at 568.

---

[7] Disenfranchisement is a severe burden. *See, e.g.*, *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014); *Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580, 597 (6th Cir. 2012).

[8] Though *Bush* was decided long after *Anderson* and *Burdick*, no opinion in *Bush* cited *Burdick* and only one concurrence cited *Anderson*, once, but for another proposition. 551 U.S. at 112 (Rehnquist, joined by Scalia and Thomas, JJ., concurring). So those older cases have no bearing on the required analysis here.

Building on *Reynolds*, *Bush* didn't discuss the scrutiny level, but held that the Florida Supreme Court could not by its orders and interpretations of state law dilute voters' fundamental right to vote, 551 U.S. at 107-11, which was either a per-se ban of vote dilution or at least an exercise of the strict scrutiny now required in equal-protection challenges involving fundamental rights with an analysis and outcome so readily apparent that it required no detailing.

*Bush* is particularly analogous because it addressed the actions of the Florida Supreme Court (not the legislature) and found them in violation of the vote-dilution barred by *Reynolds*. The issue here, is action by the Secretary and County Administrators that would do the same. *Bush* noted that "[t]he petition present[ed] the following questions: whether the Florida Supreme Court established new standards for resolving Presidential election contests, thereby violating Art. II, § 1, cl. 2, of the United States Constitution[9] and failing to comply with 3 U.S.C. § 5, and whether the use of standardless manual recounts violates the Equal Protection and Due Process Clauses." 551 U.S. at 103. The Court found that "it is not necessary to decide whether the Florida Supreme Court had the authority under the legislative scheme for resolving election disputes to define what a legal vote is and to mandate a manual recount implementing that definition," *id.* at 105, because "recount mechanisms implemented in response to the decisions of the Florida Supreme Court do not satisfy the minimum requirement for nonarbitrary treatment of voters necessary to secure the fundamental right," *id. Bush* also noted that where *both* sides claim they are vindicating the right to vote, constitutional guarantees such as equal protection still control. *Id.* at 105.[10] And *Bush* highlighted the fact that the Florida Supreme Court order lacked the necessary

---

[9] In elections selecting Electors for choosing the President and Vice President, this provision mandates that the *Legislature*, not state and local officials, establish procedures: "Each State shall appoint, in such Manner as the Legislature thereof may direct . . . . ." So the Plan here could not be used in choosing Electors because it is not the Manner directed by the Legislature.

[10] As *Bush* put it, regarding both sides claiming they advance the right, *id.*:

There is no difference between the two sides of the present controversy on these basic propositions. Respondents say that the very purpose of vindicating the right to vote justifies the recount procedures now at issue. The question before us, however, is whether the recount procedures the Florida Supreme Court has adopted are consistent with its obligation to avoid arbitrary and disparate treatment of the members of its electorate.

"safeguards" to assure confidence in the outcome. As *Bush* put it, adequate "safeguards" are mandatory, *id.* at 109:

> [W]e are presented with a situation where a state court with the power to assure uniformity has ordered a statewide recount with minimal procedural safeguards. When a court orders a statewide remedy, there must be at least some assurance that the rudimentary requirements of equal treatment and fundamental fairness are satisfied.

That mandate to maintain "safeguards" to assure confidence in the election is particularly relevant to Voters' argument below.

So the Plan here is either barred *per se*[11] if votes are diluted or it would be subject to strict scrutiny and the government must prove it is narrowly tailored to a compelling governmental interest. Under *Reynolds* and *Bush* it is readily seen that vote dilution cannot be justified.

The Plan violates the Voters' right to vote by diluting their votes with illegal votes given the removal of safeguards against illegal voting established by the Legislature. *See supra* Part I.B and *infra* at 11-14. While vote dilution in *Reynolds* and *Bush* was reviewed under an equal-protection analysis, *Reynolds* held that "[t]he right to vote can neither be denied outright, nor destroyed by alteration of ballots, nor diluted by ballot-box stuffing." 377 U.S. at 555 (internal citations omitted), and those violations don't involve equal protection. "[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise," *id.*, which is not limited to the equal-protection context. Likewise, "the Fifteenth and Nineteenth Amendments prohibit a State from overweighting or diluting votes on the basis of race or sex," *id.* at 557, which is not limited to the equal-protection context. So challenges based on vote debasement or dilution are not limited to the equal-protection context.

Consequently, since the Plan dispenses with current statutory protections against illegal voting found in actual absentee-ballot and in-person voting law, the Plan is a cognizable dilution of the votes of eligible, registered voters such as Plaintiff Voters. That dilution requires strict scrutiny, because "any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *id.* at 562, which the Plan fails.

---

[11] If government may *not* dilute voters' right to vote, doing so cannot be justified under *any* interest-tailoring analysis.

Both in-person and actual absentee-ballot voting laws include safeguards that protect against voter fraud. But the Plan strips statutory protections provided by the Legislature to prevent such fraud. For in-person voting, a first-time voter generally must appear in person with identification and proof of residence location. *See supra* Part I.B. For all in-person voters whose name appears on the roster of registered voters (or they provide an affirmation that they are entitled to vote), the voter "state[s] his or her name to the election board officer in charge of the roster," who "shall . . . [a]nnounce the name of the registered voter," require a signature and then authenticate it or resolve any discrepancy. NRS 293.285. The voter "must sign his or her name in the roster or on a signature card when he or she applies to vote." NRS.293.277(1). This is all done before witnesses who may know the person, but in any case can watch the person's demeanor and can see if the person is trying to duplicate a signature from an exemplar or produces the signature spontaneously. And observers are permitted at in-person polling places. NRS 293.124 and .247; NAC 293.245 ("Observation of conduct of voting at polling place"). The signature is then compared by an election board officer with the signature on file or on approved identification cards, such as a driver's license. *Id.* at (1)-(2). Records are checked to assure the voter has not already voted. *Id.* at (3). The law provides that any person who votes knowing he or she is not qualified commits a Class D felony, as does one attempting to vote in the name of another. NRS 293.775. The same penalty applies to those voting more than once in the same election. NRS 293.780.

To obtain an actual absentee ballot, a voter must *request* the ballot and "identif[y] himself or herself to the satisfaction of the county clerk." NRS 293.313. "A clerk that receives a request for an absent ballot shall: (1) Compare the address of the voter's residence in this State which is indicated on the request with the address which is indicated on the voter's application to register to vote." NAC 293.295. If the address is different on the voter registration and absent-ballot applications, the court will send a written notice including: "(a) A copy and explanation of the provisions set forth in NRS 293.525; and (b) A postcard to be returned by the voter to the county clerk which includes verification of the address of the voter's residence in this State.  The county clerk shall use a postcard that may not be forwarded to an address of the voter which is different from the address to which the notice is mailed." NAC 293.295(2). Of course, none of the in-person safeguards of

monitoring the voter and the signing are present with actual absentee balloting, but the same penalties apply for being unqualified to vote, voting in another's name, and voting twice. In addition, what is known as "ballot harvesting" is banned by NRS NRS 293.330(4), which bars return of an actual absentee ballot except by the voter "or, at the request of the voter, a member of the voter's family" (with the family member required to verify the facts on a form). *See also* NRS 293.353 (same restriction for "mailing ballot" as for "absent ballot"). Presumably those restrictions and penalties apply to mail-in ballots as well as to actual absentee ballots. Though some actual absentee-ballot safeguards remain under the mail-in-ballot Plan, the elimination of the necessity to request a ballot through the usual procedures is a safeguard that must not be omitted because of the fraud potential of having unrequested, perhaps unexpected ballots arriving around the state. An automatically mailed mail-in ballot might be ignored, lost in a pile of letters set aside for a period before opening to allow any resident viruses to die, not noticed because the resident voters are sheltering in place at a different location, or some other such possibility. And having large numbers of unrequested mail-in ballots flooding the state in such conditions invites ballot fraud.

Both the in-person and actual-absentee-ballot scenarios demonstrate a statutory scheme that ensures multiple levels of verification before voting to guarantee the integrity of the voting process. Voters casting fraudulent ballots face the threat of felony prosecution. All of these protections and penalties are provided by the Legislature and may not be overruled and replaced by government officials as in the Plan. The Plan would require the State to forego almost all in-person voting and instead conduct the primary by automatically mailed mail-in ballots. County Administrators would send each active registered voter in the county a mail-in ballot without the individual first having to submit an application for an actual absentee ballot. That mail-in ballot, then, is to be completed by the voter and returned by mail. An election conducted primarily by mail-in ballot, per the Plan, would all but ensure an election replete with ballot fraud.

It is all but certain that, without these measures, many mail-in ballots will be unlawfully received, voted, and counted in the primary. Those individuals who illegally vote will unlawfully negate and ultimately dilute the choices made by the lawfully registered voters of this State— voters

the Legislature has carefully and methodically taken great care to protect. (As noted in the following paragraph, this is a cognizable interest without the need for specific proof in a case.)

Because the Plan (i) strips away substantial legislative safeguards against voter fraud and (ii) substitutes a mail-in balloting scheme with a substantial risk of fraud, a substantial likelihood of additional illegal votes exists. That risk is cognizable because "safeguards" are required, *Bush*, 531 U.S. at 109, and because "confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy" and "[v]oter fraud drives honest citizens out of the democratic process and breeds distrust of our government." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). Similarly, the Seventh Circuit recently stayed an injunction by the U.S. District Court for the Western District of Wisconsin because it had given inadequate attention to the interest in preventing voter fraud by eliminating the witness requirement for absentee-ballot signatures: "This court is concerned with the overbreadth of the district court's order, which categorically eliminates the witness requirement applicable to absentee ballots and gives no effect to the state's substantial interest in combating voter fraud." *Democratic National Committee v. Bostelmann*, slip op. 3,[12] Nos. 20-1538, 20-1539, 20-1545 & 20-1546 (7th Cir. Apr. 3, 2020) (citing *Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004)).[13]

Vote dilution, identified in *Reynolds* and *Bush*, *supra* Part II.A.1, is readily apparent where illegal votes are allowed because of inadequate safeguards. Only the votes of eligible, registered

---

[12] The slip opinion could not be found on LEXIS but is available at https://moritzlaw.osu.edu/electionlaw/litigation/documents/DNC_v_Bost_BL-30.pdf.

[13] Though the district-court order in *Bostelmann*, Nos. 3:20-cv-00249-wmc, 3:20-cv-00278-wmc, 3:20-cv-00284-wmc, 2020 U.S. Dist. LEXIS 57918 (W.D. Wisc. Apr. 2, 2020), granted some election-related relief based on COVID-19 concerns, other courts have not. *See, e.g.*, *Williams v. DeSantis*, No. 1:20-cv-00067 (N.D. Fla. Mar. 17, 2020), *available at* https://www.clearinghouse.net/chDocs/public/VR-FL-0173-0003.pdf; *Mays v. Thurston*, 2020 U.S. Dist. LEXIS 54498, No. 4:20-cv-341 (E.D. Ark. voluntarily dismissed Mar. 31, 2020); *League of Women Voters of Ohio v. LaRose*, No. 2:20-cv-01638 (S.D. Ohio Apr. 3, 2020), *available at* https://moritzlaw.osu.edu/electionlaw/litigation/documents/LWVO_v_Larose_57.pdf. The Supreme Court of New Mexico recently rejected an all-mail-in-ballot plan, instead ordering that absentee-ballot applications be mailed to registered voters so they could apply, in *State ex rel Riddle v. Oliver*, No. S-1-SC-38228 (Ariz. Apr. 16, 2020) (order available at https://cms.nmcourts.gov/uploads/files/News/38228%20Final%20Order%20(4-16-20).pdf).

voters are supposed to be cast and counted. So every legitimate voter is one of the total number of legitimate voters. For example, if the legitimate voter's vote is one of ten legitimate votes cast, her vote is worth one tenth of the total. But if, in addition, ten illegal votes are cast, her vote is now worth one twentieth of the total. So her vote was debased by half as a result of vote dilution. That violates her constitutional right to vote.

In sum, because the weakened safeguards in the requested relief predict dilution and debasement by illegal voting and create doubt about the legitimacy of the election, the right to vote of eligible, registered voters is violated.

**2.    The Plan violates the right to vote for legislative representatives to establish the manner of elections by substituting a scheme that replaces the legislatures' plan.**

The Voters' right to vote is also violated by the Plan because, while Voters voted for representatives with plenary power to govern the manner of voting to represent them, they didn't vote for the Secretary and County Administrators to represent them, yet the manner of voting proposed here is to be decided by the Secretary and County Administrators instead of the elected representatives in the Legislature. This invalidates Voters' votes for their representatives in this context. While state and local officials face balloting, they are not elected to be representatives of the People in the Legislature. That eliminates representation, representatives, and the right to vote for representatives in the Legislature to decide the manner of elections. That right to vote is fundamental, *Harper*, 383 U.S. at 667, and protected by the First and Fourteenth Amendments of the U.S. Constitution, as well as Article 2, § 1 of the Nevada Constitution ("All [qualified voters] shall be entitled to vote for all officers that now or hereafter may be elected by the people, and upon all questions submitted to the electors at such election."), and Article 1, §§ 8 and 9, which protect against violations of due process (including for "liberty" deprivation) and free speech rights and so provide protection for the right to vote. "Undeniably the Constitution of the United States protects the right of all qualified citizens to vote, in state as  well as in federal elections" and to have that vote counted. *Reynolds*, 377 U.S. at 554.

1   Since the Plan would overrule and replace the representatives' chosen manner of election, the
2   Voters' votes for representatives who would decide the manner of elections is invalidated. That
3   violates the Voters' right to vote.

4       **3.   The Plan violates the right to vote under the *Purcell* Principle.**

5       The Plan also violates what has come to be called the *Purcell* Principle. *See, e.g.*, Richard L.
6   Hasen, *Reining in the* Purcell *Principle*, 43 Fl. St. U. L. Rev. 427 (2016). That Principle is named
7   for *Purcell*, 549 U.S. 1. The Principle is anchored in the right to vote and its potential for debase-
8   ment. *Id.* at 4 (citing *Reynolds*, 377 U.S. at 555). Among its critiques of the Ninth Circuit for staying
9   a voter-identification requirement near an election, the Court held in *Purcell* that such near-election
10  court orders *themselves* risk debasement and dilution of the right to vote because "[c]ourt orders
11  affecting elections, especially conflicting orders, can themselves result in voter confusion and
12  consequent incentive to remain away from the polls. As an election draws closer, that risk will
13  increase." 549 U.S. at 4-5. The "possibility that qualified voters might be turned away from the
14  polls," *id.* 4, violates their right to vote. So the general rule is that no court order altering election
15  procedures near an election is permissible because it violates the right to vote. And because the
16  Principle is anchored in the right to vote, it applies to state and local election administrators as well
17  because their election-altering actions pose the same risk.

18      On April 6, 2020, the U.S. Supreme Court issued an opinion in *Republican National Committee*
19  *v. Democratic National Committee*, No. 19A1016, 2020 U.S. LEXIS 2195 (U.S. Apr. 6, 2020) (per
20  curiam), *slip op. available at* https://www.supremecourt.gov/opinions/19pdf/19a1016_o759.pdf,
21  again applying that Principle, which it summarized thus:

22      This Court has repeatedly emphasized that lower federal courts should ordinarily not alter
        the election rules on the eve of an election. See *Purcell v. Gonzalez*, 549 U. S. 1 (2006) (per
23      curiam); *Frank v. Walker*, 574 U. S. 929 (2014); *Veasey v. Perry*, 574 U. S. __ (2014).

24  2020 U.S. LEXIS 2195, at **2-3. This *RNC* case stayed a lower-court order allowing voters to mail
25  absentee ballots after election day. *RNC* recited various problems that the lower-court order posed
26  and said they "underscore[] the wisdom of the *Purcell* principle, which seeks to avoid this kind of
27  judicially created confusion." *Id.* at **3. A crucial point was that the lower-court order "fundamen-
28  tally alters the nature of the election." *Id.*

The Plan also fundamentally alters the nature of Nevada's election, changing it from an in-person election with actual absentee ballots received by request to a scheme of mailing mail-in ballots to active, registered voters and highly restricted walk-in voting options. The same risk of voters losing their franchise because of the confusion caused by this recent Plan exists. For example, voters are accustomed to going to the polls on election day or requesting an actual absentee ballot. They may be unaware that the usual options have been replaced with mail-in ballots. They might show up at their usual polling place on election day to discover there is no poll there, and the usual whatever-else-happens, in-person, voting opportunity is gone. As noted above, an automatically mailed mail-in ballot doesn't alter the disenfranchisement risk because it might be ignored, lost in a pile of letters set aside for a period before opening to allow any resident viruses to die, not noticed because the resident voters are sheltering in place at a different location, or some other such possibility. This fundamental alteration of the nature of the election raises the same possibility of voters losing their franchise as in *Purcell* and *RNC*. Here, as in *RNC*, the *Purcell*-Principle should apply as applicable: "[W]hen a lower court intervenes and alters the election rules so close to the election date, our precedents indicate that this Court, as appropriate, should correct that error." Slip op. 3. The same should apply to state and local election administrators who alter election procedures as the Plan does long after the dates by which the Legislature established that changes must be made to avoid such disenfranchisement potential. *See supra* Part I.A.

### 4. The Plan violates the Voters' right to have, and to vote in, federal elections with the manner of election is chosen by the legislature (U.S. Const. art I, § 4, cl. 1).

The Plan violates Voters' right to have, and to vote in, a federal election where the "Manner" of election is "prescribed . . . by the Legislature," as required:

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators.

U.S. Const. art. I, § 4, cl. 1. Candidates for the office of U.S. Representative are on the Primary ballot. *See* https://www.nvsos.gov/sos/home/showdocument?id=8461 (Nevada Secretary of State, "2020 Non-Judicial Candidates Filed with the Secretary of State"); Compl. Ex. F. So the Primary must be conducted in the Legislature's prescribed manner. But the Plan is not at all what the Legis-

lature chose and is contrary to controlling legislation. *See* Part I. The Secretary and County Adminis-

trators chose a manner not authorized by the Legislature and contrary to the Legislature's choices.

*See* Part I.A. They have eliminated safeguards against vote fraud that the Legislature chose. *See* Parts

I.B and II.A.1. So the Plan violates Article I, § 4, cl. 1, including a violation of the Voter's right to

have, and to vote in, such an election as the U.S. Constitution prescribes.

Recall that in *Bush* the U.S. Supreme Court listed a similar provision requiring that elections

for presidential electors be conducted in the manner chosen by the Legislature as an issue in the case,

but decided that it need not reach it because what the Florida Supreme Court had done fell so woe-

fully short of what was required under the vote-dilution ban that the manner-of-election issue need

not be reached. 551 U.S. at 103 ("whether the Florida Supreme Court established new standards for

resolving Presidential election contests, thereby violating Art. II, § 1, cl. 2, of the United States

Constitution"). Similarly here, the parallel manner-of-election provision for other federal elections

is an issue that may not need to be reached because the vote-dilution claims under the fundamental

right to vote can readily decide the case. But if the Court doesn't decide this case on vote-dilution

or another claim, this issue must be reached. And the Plan violates Article I, § 4, cl. 1.

**5.    The Plan violates the right to a republican form of government under the United States Constitution.**

The loss of representative government and invalidation of votes for legislators identified in the

preceding claims violates the Voters' right to "a republican form of government" under the U.S.

Constitution. Article IV, § 4, of the U.S. Constitution provides that "the United States shall guarantee

to every state in this union a republican form of government" ("Guarantee Clause").

A republican form of government is lost if a Secretary of State and County Administrators

supplant the people's elected representative in exercising powers entrusted entirely to the Legisla-

ture, in this case establishing the manner of elections. And since the U.S. Constitution is founded

on and derived from the will of the People who hold the ultimate power, *see* U.S. Const. preamble

("We the People . . . ."), the people have a right to the republican government they chose in their own

exercise of that political will and which the United States guarantees. So the requested relief would

18

1  violate the very foundational rights of the Voters to a republican form of government and to vote in

2  manner established under a republican form of government.

3      Now, Defendants may argue that claims under the Guarantee Clause are nonjusticiable political

4  questions. That view is rooted in dicta in *Luther v. Borden*, 48 U.S. 1 (1849). *See New York v. United*

5  *States*, 505 U.S. 144, 184 (1992) ("view . . . has its origin in *Luther*"). But the Supreme Court has

6  severely cut back on political-question doctrine, starting with *Baker v. Carr*, 369 U.S. 186 (1962),

7  and continuing with *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189 (2012), which restricted

8  political questions to where there is either "a textually demonstrable constitutional commitment of

9  [an] issue to a coordinate political department" or "a lack of judicially discoverable and manageable

10 standards for resolving it," *id.* at 195 (citation omitted). In *New York*, the Court said "perhaps not

11 all claims under the Guarantee Clause present nonjusticiable political questions." 505 U.S. at 185

12 (citing *Reynolds*, 377 U.S. at 582).

13     In *Kerr v. Hickenlooper*, 744 F.3d 1156 (10th Cir. 2014), the Tenth Circuit decided that

14 political-question doctrine didn't prevent considering a Guarantee Clause claim against a voter-

15 initiative constitutional amendment, though that was vacated and remanded by *Kerr*, 135 S. St. 2927

16 (2015), and ultimately resolved on lack of ordinary Article III standing, 824 F.3d 1207, 1217 (10th

17 Cir. 2016). Other courts have considered Guarantee Clause claims on the merits. *See, e.g.*, *Largess*

18 *v. Supreme Judicial Court*; *Agua Caliente Band of Cahuilla Indians v. Superior Court*, 148 P.3d

19 1126, 1137-39 (Cal. 2006); *Vansickle v. Shanahan*, 511 P.2d 223, 234 (Kan. 1973).

20     Scholars advocate and foresee Guarantee Clause challenges being allowed by the Supreme

21 Court. *See, e.g.*, Erwin Chemerinsky, *Cases Under the Guarantee Clause Should Be Justiciable*, 65

22 U. Colo. L. Rev. 849, 864-69 (1994); *see also id.* at 851 ("[T]he time is clearly approaching in which

23 the Court may . . . reject the view that cases under the Guarantee Clause should always be dismissed

24 on political question grounds."); Laurence H. Tribe, *American Constitutional Law* 398 (2d ed. 1988):

25 John Hart Ely, *Democracy and Distrust: a Theory of Judicial Review* 118 n.* (1980).

26     The Plan presents a case where a Guarantee Clause challenge should not be deemed a political

27 question. In *Clinton*, the U.S. Supreme Court limited political questions to where there is either a

28 clear "constitutional commitment" to some political branch or "a lack of judicially discoverable and

manageable standards." 566 U.S. at 195. Only the "standards" issue might apply here. While such "standards" might be difficult in some situations, they are not here. The Plan substitutes the Secretary and County Administrators for the Legislature in doing the exclusively legislative function of establishing the "manner" of this election. The U.S. Supreme Court would simply need to hold that in a republican form of government, state and local officials may not usurp the legislative role and the rule of law and so declare the Plan unconstitutional under the Guarantee Clause and enjoin it. So the Plan violates the Guarantee Clause and the similar protection of the Nevada Constitution.

\*   \*   \*

In sum, Voters have a strong likelihood of success on all their claims, so that the other preliminary-injunction elements readily follow, particularly since the right to vote is based on the First and Fourteenth Amendments. And even were any particular claim deemed to present only "serious questions going to the merits," the preliminary injunction is proper because "'the balance of hardships tips *sharply* in [Voters'] favor' and the other two factors are satisfied." *Short*, 893 F.3d at 675 (citation omitted).

**B.   Voters have irreparable harm.**

Voters have irreparable harm for reasons tracking their claims. They have no remedy at law if the Plan proceeds and the election is held in violation of Voters' constitutional rights. If the Plan proceeds, their right to vote, to have equal protection, and to a federal election compliant with the federal constitution under Articles I, § 4, cl. 1 and IV, § 4 will be violated. *See supra* Part II.A. In *Obama for America*, 888 F. Supp. 2d 897 (S.D. Oh. 2012), *aff'd*, 697 F.3d 423, the district court readily found irreparable harm after finding likely merits success on the right-to-vote claim, *id.* at 910. That should happen here because constitutional violations caused by the Plan can't be repaired after the election.

**C.   The balance harms favors the injunction.**

The balance of harms favors the injunction—sharply, were that required for any claim.

On Voters' side are core, fundamental, constitutional rights that are violated by the Plan if it is allowed to proceed. That typically suffices in constitutional challenges, or else rights aren't rights.

1    On the Secretary of State's and County Administrator's side is a Plan that is not authorized by

2  the Legislature, is in violation of controlling laws, and seems to have been done without considering

3  fundamental constitutional and rule-of-law mandates that govern their work. Defendants can have

4  no cognizable interest in advancing the Plan if, as shown, it is highly likely that the Plan violates

5  constitutional and statutory provisions.

6  **D.  The public interest favors the injunction.**

7    The public interest favors following the rule of law by obeying constitutional and statutory

8  mandates and protecting constitutional rights. The public interest favors having elections held under

9  controlling authorities.

10    Now, it is true that Defendants recite the Plan as being responsive to the health risks from the

11  COVID-19 pandemic, to which Voters are of course sympathetic. And naturally the public has an

12  interest in health and safety, and the Governor has issued an  Emergency Declaration concerning

13  coronavirus.  *See*  https://d1q4hslcl8rmbx.cloudfront.net/assets/uploads/2020/03/Declaration-of-

14  Emergency-re-COVID.pdf; *see also* http://gov.nv.gov/News/Emergency_Orders/Emergency_Orders/

15  (Governor's emergency orders). But that doesn't mean Defendants can jettison constitutional and

16  statutory rights and  mandates and fashion a remedy essentially out of whole cloth. Defendants' *only*

17  options are to do what the controlling constitutional and statutory provisions permit—otherwise the

18  rule of law fails. Within that rule of law, is where they must find their remedy.

19    And Defendants do have permissible options that they should be doing instead of their forbidden

20  Plan. Early and regular voting can be held in compliance with recommendations to practice social

21  distancing, hand sanitizing, and wearing personal protection equipment, just as people do at the

22  grocery store and other essential places and functions. To the extent, the Governor were to have the

23  authority to bar in-person voting by classifying it as nonessential and were to do so (on which Voters

24  don't opine except to note that it would not be consistent with U.S. Constitution Article I, § 4, cl.

25  1 for a federal election), then the normal absentee-ballot process must control. Actual absentee

26  ballots may be requested and cast under normal procedures and anti-fraud safeguards. Instead of

27  advising the public that mail-in ballots will be automatically mailed to all active, registered voters,

28  Defendants should be using their same time and communication channels to tell all registered voters

to quickly request an actual absentee ballot and return it as the law requires. That will leave in place the normal safeguards for actual absentee ballots that are lost with the Plan.

So the public interest favors following the rule of law and abiding by constitutional and statutory mandates. It favors the requested preliminary injunction.

## Conclusion

For the reasons show, this Court should preliminarily enjoin the Plan.

Respectfully submitted,

/s/ David O'Mara

James Bopp, Jr. (Ind. bar #2838-84)*
    jboppjr@aol.com
Richard E. Coleson (Ind. bar #11527-70)*
    rcoleson@bopplaww.com
Corrine L. Youngs (Ind. bar #32725-49)*
    cyoungs@bopplaw.com
Amanda L. Narog (Ind. bar #35118-84)*
    anarog@bopplaw.com
True the Vote, Inc.
  Voters' Rights Initiative
The Bopp Law Firm, PC
1 South Sixth St.
Terre Haute, IN 47807–3510
Telephone: 812/877-4745

*Pro hac vice application pending

*Counsel for Plaintiffs*

David O'Mara (Nev. bar #8599)
The O'Mara Law Firm, P.C.
311 E. Liberty Street
Reno, NV 89501
Telephone: 775/323-1321
David@omaralaw.net

*Local Counsel for Plaintiffs*

22