CHRISTOPHER J. HICKS
Washoe County District Attorney
HERBERT B. KAPLAN
Deputy District Attorney
Nevada State Bar Number 7395
1 So. Sierra St.
Reno, NV  89501
hkaplan@da.washoecounty.us
(775) 337-5700

ATTORNEYS FOR DEANNA SPIKULA,
WASHOE COUNTY REGISTRAR OF VOTERS

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

* * *

| | |
|---|---|
| STANLEY WILLIAM PAHER, TERRESA MONROE-HAMILTON, AND GARRY HAMILTON, | Case No.  3:20-cv-00243 |
| Plaintiffs, | **WASHOE COUNTY REGISTRAR OF VOTERS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** |
| vs. | |
| BARBARA CEGAVSKE, in her official capacity as Nevada Secretary of State, DEANNA SPIKULA, in her official capacity as Registrar of Voters for Washoe County, | |
| Defendants. | |

COMES NOW Defendant, Washoe County Registrar of Voters, Deanna Spikula, by and through her attorney of record, Christopher J. Hicks, Washoe County District Attorney, and Herbert B. Kaplan, Washoe County Deputy District Attorney, and hereby oppose the motion for preliminary injunction (ECF #2) in this matter as follows.

This Opposition is brought pursuant to the Federal Rules of Civil Procedure and is based on the following Memorandum of Points and Authorities, the declaration of Deanna Spikula filed herewith, and all the pleadings and papers on file herein.

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.    INTRODUCTION**

Plaintiffs have filed a Complaint (ECF #1) asserting that the anticipated all-mail primary election scheduled for June 9, 2020, is invalid.   Plaintiffs simultaneously filed a motion for preliminary injunction (ECF #2) in an attempt to prevent the Nevada Secretary of State and the Washoe County Registrar of Voters from conducting the June 9, 2020, Nevada state and federal primary election from proceeding under the "all-mail election" plan. Plaintiffs claim that the all-mail election plan "strips the Legislature's vote-fraud-prevention safeguards that are required to prevent illegal voting that dilutes Voters' votes and violates their right to vote." They claim that the all-mail election plan is not the Legislature's prescribed manner. The issue before the Court is strictly limited to the upcoming primary election.

Plaintiffs request that this Court invalidate the all-mail election.  That would essentially force an in-person election at this late date in the process, which would place the integrity of the entire primary election at issue.  Plaintiffs' request fails to take into consideration the impact of the fast-spreading, potentially deadly COVID-19 pandemic in which the world finds itself in the midst of.  Plaintiffs' request also fails to take into the effect the damaging effect the grant of that relief would potentially have on the rest of the voting public in Nevada, as those voters would potentially be confused by changing the primary election format now, when they are expecting an all-mail primary election.

For the reasons that follow, Plaintiffs' motion for preliminary injunction must be denied, and the entirety of this case dismissed.

**II.    FACTUAL BACKGROUND**

For purposes of this Opposition, the following are the relevant facts.

**A.    COVID-19 GLOBAL PANDEMIC**

These are extraordinary times in which we as a society find ourselves.

*//*

In February/March 2020, the United States, including the State of Nevada, began to see the impact of the COVID-19 virus.  First, cases of individuals testing positive for the virus began to spring up. Then the increase in positive cases occurred fast and somewhat furiously. Next, major sporting and cultural events were cancelled or postponed worldwide.  For instance, the NBA suspended its season after a player tested positive for coronavirus, and the International Olympic Committee has delayed the 2020 Summer Olympic Games until 2021.  Disney parks have been closed indefinitely.  In the United States, many employers are telling workers to stay home, and religious institutions and schools are closing their doors in an effort to contain the disease.  The court system is also on hold, with the limited exception of essential cases, and even the essential cases are being conducted for the most part through technology rather than in-person appearances.

Considering the fast spreading of the potentially deadly COVID-19 virus, on March 12, 2020 Governor Steve Sisolak reacted with a declaration of emergency for the State of Nevada.[1] The following day, President Trump declared a nationwide emergency.[2]  The World Health Organization and the United States Centers for Disease Control and Prevention advised that there is a correlation between density of persons gathered and the risk of transmission of COVID-19.

Governor Sisolak's declaration of emergency was followed in somewhat fast succession with a number of other declarations imposing restrictions, escalating in nature, in an effort to stop the spread of the highly contagious, potentially deadly virus.  More recently, individuals have been urged to wear protective masks in public to combat the spread of the virus.

//

//

---

[1] All of Governor Sisolak's COVID-19 declarations referenced herein can be found at http://gov.nv.gov/News/Emergency_Orders/Emergency_Orders/. The declarations are not the subject of any dispute in this matter to the best of counsel's knowledge.  However, the Court can take judicial notice of those declarations if necessary.

[2] See Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, which can be found at https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

On April 21, 2020, Governor Sisolak stated that Nevada is in "phase zero" of its economic rebound efforts.[3]  He also stated that schools would not be reopening for the remainder of the 2019-2020 school year, and that the remainder of the school year would be through distance learning.  Id.

While the restrictions currently in place, including restrictions on gatherings of 10 or more people, are set to expire on April 30, 2020, and Governor Sisolak has not extended that deadline to date, it is simply unknown what will occur in the future.  There is no way to know what the status of social distancing restrictions might be on May 23, 2020 when early voting is scheduled to begin, or for the June 9, 2020 primary election.

What is known is that COVID-19 continues to be a life-threatening, global pandemic.  New cases around the country, including in Nevada, and more specifically in Washoe County, come each and every day.  More deaths accompany those continuing cases.  As of April 22, 2020, there were 494 active cases of Coronavirus.  https://www.washoecounty.us/health/programs-and-services/communicable-diseases-and-epidemiology/educational_materials/COVID-19.php.  There have been a total of 710 cases just in Washoe County over the past month and a half.[4]  Id. 21 of those people died.  Id.  The history of those identified cases shows a consistent number of new cases over that period.  The emergency situation continues, with no end in sight.

Nobody envisioned this scenario manifesting, and certainly nobody envisioned the extreme restrictions that have been imposed, especially over such an extended period of time.

Other states have also altered the course of the primary election.  For instance, the Ohio primary election was postponed from March and is scheduled to be held on April 28.  It is being conducted as an all-mail election, with very limited opportunity for in-person voting.  See "All

---

[3] See Reno Gazette Journal, April 21, 2020,   https://www.rgj.com/story/news/2020/04/21/covid-19-nevada-governor-details-plan-reopen-nevada-economy/3001396001/ .

[4]The Washoe County Health District first press conference, in which the first identified case in Washoe County was announced, was conducted on March 6, 2020.  That press conference can be viewed on YouTube at https://www.youtube.com/watch?v=_UiFq1vSj40.

eyes on Ohio's election: Nation will learn from Ohio's success or failure on Tuesday," The (Cincinnati) Enquirer Online, at https://www.cincinnati.com/story/news/2020/04/25/ohio-primary-coronavirus-caused-ohio-go-all-mail-primary-work/5165457002/.  While it is acknowledged that that primary election is being conducted as an absentee ballot election, it is noteworthy that the nature of the election has been modified.  Of equal note is the fact that many are concerned with the fact that absentee ballots may not be received in time to actually be voted and counted.

**B.    The Primary Election Process**

At issue in this case is the primary election.  A primary election is an election to select candidates to run for public office at the general election to be conducted in November.  In Nevada, primaries are closed, meaning that only declared party members are allowed to vote for candidates in the partisan contests.  In short, voters decide their designated party's candidates that will go on to the general election.  To that end, separate primary ballots for each major political party are required.  NRS 293.257(1).  "A registered voter may cast a primary ballot for a major political party at a primary election only if the registered voter designated on his or her application to register to vote an affiliation with that major political party."  NRS 293.257(3).

In Nevada, the primary election "must be held on the second Tuesday in June of each even-numbered year."  NRS 293.175.  This year's primary election is scheduled to occur on June 9, 2020.  Early voting is scheduled to begin May 23 and continue through June 5.

Pursuant to NRS 293.124, the Secretary of State is the Chief Officer of Elections for the State of Nevada, and in that capacity "is responsible for the execution and enforcement of the provisions of title 24 of NRS and all other provisions of state and federal law relating to elections in this State."  NRS 293.124.  The Secretary of State is authorized to "take other actions necessary for the effective administration of the statutes and regulations governing the conduct of primary, general, special and district elections in this State."  NRS 293.247(4).

//

The county clerks, or where there is authorized an appointed Registrar of Voters, [5] are the local election officials.  NRS 293.205 requires local election officials to establish election precincts on or before the third Wednesday in March of every even-numbered year.  NRS 293.213 authorizes the designation of mailing precincts under certain conditions; however, a local election official is also authorized, aside from the express circumstances set forth in subsections 1, 2 or 3 or NRS 293.213, to "establish a mailing precinct or an absent ballot mailing precinct . . . if the county clerk obtains prior approval from the Secretary of State."  NRS 293.213(4).

NRS 293.2546 sets forth the Voters' Bill of Rights.  That provision gives every voter the right to receive and cast a ballot that "(a)  Is written in a format that allows the clear identification of candidates; and (b)  Accurately records the voter's preference in the selection of candidates."  Generally, that right to vote has historically been provided as primarily an in-person vote, supplemented by mail or absent ballots.

NRS 293.3072 authorizes the registrar of voters to "establish one or more polling places in the county where any person entitled to vote in the county by personal appearance may do so on the day of the primary election or general election."  This is left to the discretion of the election officials.

Title 24 of the Nevada Revised Statutes is required to be construed liberally to ensure that all electors have an opportunity to participate in the election and to cast their votes.  NRS 293.127(1).  That liberal interpretation is intended to ensure that the "real will of the electors is not defeated by any informality or by failure substantially to comply with the provisions of this title with respect to the giving of any notice or the conducting of an election or certifying the results thereof."  NRS 293.127(1)(c).

---

[5] The statutory scheme refers to the county clerk as the local election officer.  In some counties, including Washoe County, a registrar of voters has been named to act in the place and stead of the county clerk for election purposes only.  Since the Washoe County Registrar of Voters is the only local official named as a defendant in this matter, the term "Registrar of Voters" will be used herein.

1    In an effort to combat voter fraud, a multitude of voter fraud safeguards are in place to

2  avoid invalid votes being counted.  Those safeguards remain in place for the primary election

3  plan.

4    NRS 293.272 does require certain individuals to vote in person, including individuals

5  who registered by mail or computer to vote shall, for the first election in which the person votes

6  at which that registration is valid, vote in person unless he or she has previously voted in the

7  county in which he or she is registered to vote.  NRS 293.272(1).  And even that requirement

8  does not apply to certain designated individuals. See NRS 293.272(2).  The overall purpose of

9  the requirement to vote in person is to ensure that the voter is actually who they hold themselves

10  out to be and that each individual voting is entitled to vote in the specific election—it is one of

11  the many protections against voter fraud built into the system.  NRS 293.2725 provides further

12  clarification, setting forth the requirements for election officials to determine the validity of an

13  individual's registration prior to allowing a vote.  Those safeguards remain in place and are

14  accommodated by the in-person polling locations.

15    With regard to the safeguards for the mailed ballots, ballots are being mailed to the

16  mailing address on file for each active registered voter.  It is the responsibility of the voter to

17  ensure that their address with the election officials office is current.  Registering or updating that

18  information can be accomplished in-person at the office of the election official, online, through

19  the Department of Motor Vehicles (although that is currently closed), or through the mail.  The

20  deadline to update voter registration online and still receive a ballot by mail is May 21, 2020.

21  Those voters complying with that deadline will be able to be provided the ballot based on their

22  new address and may still vote by mail.  After May 21, and continuing through June 4, 2020,

23  voters may still update their registration online, but will then be required to appear in person to

24  vote and provide a current and valid Nevada driver's license or identification card and proof of

25  residency.  On June 5, 2020 through June 9, 2020, voters who need to register or update their

26  //

current registration will be required to do so in person and provide a current and valid Nevada driver's license or identification card and proof of residency.

Ballots mailed may not be forwarded to any other address.  If a registered voter has moved and failed to update their address, the ballot will be returned to the office of the local election official.  Those voters will still be able to appear in person to vote on June 9, 2020, requiring the same identification and proof of residency set forth above.

The normal restrictions and safeguards for absent ballots and mail-in ballots remain in place for the primary election plan.  Specifically, only the actual voter may complete their ballot. The ballot must be returned in the envelope, postage prepaid, provided, as each ballot issued is associated with the return envelope provided.  The voter is required to sign the return envelope and seal the envelope.  The voter is required to return the ballot, in the sealed, signed envelope, by placing the same in the United States mail, having it postmarked no later than June 9, 2020, or by returning the envelope in person to the office of the election official or to the polling location if that is different.  Voters may authorize a family member to place the ballot in the mail or deliver the ballot.  However, no other individual may be authorized to do so.  As a result, the ballot should not be in the hands of anyone other than the voter, a family member if authorized by the voter, the U.S. Postal Service, and the election official personnel.

For those individuals who must request an absent ballot because they have failed to update their registrations and did not receive the mail ballot, or for those individuals who choose to request an absent ballot, every such request must be made available for public inspection by the election official.  NRS 293.315. The election official must determine before issuing the absent ballot that the person who requested the absent ballot is a registered voter in the proper county.  NRS 293.320.

Upon receipt of an absent or mail-in ballot, the election official must verify the signature on the return envelope against all signatures of the voter available in the records of the election official.  If at least two employees in the office of the election official believe there is a

reasonable question of fact as to whether the signature on the absent ballot matches the signature of the voter, the election official must then contact the voter and ask the voter to confirm whether the signature on the absent ballot belongs to the voter.  With regard to the Washoe County Registrar, her office will contact the individual by phone or e-mail if possible, or if not possible, by mail, to attempt to verify that the ballot is submitted by the identified voter and can be counted.

Moreover, it remains "unlawful for a person fraudulently to request an absent ballot in the name of another person or to induce or coerce another person fraudulently to request an absent ballot in the name of another person. A person who violates this subsection is guilty of a category E felony and shall be punished as provided in NRS 193.130."  NRS  293.313.

In addition, a voter is prohibited from (a)  receiving a ballot from any person other than an election board officer, (b) delivering to an election board or to any member thereof any ballot other than the one received, or (c)  placing any mark upon his or her ballot by which it may afterward be identified as the one voted by the person.  NRS 293.730(2).  Violation of those provisions is a category E felony and shall be punished as provided in NRS 193.130.  NRS 293.730(3).

NRS  293.775 makes it a category D felony, punishable as provided in NRS 193.130, for any "person who is not a qualified elector and who votes or attempts to vote knowing that he or she is not a qualified elector," or for any "person who votes or attempts to vote using the name of another person."

In addition to the criminal penalties for voter fraud, NRS 293.840 provides for a civil penalty, not to exceed $20,000 for each violation of Title 24, NRS Chapter 293.

Those same safeguards remain in place for the 2020 Nevada primary election.

**C.      Election Officials' Response to the State of Emergency Restrictions**

Shortly after the imposition on the significant restrictions on conducting any and all business in the State of Nevada, concerned about the effect of those restrictions on the rapidly

approaching primary election, discussions were conducted between all of the local election officials and the Secretary of State's Office.  As a result, on March 24, 2020, the Secretary of State's Office issued a press release advising that the primary election will be conducted as an all-mail election "[i]n order to maintain a high level of access to the ballot, while protecting the safety of voters and poll workers."  See Press Release attached to Complaint as Exhibit A.  It advised all voters in Nevada that

> "All active registered voters in Nevada will be mailed an absentee ballot for the primary election.  No action or steps, such as submitting an absentee ballot request application, will be required by individual voters in order to receive a ballot in the mail.  Voters will be able to mark their ballot at home and then return it by mail using a postage-prepaid envelope or by dropping it off in person at a designated county location."

The press release went on to reassure voters that their "health and safety while participating in voting is paramount to state and local election officials."  Id.  The release further advised that "training of thousands of poll workers who support Nevada's large in-person voter effort was scheduled to begin next week (the first week of April)" and that the majority of those poll workers "belong to groups at high risk of severe illness from COVID-19."  Id.

The release also noted that there will be available at least one in-person polling location in each county for the June 9, 2020 primary election, and advising that "in-person voting opportunities will be extremely limited for the primary election," encouraging all voters to register to vote, or update their existing voter record, and not rely on the limited polling locations.  Id.

Over the next few weeks, local election officials began working hard to facilitate the election plan.  Hundreds of thousands of the mail-in ballots have been printed at great expense.  Also printed were return, postage paid envelopes for each of those ballots, at additional expense.  At the same time, for nearly a month after the March 24, 2020 announcement, there was no objection to the primary election plan.

Of great import, notice has been provided to all Nevada registered voters, if not to all residents, that the election will be conducted as an all-mail election.  Sample ballots were

recently sent to all active registered voters.  Included in each of those sample ballots was another announcement of the primary election being conducted as an all-mail election and the process to follow in voting.  Washoe County's notice and sample ballots, a copy of an example of which is attached as Exhibit C to the Complaint in this matter, were mailed prior to the initiation of the current lawsuit.   Exhibit D to the Complaint is a notice from the Elko County Clerk of the all-mail primary election, which was presumably published on March 31, and April 6, 2020, as noted on the bottom of the notice.  Exhibit G to the Complaint is Clark County's notice and instruction regarding the all-mail primary election.

The actual mail ballots were just recently mailed to all Washoe County active registered voters.  The expectation of Nevada voters is that they are urged to vote their ballot by mail due to restrictions in place and continuing concerns over the spread of COVID-19.

In Washoe County, "The Office of the Washoe County Registrar of Voters will be the only polling location for in-person voting, updates to registration, and same-day registration during Early Voting (May 23-June 5, 2020) and on Election Day (June 9, 2020)."  See page 3 of Washoe County's notice and sample ballot, a copy of an example of which is attached as Exhibit C to the Complaint in this matter.

## III.    LEGAL ANALYSIS

For the following reasons, this preliminary injunction requested by Plaintiffs must be denied.

### A.    Plaintiffs Lack Standing

"Standing is perhaps the most important of the jurisdictional doctrines." *United States v. Hays*, 515 U.S. 737, 742, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995) (internal marks omitted). Federal courts are courts of limited jurisdiction, cabined by the authority granted to them by Article III of the United States Constitution. Article III limits federal courts' jurisdiction to the deciding of "Cases" and "Controversies." U.S. Const. art III, § 2; *see also Hein v. Freedom from Religion Found., Inc.,* 551 U.S. 587 (2007) (" ' "No principle is more fundamental to the

judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." ' ") (*quoting Raines v. Byrd,* 521 U.S. 811, 818 (1997) (*in turn quoting Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976))). "'One of the controlling elements in the definition of a case or controversy under Article III' is standing." *Hein*, 551 U.S. at 588 (*quoting ASARCO Inc. v. Kadish*, 490 U.S. 605, 613 (1989) (Kennedy, J., concurring)).

At a "'constitutional minimum,'" standing requires three elements: (1) injury in fact, (2) causation, and (3) redressability. U.S. v. *Hays*, 515 U.S. 737, 742–43 (*quoting Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992)). Injury in fact requires the party bringing suit to have "a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 743 (internal marks omitted).

### 1.    No Infringement on Right to Vote

Each of the Plaintiffs, as well as all other qualified individuals in Nevada, will be afforded the right and ability to vote.

Plaintiff Stanley William Paher is a resident of the City of Reno, County of Washoe and a duly registered voter in the State of Nevada. He votes early in-person.

Plaintiff Terresa Monroe-Hamilton is a resident of the City of Reno, County of Washoe and a duly registered voter in the State of Nevada. She is married to Plaintiff Garry Hamilton and both recently moved to Nevada and registered online in April 2020. She usually votes early or on election day in-person.

Plaintiff Garry Hamilton is a resident of the City of Reno, County of Washoe and a duly registered voter in the State of Nevada. He is married to Plaintiff Terresa Monroe-Hamilton and both recently moved to Nevada and registered online yesterday. He usually votes early or on election day in-person.

Those are the named Plaintiffs.

//

1    Pursuant to Ms. Spikula's declaration filed herewith, while all voters are encouraged to

2   vote by mail to accommodate the emergency circumstances surrounding COVID-19, any voter

3   who appears in person during early voting or at the June 9 primary election will be allowed to

4   vote.  While the all-mail election is in place in an effort to avoid numerous people gathering at

5   the polling locations, exposing both themselves and the poll workers to COVID-19, Ms. Spikula

6   does not intend to reject any individual who shows up to vote in person, regardless of being

7   required to or not, during the period of early voting and on the June 9, 2020 primary election.

8    Mr. Paher may appear to vote in person during early voting, as he asserts he normally

9   does.  If he chooses to vote the mail ballot, he may do so.  Mr. Paher will be allowed to vote.  He

10  will suffer no harm.

11    Mr. and Mrs. Hamilton likewise will be allowed to vote.  They have already taken

12  advantage of the ability to register online.  If they have provided the requisite identification and

13  proof of residency within the specified time periods, they may vote by mail by timely requesting

14  a ballot.  They may also vote in person at either early voting or on primary election day if they so

15  choose.  If they have not provided that information by the deadline stated, they will be required

16  to appear in person to vote at the Registrar's Office, the designated in-person polling location,

17  either at early voting or on the day of the actual primary election.  They will be allowed to vote.

18  They also will suffer no harm.

19                2.    **No Vote Dilution**

20    Furthermore, there is no indication that there will be vote dilution.

21    Plaintiffs' argument is quite simple in this regard—the alleged elimination of voter fraud

22  protections (which protections actually remain in place) leads to voter fraud, which thereby

23  results in Plaintiffs' votes being diluted.  Plaintiffs assert without any support that "An election

24  conducted by mail ballot only, per the Plan, would all but ensure an election replete with both

25  ballot fraud."   The argument lives, and ultimately dies, on the assumption that the alleged

26

1  elimination of voter fraud protections, will result in rampant voter fraud and some sort of illegal

2  stuffing of the ballot box.

3       There is no suggestion that there has been voter fraud in historical mail-in precincts.  In

4  those precincts, the ballot process is exactly the same as the mail-in process to be utilized at the

5  primary election.   While the entirety of Washoe County will essentially be treated as a mail-in

6  precinct, the volume is irrelevant based on the safeguards in place to identify the voter, to ensure

7  the voter completes the ballot, and that the voter returns the ballot, all of which remain in place

8  as specified herein.

9       The assertion of "an election replete with both ballot fraud" is nothing more than

10  unsupported, and unsupportable, hyperbole and rhetoric.

11       The vote dilution issue has been applied to larger-scale issues, under the Voting Rights

12  Act of 1965, not based on individual votes being offset by the possible, but highly unlikely, voter

13  fraud.

14       For instance, in *Thornburg v. Gingles*, at issue was the legislative decision to employ

15  multimember, rather than single-member, districts in the contested jurisdictions. *Thornburg v.*

16  *Gingles,* 478 U.S. 30 (1986).  The claim was that submerging black voters into a district with a

17  white majority, it diluted the black votes, impairing their ability to elect representatives of their

18  choice based on the theoretical basis that where minority and majority voters consistently prefer

19  different candidates, the majority, by virtue of its numerical superiority, will regularly defeat the

20  choices of minority voters.. *Id.* There, the Court noted that

21       Dilution of racial minority group voting strength may be caused by the dispersal
        of blacks into districts in which they constitute an ineffective minority of voters or from
22       the concentration of blacks into districts where they constitute an excessive majority.
        Engstrom & Wildgen, Pruning Thorns from the Thicket: An Empirical Test of the
23       Existence of Racial Gerrymandering, 2 Legis.Stud.Q. 465, 465–466 (1977) (hereinafter
        Engstrom & Wildgen). See also Derfner, Racial Discrimination and the Right to Vote, 26
24       Vand.L.Rev. 523, 553 (1973) (hereinafter Derfner); F. Parker, Racial Gerrymandering
        and Legislative Reapportionment (hereinafter Parker), in Minority Vote Dilution 86–100
25       (Davidson ed., 1984) (hereinafter Minority Vote Dilution).

26  Id., 478 U.S. at 47, n. 11.

-14-

There have been numerous other cases involving alleged vote dilution involving districting.  *See, e.g., Bartlett v. Strickland,* 556 U.S. 1 (2009); *League of United Latin American Citizens v. Perry,* 548 U.S. 399 (2006); *Johnson v. DeGrandy,* 512 U.S. 997 (1994); *Voinovich v. Quilter*, 507 U.S. 146 (1993); *Growe v. Emison*, 507 U.S. 25 (1993).

*U.S. v. Saylor* involved a claim of election officials conspiracy to stuff ballot boxes.   322 U.S. 385 (1944).  There, election officials were charged criminally alleging that they "tore from the official ballot book and stub book furnished them, blank unvoted ballots and marked, forged, and voted the same for the candidate of a given party, opposing the candidate for whom the injured voters had voted, in order to deprive the latter of their rights to have their votes cast, counted, certified and recorded and given full value and effect; that the defendants inserted the false ballots they had so prepared into the ballot box, and returned them, together with the other ballots lawfully cast, so as to create a false and fictitious return respecting the votes lawfully cast." *Id.*  Are Plaintiffs suggesting that the election officials will engage is such a crime?

The Supreme Court has "'consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy.' " *Lance v. Coffman*, 549 U.S. 437, 127 S.Ct. 1194, 1196, 167 L.Ed.2d 29 (2007) (quoting Lujan, 504 U.S. at 573–74, 112 S.Ct. 2130).

In *Lance*, four Colorado voters brought a claim in federal court, alleging that a provision of the Colorado Constitution permitting congressional redistricting only once per census violated their Elections Clause right to have their elected representatives set their congressional district boundaries. *See id.* The Supreme Court held that the voters lacked standing to challenge application of the Colorado Constitution because their only injury, "that the law—specifically the Elections Clause—ha[d] not been followed," alleged only a generalized grievance. *Id.* at 1198.

Here, Plaintiffs fail to allege a particularized injury and thus lack standing to bring this claim. Article III's case and controversy prerequisite "requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant.'" *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,* 454 U.S. 464 (1982) (*quoting Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 99 (1979)). *See also Lujan*, 504 U.S. at 560 n. 1, 112 S.Ct. 2130 ("By particularized, we mean that the injury must affect the plaintiff in a personal and individualized way.").

Any claim of vote dilution is speculative and unsupported at best. There is no way to prove or disprove that Plaintiffs or any voters will suffer vote dilution because there is no evidence that there is any increased chance of voter fraud in connection with 2020 primary election. The alleged harm is neither actual nor imminent, but is instead conjectural and hypothetical. As a result, Plaintiffs lack standing and this case must be dismissed in its entirety.

**B.     Plaintiffs Fail to Satisfy the High Standard for Preliminary Injunction**

Moreover, Plaintiffs fail to satisfy the high standard for the requested preliminary injunction to issue.

A preliminary injunction is an extraordinary remedy never awarded as of right. *Munaf v. Geren,* 553 U.S. 674, at 689 – 690 (2008). A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest. *Id.*; *Amoco Production Co. v. Gambell*, 480 U.S. 531, 542 (1987); *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 311–312 (1982).

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Romero–Barcelo,* 456 U.S. at 312; *see also Railroad Comm'n of Tex. v. Pullman Co.,* 312 U.S. 496, 500 (1941). //

### 1.    Plaintiffs Not Likely to Suffer Irreparable Harm

To prevail, Plaintiffs must establish that they are likely to suffer irreparable harm in the absence of preliminary relief.  In terms of the alleged harm, it is not enough to show a possible harm.  Plaintiffs seeking preliminary relief must demonstrate that irreparable injury is *likely* in the absence of an injunction. *Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983); *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 441 (1974); *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974); see also 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948.1, p. 139 (2d ed.1995) (applicant must demonstrate that in the absence of a preliminary injunction, "the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered").

Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with the United States Supreme Court's characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam).

Here, for the reasons set forth on the preceding section "Plaintiffs Lack Standing," it is clear that Plaintiffs will suffer no harm.  Not only is any harm *not likely*, any assertion of any *possible* harm, which would not support the grant of the relief here, is merely speculative in any event.  Their request for preliminary injunction, therefore, must fail.

### 2.    Balance of Equities Requires No Preliminary Injunction

In addition, the balancing of the equities here clearly tips in the favor of withholding the issuance of the requested preliminary injunction.

It is not disputed that "voting is of the most fundamental significance under our constitutional structure." *Ill. Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979). However, as our Supreme Court has noted, "It does not follow, however, that the right to vote in any manner . . . [is] absolute." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). The Constitution explicitly provides State legislatures with "broad power to prescribe the `Times,

1  Places and Manner of holding Elections for Senators and Representatives.'" *Clingman v. Beaver*,

2  544 U.S. 581, 586 (2005) (quoting U.S. Const., art. 1, § 4, cl. 1). This power under the Elections

3  Clause to regulate elections for federal offices "is matched by state control over the election

4  process for state offices." *Id.* "Governments necessarily `must play an active role in structuring

5  elections,'" *Pub. Integrity All., Inc. v. City of Tucson*, 836 F.3d 1019, 1024 (9th Cir. 2016) (en

6  banc) (*quoting Burdick*, 504 U.S. 428, 433), and "as a practical matter, there must be a

7  substantial regulation of elections if they are to be fair and honest and if some sort of order,

8  rather than chaos, is to accompany the democratic processes," *Storer v. Brown,* 415 U.S. 724,

9  730 (1974).

10      The level of scrutiny to be applied here is determined by the Anderson-Burdick test.  That

11  test requires "weighing 'the character and magnitude of the asserted injury to the rights . . . that

12  the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as

13  justifications for the burden imposed by its rule,'" considering "'the extent to which those

14  interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428,

15  434 (1992) (*quoting Anderson v. Celebrezze*, 460 U.S. 780, 788–89 (1983)).

16      "[W]hen a state election law provision imposes only `reasonable, nondiscriminatory

17  restrictions' upon the First and Fourteenth Amendment rights of voters, `the State's important

18  regulatory interests are generally sufficient to justify' the restrictions." *Burdick*, 504 U.S. at 434,

19  112 S.Ct. 2059 (*quoting Anderson*, 460 U.S. at 788, 103 S.Ct. 1564); *see also Ariz. Green Party*,

20  838 F.3d at 988.  The burdens here are reasonable, nondiscriminatory, and necessary under the

21  extreme emergency conditions that exist.  The character and magnitude of the asserted injury to

22  rights are speculative and fabricated—no vote vote dilution, no voter disenfranchisement.

23      First, laches precludes the issuance of the preliminary injunction.  "Laches is an equitable

24  time limitation on a party's right to bring suit," *Boone v. Mech. Specialties Co*., 609 F.2d 956,

25  958 (9th Cir.1979), resting on the maxim that "one who seeks the help of a court of equity must

26  not sleep on his rights." *Piper Aircraft Corp. v. Wag–Aero, Inc.,* 741 F.2d 925, 939 (7th

Cir.1984) (Posner, J., concurring).  A party asserting laches must show that it suffered prejudice as a result of the plaintiff's unreasonable delay in filing suit. *Couveau v. Am. Airlines, Inc.,* 218 F.3d 1078, 1083 (9th Cir.2000).

Here, the primary election plan was announced on March 24, 2020.  The election officials in the State of Nevada took action consistent with that plan, and at great expense, without any objection.  It was not until nearly a full month after the announcement that Plaintiffs filed the instant action on April 21, 2020.  The delay, which was unnecessary, is tantamount to Plaintiffs having slept on their rights, which should prevent the issuance of the equitable relief sought.

In any event, that delay has had a number of affects that now cannot be remedied if the relief requested is granted.

First, and foremost, all voters in Nevada have been advised of the mail-in primary election plan.  They have been told that they will receive a ballot and that no request for an absentee ballot is necessary.  They have been advised as to how the mail-in ballot may be completed and submitted.  Those unregistered, or designated as inactive, along with those active registered voters who have not updated their registration information, have been urged to register or update the information as soon as possible, and advised as to how that could be easily accomplished.  There is an expectation of voters that the ballots they receive will be able to be submitted and counted.

If the primary election plan is enjoined, the ballots sent to all registered voters, some of which will ultimately be submitted to be counted, will potentially result in those voters' votes not being counted.  According to Plaintiffs' argument, those ballots must be rejected altogether because they were not requested by the voters.  Voters who relied on the information and instruction provided by election officials will believe that they have voted.  While efforts can be made to encourage all voters to request absent ballots, there will be confusion on the part of the voters, with not all understanding that they need to take further action.

//

In addition, if an in-person election is to be restored, registered voters have been advised that they need not request an absent ballot. There are numerous voters who would prefer to avoid the social contact required by voting in person. They may wish to void that contact by voting an absent ballot. Again, confusion abound. There is great potential that those voters will not understand that they will now need to request an absent ballot for their vote to be counted.

In-person locations have been arranged and provided consistent with the primary election plan. They are limited in an effort to accommodate same-day voter registration, as well as assist voters who have issues with the ballot that was mailed to them, while also placing paramount concern for the health and welfare of voters and poll workers. If the preliminary injunction is granted, election officials throughout Nevada will have to scramble to provide adequate in-person polling locations. Early voting, which also would require the same vast expansion of polling locations, begins in just a few weeks. Locations willing and able to house polling locations would have to be secured. Poll workers to staff those locations would have to be located and trained. As stated in the March 24, 2020 press release, that training ordinarily occurs in the very first part of April to adequately ensure proper training. Also stated was the fact that the majority of Nevada's poll workers belong to groups that are at high-risk for severe illness from COVID-19. With the potential for the spread of COVID-19 still very real, as new cases continue to arise even with the restrictions in place, use of those at-risk poll workers is unrealistic. The result will be many brand new poll workers, assuming an adequate number of poll workers can be secured. Having a majority of brand new, questionably-trained poll workers will necessarily place into question the integrity of the primary election.

On the other hand, if the preliminary injunction is denied, voters will have a choice to vote by mail, which has been made as easy as possible to accomplish without compromising the security and integrity of the votes. For those voters who forego that option, they can still vote in-person, however the wait to do so is unknown in this unprecedented emergency situation. Just like any election, however, voting in person will come at the cost of waiting in line to do so.

1    Moreover, the public interest favors denial of the injunction for the same reasons set forth

2    above—the preliminary injunction would cause voter confusion and likely lead to voter's votes

3    not being counted, as they will submit the mail-in ballot as they have been instructed for the past

4    month and a half.   Issuing the preliminary injunction further flies in the face of public interest as

5    requiring swarms of people to appear at in-person voting locations greatly enhances the risk of

6    spread of the deadly COVID-19 virus, not only to the voters themselves, but to the poll workers

7    as well.

8    As a result, the balancing of the equities mandates the denial of the preliminary

9    injunction.

10    Moreover, the principle set forth in *Purcell v. Gonzalez*, 549 U.S. 1 (2006), provides that

11    near-election court orders themselves risk debasement and dilution of the right to vote because

12    "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter

13    confusion and consequent incentive to remain away from the polls. As an election draws closer,

14    that risk will increase." 549 U.S. at 4-5. The "possibility that qualified voters might be turned

15    away from the polls," id. 4, violates their right to vote.

16    Here, an order from this Court changing the rules of the election so close to the start of

17    early voting would undoubtedly cause confusion on the part of voters as described herein in

18    greater detail.  The Supreme Court "has repeatedly emphasized that lower federal courts should

19    ordinarily not alter the election rules on the eve of an election.  *See Purcell v. Gonzalez*, 549 U.

20    S. 1 (2006) (per curiam); *Frank v. Walker*, 574 U. S. 929 (2014); Veasey v. Perry, 574 U. S. __

21    (2014)."  *Republican National Committee v. Democratic National Committee*, No. 19A1016,

22    2020 U.S. LEXIS 2195 (U.S. Apr. 6, 2020) (per curiam), slip op. available at

23    https://www.supremecourt.gov/opinions/19pdf/19a1016_o759.pdf.

24    The *DNC* case involved a situation wherein the political parties filed a lawsuit to assert

25    the rights of their members who faced burdens in voting in the immediately upcoming primary

26    election in the midst of the outbreak of COVID-19 pandemic.  *Id.*  They sought in that lawsuit to

1   bar enforcement of state statutory election requirements, including deadlines for electronic and

2   mail-in voter registration and for state's receipt of absentee ballots, and voter ID requirements.

3   *Id.*  The United States District Court granted a preliminary injunction extending the deadline for

4   the clerks to receive absentee ballots from April 7 to April 13.  The sole question before the

5   Supreme Court in that case was whether absentee ballots had to be "mailed and postmarked by

6   election day, Tuesday, April 7, as state law would necessarily require, or instead may be mailed

7   and postmarked after election day, so long as they are received by Monday, April 13."  *Id.*  The

8   Court noted that the preliminary injunction motions did not include any request for such a

9   modification, and "changing the election rules so close to the election date and by affording

10  relief that the plaintiffs themselves did not ask for in their preliminary injunction motions, the

11  District Court contravened this Court's precedents and erred by ordering such relief."  *Id.*  The

12  Court recognized that the deadline for receiving ballots was already extended to accommodate

13  voters in the midst of the pandemic, which extension "was designed to ensure that the voters of

14  Wisconsin can cast their ballots and have their votes count."  The Court, as a result, did not allow

15  the additional extension unilaterally provided by the district court which would have allowed

16  voting for six additional days after the election.  Most relevant here, the Court advised that it's

17  decision on the narrow question before it "should not be viewed as expressing an opinion on the

18  broader question of whether to hold the election, or whether other reforms or modifications in

19  election procedures in light of COVID–19 are appropriate. That point cannot be stressed

20  enough."  *Id.*

21         Just as in *DNC*, the modifications in the election procedures were deemed necessary in

22  light of COVID-19.  The modifications were designed to ensure that the voters of Nevada can

23  cast their ballots and have their votes count, while protecting the health and welfare of the voters

24  and poll workers in the midst of COVID-19.  The modification by this Court of the primary

25  election procedure suggested by Plaintiffs would alter the election rules too close to the election

26  //

-22-

1     and would result in voter confusion.  This Court should heed the warning of *Purcell,* and refrain

2     from intervening to alter the election rules at this late date.

**IV.     CONCLUSION**

       Voters should not be placed in the tenuous position of having to choose between their health and their civic duty of voting.

       The world is faced with the unprecedented restrictions necessitated by the emergency COVID-19 pandemic.  Citizens are told not to go out unless necessary.  They are told not to go to work unless necessary.  Many businesses, including casinos, in Nevada, have been closed. Schools have been closed for the remainder of the current school year.  All forms of spectator sports have been put on hold indefinitely.  Even with these restrictions, the pandemic continues with no end in sight.

       The emergency situation requiring multiple forms of restrictions was not anticipated by anyone, including our Legislature, in addressing the conduct of the election.

       Election officials acted swiftly in an effort to 1) promote voter participation to allow all the opportunity to cast a ballot, 2) prevent further spread of the disease, and protect the health and welfare of voters and poll workers, and 3) protect the integrity, accessibility, and security of the electoral process.  The primary election plan satisfies all of those concerns.  All entitled to vote will be able to vote.  If individuals choose to do so by mail, they have that ability.  If they choose to forego that option, they can appear to vote in-person, but may have to wait longer than usual to do so.  The bottom line is that all voters will be afforded the opportunity to vote with the same voter fraud safeguards in place under normal circumstances.

       On the other hand, the Plaintiffs slept on their rights for nearly a month before bringing forth a challenge, during which time election officials undertook great efforts to conduct the mail-in election.  Granting the preliminary injunction at this late date in the process will change the course of the election procedure in place and would adversely impact voters' right and ability

//

to vote.  The Court must exercise its discretion and refrain from taking that action as it would cause great confusion amongst voters.

As a result of the foregoing, the Washoe County Registrar of Voters, Deanna Spikula, respectfully urges this Court to deny the motion for preliminary injunction and grant such other relief as it deems appropriate in the premises.

Dated this 27th day of April, 2020.

CHRISTOPHER J. HICKS
District Attorney

By ____/s/ Herbert B. Kaplan_____
HERBERT B. KAPLAN
Deputy District Attorney
One South Sierra St.
Reno, NV  89501
hkaplan@da.washoecounty.us

ATTORNEYS FOR WASHOE COUNTY
REGISTRAR OF VOTERS, DEANNA SPIKULA

### CERTIFICATE OF SERVICE

Pursuant to FRCP 5(b), I certify that on this date, the foregoing was electronically filed with the Second Judicial District Court by using the ECF System.  Electronic service of the foregoing document shall be made in accordance with the Master Service List as follows:

James Bopp, Jr.,

Richard E. Coleman Esq.

Amanda L. Narong, Esq.

David C. OMara, Esq.

Corrine L. Youngs, Esq.

Gregory Louis Zuning, Esq

I certify that on this date, I e-mailed a true and correct copy of the foregoing Opposition to the following:

Sandra L. Geyer, Esq.
sgeyer@ag.nv.gov

Dated this 27th day of April, 2020.

                                  /s/ M. Coin
                                  M. Coin