UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

STANLEY WILLIAM PAHER, *et al.*,

                              Plaintiffs,

    v.

BARBARA CEGAVSKE, in her official capacity as Nevada Secretary of State, *et al.*,

                              Defendants.

Case No. 3:20-cv-00243-MMD-WGC

ORDER

## I.    SUMMARY

Contending with the novel coronavirus disease ("COVID-19") pandemic, Nevada's Secretary of State Barbara Cegavske (the "Secretary"), in partnership with Nevada's 17 county election officials, developed a plan to implement an all-mail election for the upcoming June 9, 2020 Nevada primary in order to diminish the spread of COVID-19 (the "Plan"[1]). Relevantly, there are currently five states in the western United States that conduct elections entirely by mail: Oregon, Washington, Colorado, Utah, and Hawaii. Nevada also currently allows for mail-in voting in certain mailing precincts—separate from absent ballot precincts—with no reported incidents of election fraud. It is also undisputable that under NRS Chapter 293, the Nevada Legislature has vested the Secretary with authority to enact voting regulations and that the Secretary has pronounced the Plan to safeguard the health and safety of Nevada voters (and the larger public) during unprecedented times.

///

///

---

[1]The Court adopts Plaintiffs' reference to the Plan but recognizes that Plaintiffs challenge only the expansion of voting by mail. Intervenor-Defendants have filed a separate action challenging other aspects of the Plan (ECF No. 27 at 3–4) which are not at issue in this case.

Plaintiffs William Paher, Gary Hamilton, and Terresa Monroe-Hamilton here sue the Secretary and Deanna Spikula—Registrar of Voters for Washoe County ("Washoe Registrar")—chiefly claiming that the Plan is not "chosen" by Nevada's Legislature, and that an all-mail election strips voter-fraud-prevention safeguards and unconstitutionally violates Plaintiffs' right to vote due to purported vote dilution. (ECF No. 1.) Upon these contentions and others, Plaintiffs seek a preliminary injunction to stop the Plan ("PI Motion").

The Court finds that Plaintiffs have not established an injury particularized to them to confer standing. However, even if they can establish standing, Plaintiffs' claims fail on the merits and the other relevant factors for preliminary injunctive relief counsel against the Court enjoining Defendants from implementing the all-mail election provisions of the Plan. The Court finds that Defendants' interests in protecting the health and safety of Nevada's voters and to safeguard the voting franchise in light of the COVID-19 pandemic far outweigh any burden on Plaintiffs' right to vote, particularly when that burden is premised on a speculative claim of voter fraud resulting in dilution of votes. The Court will therefore deny the PI Motion.[2]

## II.    BACKGROUND

The following facts are taken from the Verified Complaint and exhibits attached thereto as well as the evidence submitted concerning the PI Motion.

### A.    The Parties

This action stems from the decision to hold the all-mail primary (i.e., to implement the Plan's mailing provisions), which was announced to the public on March 24, 2020.

///

///

---

[2]In addition to the PI Motion, the Court has considered Defendants' and Intervenor-Defendants' oppositions (ECF Nos. 25 (Washoe Registrar), 27-1 (Defendant-Intervenors), 28 (Secretary), and Plaintiffs' reply (ECF No. 43). The Court has also deliberated the arguments the parties presented at a hearing on the PI Motion on April 29, 2020 ("Hearing"). Because Plaintiffs' reply was unresponsive to Intervenor-Defendants' brief, the Court provided Plaintiffs an additional opportunity for Plaintiffs to respond to those arguments at the Hearing.

1    (ECF No. 1-1.) The Plan applies only to Nevada's June 9, 2020 primary election. (*Id.*) The

2    parties are described as follows.

3         Plaintiffs are all registered Nevada voters. (ECF No. 1.) Stanley resides in Reno,

4    Nevada and typically participates in in-person early voting. (*Id.*) Terresa Monroe-Hamilton

5    and Garry Hamilton (together, "Hamiltons") are married, recently moved to Nevada, and

6    also reside in Reno. (*Id.*) The Hamiltons ordinarily vote early or in person on election day.

7    They registered to vote online the day before filing this lawsuit. (*Id.*)

8         The Secretary is the Chief Officer of Elections for the State of Nevada, *see* NRS §

9    293.124. (*Id.*) The Washoe Registrar is responsible for implementing the state's election

10   laws in Washoe County. (*Id.*) The Secretary and Washoe Registrar are collectively

11   referenced as Defendants, where not individually referenced.

12        **B.    Impetus and Concerns that Led to the Plan**

13        The decision to implement the Plan was made to "maintain a high level of access

14   to the ballot, while protecting the safety of voters and poll workers[—who belong to groups

15   who are at high risks for severe illness from COVID-19—]." (ECF No. 1-1.) In decreeing

16   the Plan, the Secretary wanted to "reassure voters in Nevada that their health and safety

17   while participating in voting is paramount to state and local election officials." (*Id.*)

18   Pertinently, the Secretary is quoted, stating:

19            Because of the many uncertainties surrounding the COVID-19 pandemic, as
             well as the immediate need to begin preparations for the 2020 primary
20           election, it became necessary for me to take action regarding how the
             election will be conducted.

21

22   She further states that she, along with Nevada's 17 county election officials, "jointly"

23   determined that "the best option for the primary election is to conduct an all-mail election."

24   (*Id.*) The Secretary's announcement of the Plan emphasized that election officials are

25   focused on also maintaining the integrity of the election: "the high standard Nevada has

26   set for ensuring the security, fairness, and accuracy of elections will still be met." (*Id.*)

27   ///

28   ///

1

2   **C.    The New Details of the Plan and Maintained Election Safeguards**

3   Under the Plan, all *active* registered voters will be mailed an absentee ballot (mail-

4   in ballot) for the primary election. If a voter is registered to vote at his or her current

5   address, they need not take any further action to receive an absentee ballot. (*E.g.*, ECF

6   No. 1-3.)  If an individual is not registered or needs to update registration information (*e.g.*,

7   name, address, and party), they are required to do so. (*Id.*) To accommodate same-day

8   registration requirements enacted by the 2019 Nevada Legislature, the Plan also

9   establishes at least one physical polling place in each of Nevada's counties and in Carson

10   City. (ECF No. 1-1.)

11   The Plan otherwise maintains Nevada's election system and safeguards. (*See* ECF

12   No. 21 (Decl. of Wayne Thorley, Deputy of Elections for the Secretary).) For example,

13   NRS § 293.2725(1) requires first-time voters in Nevada to present identification and proof

14   of residency before being allowed to vote, whether in person or by mail. (*Id.*) The

15   requirements to present identification and proof of residency for first-time voters are

16   waived pursuant to NRS § 293.2725(2)(b) if election officials are able to match the voter's

17   driver's license number, ID card number or social security number with personal identifier

18   on file with the Nevada Department of Motor Vehicle ("DMV") or Social Security

19   Administration ("SSA"). (*Id.*)

20   When voter registration applicants register (1) by mail, (2) through the DMV by

21   appearing in person or using the DMV's on-line system, or (3) via the Secretary of State's

22   on-line system, the overwhelming majority of those applicants are positively matched to

23   the personal identifiers on file with the DMV or the SSA. (*Id.*) The match is made through

24   automated systems, which the Secretary finds to be highly reliable. (*Id.*) Voters who are

25   positively matched to personal identifiers on file with the DMV or SSA are not required to

26   present identification and proof of residency before voting, even if they are voting for the

27   first time in Nevada. (*Id.*) They can simply vote in person or by mail without submitting to

28   ///

///

4

additional verification processes. (*Id.*) Voters who are not positively matched[3] to personal identifiers on record with the DMV or SSA must present identification and proof of residency before voting (referred to as "ID required voters"). (*Id.*) These ID required voters constitute less than 1% of all registered voters. (*Id.*) They have different ballot return envelopes than other voters with an envelope flap indicating that the voter must return a copy of the voter's identification and proof of residency, without which their votes will not count.

Penalties against fraudulent votes are provided for under, *inter alia*, NRS §§ 293.313, 293.730(2), (3), and 293.840.

**D.   Nevada's Election System Already Permits Mail-in Ballots in Mailing Precincts**

Nevada's governing statutes provide for mailing precincts—specifically NRS §§ 293.343 through 293.355. Through these provisions, the Nevada Legislature has given the Secretary and county clerks authority to mail ballots to registered voters rather than requiring voters to request those ballots through the absent ballot process.

NRS § 293.343 provides that "[w]henever the county clerk has designated a precinct as a mailing precinct, registered voters residing in that precinct may vote at any election regulated by this chapter in the manner provided in NRS [§§] 293.345 to 293.355, inclusive." NRS § 293.343(2). Further, NRS § 293.213 gives the county clerk unilateral authority to designate a precinct as a mailing precinct if one of two conditions is met: (1) if fewer than 20 registered voters reside in that precinct, or (2) if fewer than 200 ballots were cast in the last general election. NRS § 293.213(1), (3). A county clerk may establish a mailing precinct that does not meet the requirements of NRS § 293.213(1)–(3) "if the county clerk obtains prior approval from the Secretary of State." NRS § 293.213(4).

Mailing precincts, as opposed to absent ballot precincts, have been used in Nevada—albeit on a small scale—for many years. (ECF No. 21 at 3.) In recent Nevada

---

[3]The Deputy of Elections for the Nevada Secretary of State attests that the lack of a match is "almost always because of a typographical or printing error in [the] application to register to vote." (ECF No. 21 at 2.)

1   elections, a statistically significant numbers of ballots were cast by the voters in mailing

2   precincts, providing a reasonable sample of ballots cast without incidents of election fraud.

3   (*Id.*) The number of ballots that voters recently cast in mailing precincts are: 2018 General

4   election (3,879); 2018 Primary election (2,273); 2016 General election (6,069); 2016

5   Primary election (362); 2014 General election (4,288). (*Id.*)

6       **E.**    **Lawsuit**

7       Plaintiffs filed this lawsuit on April 21, 2020. The Verified Complaint asserts five

8   claims for relief, detailed *infra*, and requests declaratory and injunctive relief to prevent the

9   Secretary and county administrators from implementing the Plan. (ECF No. 1 at 8–13.)

10  Plaintiffs particularly challenge the Plan's expansion of mail-in voting or in their

11  characterization, "[t]he Plan would require the State to forego almost all in-person voting

12  and instead conduct the Primary by mailed absent ballots." (ECF No. 1 at 9.) Plaintiffs

13  contend that the largely all-mail primary circumvents various statutory safeguards

14  designed to protect against voter fraud, and that their votes will as a result be diluted by

15  illegal votes. (*E.g.*, *id.*, at 2, 9, 12.)

16      Along with the Verified Complaint, Plaintiffs filed the PI Motion, a motion to expedite

17  briefing and hearing on the PI Motion, and a motion to consolidate the requested hearing

18  on the PI Motion with hearing on the merits of Plaintiffs' Verified Complaint ("Consolidation

19  Motion"). (ECF Nos. 1, 2, 3,4.) The Court granted the motion to expedite in part (ECF No.

20  14) and later granted the Consolidation Motion under Fed. R. Civ. P. 65(a)(2) (ECF No.

21  36)[4]. The Court further granted intervention by the following parties: Nevada State

22  Democratic Party ("NSDP"), DNC Services Corporation/Democratic National Committee

23  ("DNC"), DCCC, Priorities USA, and John Solomon (collectively, "Intervenor-Defendants").

24  (ECF No. 39.)

25  ///

26  ///

27      [4]However, at the Hearing the Court determined that a resolution on the merits of

28  the case should be deferred given the Secretary's position as to her right to assert
Eleventh Amendment immunity. Such a deferral would not affect the parties' ability to seek
interlocutory appeal.

1  III.    **PI MOTION STANDARD**

2        Federal Rule of Civil Procedure 65 governs preliminary injunctions. "'An injunction

3  is a matter of equitable discretion' and is 'an extraordinary remedy that may only be

4  awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Earth Island Inst.*

5  *v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010) (quoting *Winter v. Nat. Res. Def. Council*,

6  555 U.S. 7, 22, 32 (2008)). This relief is "never awarded as of right." *Alliance for the Wild*

7  *Rockies v. Cottrell ("Alliance")*, 623 F.3d 1127, 1131 (9th Cir. 2011). To qualify for a

8  preliminary injunction, a plaintiff must satisfy four requirements: (1) a likelihood of success

9  on the merits; (2) a likelihood of irreparable harm; (3) that the balance of equities favors

10  the plaintiff; and (4) that the injunction is in the public interest. *See Winter*, 555 U.S. at 20.

11  A plaintiff may also satisfy the first and third prongs by showing serious questions going

12  to the merits of the case and that a balancing of hardships tips sharply in plaintiff's favor.

13  *Alliance*, 632 F.3d at 1135 (holding that the Ninth Circuit's "sliding scale" approach

14  continues to be valid following the *Winter* decision).

15        On the merits-success prong, "the burdens at the preliminary injunction stage track

16  the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546

17  U.S. 418, 429 (2006); *see also id.* at 428 (citing *Ashcroft v. ACLU*, 542 U.S. 656, 666

18  (2004).

19  IV.    **DISCUSSION**

20        Plaintiffs' claims are that the Plan: (1) violates the right to vote by removing

21  safeguards against fraudulent votes that dilute votes, which they claim is a severe burden;

22  (2) violates the right to vote for legislative representatives to establish the manner of

23  elections by substituting a scheme that replaces the Nevada Legislature's plan; (3) violates

24  the right to vote under the *Purcell*[5] principle; (4) violates Plaintiffs' right to have, and to

25  vote in, federal elections where the manner of election is chosen by the state's legislature;

26  and (5) violates the right to a republican form of government under the United States

27

28        [5]*Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam).

7

1   Constitution. (ECF No. 2 at 7–20.)  Defendants and Intervenor-Defendants raise threshold

2   issues about Plaintiffs' claims that the Court will address before turning to the merits.[6]

3       **A.    Standing**

4       Both Defendants and Intervenor-Defendants argue that Plaintiffs lack standing to

5   assert their claims. (ECF No. 25 at 11–16; ECF No. 28 at 8–10; ECF No. 27-1 at 9–11.)

6   The Court agrees.

7       "Article III of the Constitution limits federal-court jurisdiction to 'Cases' and

8   'Controversies.'" *Massachusetts v. EPA*, 549 U.S. 497, 516 (2007). "To satisfy Article III's

9   standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a)

10  concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2)

11  the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely,

12  as opposed to merely speculative, that the injury will be redressed by a favorable

13  decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC) Inc.*, 528 U.S. 167, 180-

14  81 (2000) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). The party

15  invoking federal jurisdiction bears the burden of establishing these elements. *FW/PBS,*

16  493 U.S. at 231.  Moreover, the party invoking standing also must show that it has standing

17  for each type of relief sought. *Summers v. Earth Island Inst.,* 555 U.S. 488, 493 (2009).

18      Among other things, the Secretary argues that Plaintiffs lack standing because their

19  alleged injury is speculative and at best Plaintiffs hint at a possible injury only in the first

20  claim for voter dilution. (ECF No. 28 at 8–10.) Washoe Registrar similarly argues that

21  Plaintiffs' injury is speculative, unsupported and not particularized. (ECF No. 25 at 11–16.)

22  Intervenor-Defendants make the same arguments, but more fully argue why Plaintiffs have

23  not alleged an injury-in-fact. (ECF No. 27-1 at 9–11.) Intervenor-Defendants contend, *inter*

24  *alia*, that Plaintiffs do not allege an injury-in-fact because Plaintiffs' "purported injury is no

25  ///

26  _____

27      [6]Intervenor-Defendants argue that this Court is barred by the Eleventh Amendment
from deciding this action—which they contend amounts to an action to enjoin state officials
for alleged violations of state law. (ECF No. 27-1 at 8–9.) Neither the Secretary nor the

28  Washoe Registrar, who are the directly concerned parties, substantively argue the issue
in briefing or at the Hearing. The Court will therefore not consider the issue here.

1   different than that of any other voter in Nevada (or any other citizen who will be governed

2   by the candidates elected through Nevada's elections, for that matter)." *(Id.* at 10.) In

3   briefing and at the Hearing, Plaintiffs counter that they have standing, in gist arguing that

4   mail-in ballots are unlawful under state law, resulting in vote dilution, and that vote dilution

5   from voter fraud results in disenfranchisement, and "disenfranchisement is a severe

6   burden that is personal to the person disenfranchised." (*E.g.*, ECF No. 43 at 4, 7.)

7          Plaintiffs' argument is difficult to track and fails to even minimally meet the first

8   standing prong. The theory of Plaintiffs' case, and which is the only alleged injury driving

9   all of their claims, is that the Plan will lead to an increase in illegal votes thereby harming

10  them as rightful voters by diluting their vote. (*See generally* ECF No. 1.) But Plaintiffs'

11  purported injury of having their votes diluted due to ostensible election fraud may be

12  conceivably raised by any Nevada voter. Such claimed injury therefore does not satisfy

13  the requirement that Plaintiffs must state a concrete and particularized injury. *See, e.g.*,

14  *Spokeo Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (citation omitted) (providing, *inter*

15  *alia*, that an injury must be "concrete and particularized"); *Lujan v. Defs. of Wildlife*, 504

16  U.S. 555, 573–74 (1992) (explaining that U.S. Supreme Court's case law has "consistently

17  held that a plaintiff raising only a generally available grievance about government—

18  claiming only harm to his and every citizen's interest in proper application of the

19  Constitution and laws, and seeking relief that no more directly and tangibly benefits him

20  than it does the public at large—does not state an Article III case or controversy").  This is

21  not a pioneering finding. Other courts have similarly found the absence of an injury-in-fact

22  based on claimed vote dilution. *See, e.g.*, *Am. Civil Rights Union v. Martinez-Rivera*, 166

23  F. Supp. 3d 779, 789 (W.D. Tex. 2015) ("[T]he risk of vote dilution[ is] speculative and, as

24  such, [is] more akin to a generalized grievance about the government than an injury in

25  fact."); *cf. United States v. Florida*, No. 4:12cv285-RH/CAS, 2012 WL 13034013, at *1

26  (N.D. Fla. Nov. 6, 2012) (rejecting a motion to intervene under Rule 24 based on the same

27  theory of vote dilution because the "asserted interests are the same . . . as for every other

28  registered voter in the state" and therefore constitute "[g]eneralized interests").

1    The Secretary additionally argues that she did not violate state law—because she

2    was authorized to implement the Plan under NRS § 293.213(4) and therefore Plaintiffs fail

3    to show a "causal connection" between the alleged injury of vote dilution and the purported

4    unlawful conduct they allege the Secretary has engaged in, *see Lujan*, 504 U.S. at 560.

5    (ECF No. 28 at 4, 7, 9.) The Court ultimately agrees with this contention in light of its

6    findings below.[7]

7    Even if the Court had concluded that Plaintiffs have standing here, Plaintiffs' claims

8    also fail on the merits.[8]

9    ### B.    The Merits of Plaintiffs' Claims

10   In the PI Motion, Plaintiffs focus chiefly on likelihood of success on the merits,

11   arguing that they are likely to succeed on each of their claims. (*See* ECF No. 2 at 7–20.)

12   In considering the merits of Plaintiffs' claims, the Court finds that Plaintiffs' second, fourth,

13   and fifth claims are in many ways materially intertwined, as discussed *infra.* The Court

14   ultimately concludes that Plaintiffs fail to establish the merits of each claim. While the Court

15   therefore need not further consider the *Winter* factors, the Court also finds that the balance

16   of equities favors Defendants and Intervenor-Defendants and that injunction would not be

17   in the public's interest.[9]

18   ///

19   ///

---

20   [7]Even if the Court had concluded *infra* that there was a violation of Nevada law in
21   the implementation of the all-mail provisions of the Plan, such as the Plan being untimely
     or otherwise "inconsistent" with the intent of Nevada's Legislature—which Plaintiffs argue,
22   *see infra*, the Court finds that Plaintiffs have not established a nexus between such alleged
     violations and the alleged injury of vote dilution.

23   [8]The Court does not consider Intervenor-Defendants' argument that Plaintiffs do
     not state a cognizable federal cause of action because Plaintiffs have no private right of
24   action to enforce Nevada's election laws. (ECF No. 27-1 at 11–12.)

25   [9]If the Court had concluded that Plaintiffs establish that they are likely to succeed
     on the merits, the Court would also necessarily find irreparable harm. *See Sanchez, et al.*
26   *v. Cegavske, et al.,* 214 F. Supp. 3d 961, 976 (D. Nev. 2016) *(*citing *Cardona v. Oakland*
     *Unified Sch. Dist., California,* 785 F. Supp. 837, 840 (N.D. Cal. 1992) ("Abridgement or
27   dilution of a right so fundamental as the right to vote constitutes irreparable injury.") &
     *Melendres v. Arpaio,* 695 F.3d 990, 1002 (9th Cir. 2012) ("It is well established that the
28   deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'")).

1

### 1.   Plaintiffs' First Claim

Plaintiffs' predominant claim, on which they expend most of their bandwidth, is that the Plan violates the fundamental right to vote by removing safeguards against fraudulent votes—that they claim are attendant to in-person and request-only-absentee-ballot voting—that dilute votes. (ECF No. 2 at 7–15; ECF No. 43 at 3.) The Court addresses some threshold issues before turning to the merits (i.e., whether Plaintiffs have established a constitutional violation).

As an initial matter, the Court must determine the applicable test/analytical framework for considering this argument. Plaintiffs specifically present the *Anderson-Burdick* balancing test/line of cases and the *Reynolds-Bush* line of cases as the possible frameworks for this case (ECF No. 2 at 8–9). *Compare Anderson v. Celebrezze*, 460 U.S. 780, 788–89 (1983) & *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) *with Reynolds v. Sims*, 377 U.S. 533 (1964) & *Bush v. Gore*, 531 U.S. 98 (2000) (per curiam). Plaintiffs argue that the latter should govern the case because they claim that voter disenfranchisement in the form of vote dilution is at issue here and that the *Anderson-Burdick* balancing test is not suitable for such claims. (*See id.* at 9.) They additionally posit that the *Anderson-Burdick* line of cases should not apply because the Plan being challenged is not a state-enacted election law, to which they appear to concede the *Anderson-Burdick* balancing test would typically apply. (*See id.*) Defendants and Intervenor-Defendants argue that the Court should, like other courts, apply the *Anderson-Burdick* balancing test where it is alleged that an election law or policy violates the right to vote. (ECF No. 28 at 7; ECF No. 27-1 at 14–15; ECF No. 25 at 18.)

The Court will apply the *Anderson-Burdick* balancing test. The Court finds Plaintiffs' reasons for the *Reynolds-Bush* framework and for rejecting the *Anderson-Burdick* balancing test, which Plaintiffs admit is ordinarily applicable to these types of cases, unpersuasive. For one, as will be explained *infra*, the Court disagrees with Plaintiffs that the Plan does not constitute state-enacted election law. Further, Plaintiffs provide no case where a *Reynolds-Bush* framework was applied within a context similar to the instant one.

1   (*See id.* at 9–15.) To be sure, while Plaintiffs present this case as one about voter

2   disenfranchisement due to purported vote dilution as a result of voter fraud; their claim of

3   voter fraud is without any factual basis.[10] Regarding the latter, Plaintiffs notably moved to

4   consolidate the hearing on the PI Motion with a motion on the merits of the Verified

5   Complaint, contending that the merits of this case turns on "purely legal issues." (*E.g.*,

6   ECF No. 4 at 1.) Moreover, at least one case more recent than *Reynolds*, *Anderson*,

7   *Burdick*, and *Bush—Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 190 (2008)—

8   applies the *Anderson-Burdick* balancing test.[11]

9         Plaintiffs next argue that if the Court applies the *Anderson-Burdick* balancing test,

10   the Court should apply strict scrutiny in evaluating the burdens caused by the Plan. (ECF

11   No. 2 at 8.)[12] But the Supreme Court has not been so exacting. In *Crawford*, the Court

12   reiterated that it has not "identif[ied] any litmus test for measuring the severity of a burden

13   that a state law imposes on a political party, an individual voter, or a discrete class of

14   voters. However slight that burden may appear, as *Harper* [*v. Virginia Bd. Of Elections*,

15   383 U.S. 663 (1966)] demonstrates, it must be justified by relevant and legitimate state

16   interests 'sufficiently weighty to justify the limitation.'" *Id.* at 190 (quoting *Norman v. Reed*,

17   502 U.S. 279, 288–289 (1992)); *see also Timmons v. Twin Cities Area New*

18   *Party*, 520 U.S. 351, 359 (1997) ("No bright line separates permissible election-related

19   regulation from unconstitutional infringements."). But, "[w]hen a state election law

20   ///

21   _____

22       [10]Plaintiffs, for the first time in their reply, attempt to argue voter fraud through the
presentation of evidence in the form of newspaper articles. (*See* ECF No. 43 at 4–5.)

23       [11]The PI Motion makes no mention of *Crawford* and appears to suggest that

24   *Anderson* and *Burdick* should not apply here also because they predate *Bush*. (*See* ECF
No. 2 at 9 n.8.)

25       [12]Notably, Plaintiffs concede that *Bush* did not discuss, much less explicate, any

26   particular level of scrutiny. (*See* ECF No. 2 at 10 ("Building on *Reynolds*, *Bush didn't
discuss the scrutiny level*, but held that the Florida Supreme Court could not by its orders

27   and interpretations of state law dilute voters' fundamental right to vote, 551 U.S. at 107–
11, which was either a per-se ban of vote dilution or at least an exercise of the strict
scrutiny now required in equal-protection challenges involving fundamental rights with an

28   analysis and outcome so readily apparent that it required no detailing.") (emphasis added).

provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788; *see Crawford*, 553 U.S. at 189–90 (internal quotation and citations omitted) ("[E]venhanded restrictions that protect the integrity and reliability of the electoral process itself are not invidious.").

As the Supreme Court did in *Crawford*, this Court begins its analysis of the constitutionality of the Plan's all-mail provision by focusing on the state's interests. *See id.* at 191. Here, the Secretary, acting on behalf of the State of Nevada, has identified at least two interests that justify the burdens that the Plan imposes on voters and potential voters like Plaintiffs. The Secretary expressly implemented the Plan to protect the health and safety of Nevada's voters and to safeguard the voting franchise. (*E.g.*, ECF No. 1-1.) These are indisputably compelling and longstanding interests. For example, the states' police powers over matters of public health and safety and to act over the general welfare of their inhabitants is entrenched in the rights reserved to the state under the Tenth Amendment to the United States Constitution. *See also Reynolds*, 377 U.S at 554 ("Undeniably the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections.").

On the other hand, and as the Secretary puts it (ECF No. 28 at 8), Plaintiffs cannot demonstrate a burden upon their voting rights, only an imposition upon their preference for in-person voting—as opposed to mail-in voting, where ballots are mailed to voters. The same can be said regarding Plaintiffs' emphasis on request-only-absentee-ballots, where ballots are sent to voters only if they request one. (ECF No. 2 at 12–13, 17, 21.) *Cf. McDonald v. Bd. of Election Commissioners,* 394 U.S. 802, 807 (1969) (providing that the right to absentee voting (i.e., a preference where other voting options exists) is not a fundamental right because it does not in fact put the right to vote at stake). Further, Plaintiffs' overarching theory that having widespread mail-in votes makes the Nevada ///

1   election more susceptible to voter fraud seems unlikely where the Plan essentially
2   maintains the material safeguards to preserve election integrity. (*See* ECF Nos. 1-1, 21.)
3       Moreover, although Plaintiffs cloak their preference in a claim of voter
4   disenfranchisement (*e.g.*, ECF No. 2 at 8, 9, 17; ECF No. 43 at 7), Defendants may equally
5   claim that voters will be disenfranchised. For example, if the Plan is not implemented
6   voters worried about risks to their health or unsure about how to obtain an absentee ballot
7   may very well be discouraged from exercising the right to vote all together. Additionally,
8   as Defendants also point out, under the Plan, Plaintiffs may—if they choose to exercise
9   their preference for in-person voting—vote in person on election day at a county wide
10  polling center regardless of their precinct per NRS §§ 293.3072–.3075. (*Id.* at 6–7; ECF
11  No. 25 at 13.) The Court therefore concludes that Nevada's interests, reflected by the
12  Secretary in implementing the Plan, far outweigh the burdens placed on Plaintiffs' right to
13  vote. Thus, Plaintiffs' first claim fails on the merits.

14                  **2.    Plaintiffs' Second and Fourth Claims**

15      For efficiency, the Court discusses Plaintiffs' second and fourth claims in a single
16  section because the two overlap. As noted above, Plaintiffs' second argument is that the
17  Plan violates the right to vote for legislative representatives to establish the manner of
18  elections by substituting a scheme that replaces the Nevada Legislature's plan. (ECF No.
19  2 at 15–16.) This argument is expressly premised on Plaintiffs' fourth contention. (*See id.*
20  at 16; *see also* ECF No. 43 at 7–8 (explaining that the violation in the second claim results
21  due to the Plan allegedly disregarding the legislature's chosen manner of elections—which
22  is captured by the fourth claim).) The latter is that the Plan violates Plaintiffs' right to have,
23  and to vote in, federal elections where the manner of election is chosen by the state's
24  legislature under Article I, section 4, clause 1 of the United States Constitution.[13] (*Id.* at 3–
25  ///

26  _____
27      [13]Article I, section 4, clause 1 provides:

28      The Times, Places and Manner of holding Elections for Senators and
        Representatives, shall be prescribed in each State by the Legislature

14

5, 17–18.) To be clear, both arguments rest on the claim that the Plan contravenes Nevada's Legislature/representatives' chosen manner of election.

Plaintiffs appear to classify the June 9, 2020 Nevada Primary as a "federal" election because "[c]andidates for the office of U.S. Representative are on the Primary ballot." (*Id.* at 17.) Assuming that this primary constitutes a "federal election," the Court disagrees with Plaintiffs' material premise—that the Plan is not the Legislature's chosen manner of election.

The Nevada Legislature has authorized the Secretary to enact voting regulations under NRS § 293.124. The section provides:

> 1. The Secretary of State shall serve as the Chief Officer of Elections for this State. As Chief Officer, the Secretary of State is responsible for the execution and enforcement of the provisions of title 24 of NRS and all other provisions of state and federal law relating to elections in this State.
>
> 2. The Secretary of State shall adopt such regulations as are necessary to carry out the provisions of [the election laws under Title 24—NRS Chapters 293–306].

NRS § 293.124(1)–(2). While at the Hearing Plaintiffs' counsel argued that the Plan is not a regulation—but instead a news release—such is an argument of mechanical semantics. The Plan is in fact a directive authorized by the Secretary regulating the upcoming Nevada primary. The Court therefore finds that, as a baseline, the Plan is effectively prescribed by the state's legislature because the Nevada Legislature has in the first instance authorized the Secretary to adopt regulations to carry out the state's election laws.

Plaintiffs nonetheless argue that the Plan is inconsistent with the state's election laws, contrary to NRS § 293.247. (ECF No. 2 at 3–5.) NRS § 293.247 pronounces:

> 1. The Secretary of State shall adopt regulations, *not inconsistent* with the election laws of this State, for the conduct of primary, general, special and district elections in all cities and counties. *Permanent regulations* of the Secretary of State that regulate the conduct of a primary, general, special or district election and are effective on or before the last business day of

///

thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of ch[oo]sing Senators.

U.S. Const. art. I, § 4, cl. 1.

February immediately preceding a primary, general, special or district election govern the conduct of that election.
. . .

3.  The regulations must prescribe: [*inter alia*]

(j) Such other matters as determined necessary by the Secretary.

4.  The Secretary of State *may provide interpretations and take other actions necessary* for the effective administration of the statutes and regulations governing the conduct of primary, general, special and district elections in this State.

(Emphasis added.)

Plaintiffs particularly pinpoint four ways in which they believe the Plan is "inconsistent" with election laws. Defendants and Intervenor-Defendants largely ignore the minutiae of these purported inconsistencies. They instead directly argue that the all-mail provisions of the Plan were lawfully prescribed pursuant to, *inter alia*, NRS § 293.213(4)— detailed *supra* (ECF No. 25 at 6; ECF No. 28 at 2, 4; ECF No. 27-1 at 13) NRS § 293.247(4) (*see* ECF No. 25 at 5 (Washoe Registrar's brief); and NRS §§ 293.343–.355 (ECF No. 27-1 at 13)). Plaintiffs similarly fail to grapple with the statutes Defendants and Intervenor-Defendants contend authorize the all-mail in provisions of the Plan; Plaintiffs merely claim that NRS § 293.213(4) was not intended to apply to the whole state. (ECF No. 2 at 4 n.5.) Plaintiffs also do not particularly address subsections within NRS § 293.247, such as subsection (4),[14] which the Court concludes also supports the implementation of the Plan's mail-in provisions. In any event, upon considering each of Plaintiffs' arguments of inconsistencies, the Court finds they are tenuous at best. The Court addresses each purported inconsistency in turn below.

///

///

---

[14]That is, Plaintiffs provide no argument beyond the claim at the Hearing that the Plan is not a regulation and therefore the subsection does not apply. But, if NRS § 293.247(4) does not apply based on Plaintiffs' "the Plan is not a regulation" contention, then NRS § 293.247(1), which Plaintiffs rely on for their claimed inconsistencies would be equally inapplicable. Plaintiffs' reliance on NRS § 293.247(1) in briefing is an implicit concession that the Plan is a regulation.

First, Plaintiffs argue that the Plan is untimely, seemingly based on the last sentence in subsection 1 of NRS § 293.247, because it was only announced on March 24, 2020. (ECF No. 2 at 3–4.) According to Plaintiffs, per subsection 1, the Plan had to be implemented on or before the last business day of February 2020. (*Id.*) Plaintiffs' argument is flawed, at minimum, because the subject sentence clearly pertains to [p]ermanent regulations of the Secretary." NRS § 293.247(1). It is undisputed that the Plan is not intended to be permanent—it only applies to the upcoming June 9, 2020 primary. (*See, e.g.*, ECF No. 1-2.)

Second, Plaintiffs argue that the Plan is inconsistent with certain requirements under NRS §§ 293.205 and .206. (ECF No. 2 at 4.) It became clear at the Hearing that Plaintiffs were more precisely contending that the Plan's "designation" of mailing precincts under NRS § 293.343[15] was not timely per NRS § 293.205. Plaintiffs' counsel appeared unaware that the PI Motion also argues NRS § 293.206(1). In diligence, the Court discusses both sections as briefed.

The first provision, NRS § 293.205, pertains to election precincts. Plaintiffs particularly rely on NRS § 293.205(1), noting that it requires county clerks to establish election precincts "on or before the third Wednesday in March of every even-numbered year." (*Id.*) NRS § 293.206 requires that "[o]n or before the last day in March of every even-numbered year, the county clerk shall provide the Secretary of State and the Director of the Legislative Counsel Bureau with a copy or electronic file of a map showing the boundaries of all election precincts in the county," NRS § 293.206(1). (*See id.*) In making these arguments, Plaintiffs appear to recognize the obvious—that these provisions on their face concern physical election precincts, not mail-in votes. (*Id.* (recognizing that county clerks may establish "mailing precincts" with certain exceptions under NRS 293.343).) Plaintiffs nonetheless contend that based on NRS §§ 293.205(1) and .206(1)

///

---

[15]While both the PI Motion and Plaintiffs' reply once reference NRS § 293.343, neither even mentions the words "designate" or "designation." (*See generally* ECF Nos. 2, 43.)

1    election precincts and maps showing the precincts' boundaries had to be established by

2    March 18, 2020. (*Id.*)

3         However, the Plan would not violate the date requirements of NRS § 293.206(1)

4    because March 24 is before the "last day in March." Even accepting Plaintiffs' position, in

5    briefing, that the Plan is inconsistent with NRS §§ 293.205(1) and .206(1), based on the

6    purported March 18 deadlines of these provisions and assuming such provisions apply

7    here, Plaintiffs' argument is transparently grounded on the technicality of a difference of

8    six days. It is hard to imagine that a procedural difference of six days in implementation

9    would render the Plan inconsistent with Nevada's election laws.

10        In any event, the Court finds that Plaintiffs' argument does not support a conclusion

11   that the Plan is inconsistent. It is obvious that the Plan does not alter the establishment of

12   precincts nor their existence as a matter of fact. The Secretary echoes this in her

13   opposition. (*See* ECF No. 28 at 6 ("[T]here were no changes to precinct boundaries . . .

14   [t]he only change was to the method of voting within existing precinct boundaries.").) On

15   its face, the Plan simply supersedes the need to appear at a physical precinct as the

16   Secretary found "necessary" due to the COVID-19 pandemic. (*See* ECF No. 1-1 (the

17   Secretary explaining that the Plan was enacted because in light of the uncertainties

18   surrounding the COVID-19 pandemic, "it became necessary for me to take action

19   regarding how the election will be conducted").)

20        Moreover, the Court finds that the Secretary has authority based on the plain

21   reading of NRS §§ 293.213(4) and 293.247 to prescribe regulations, like the Plan here, to

22   allow for voting by mail. Particularly, § 293.213(4) gives the Secretary authority to approve

23   mailing precincts. As noted *supra*, Plaintiffs merely claim that NRS § 293.213(4) was not

24   intended to apply to the whole state. (ECF No. 2 at 4 n.5.) But § 293.213(4) does not

25   suggest such a reading because it effectively operates as an exception to the preceding

26   sections—*e.g.*, subsections (1) and (3), which permits mailing precincts if fewer than 20

27   registered voters reside in a precinct, or fewer than 200 ballots were cast in the precinct

28   in the last general election, respectively. At minimum, the Secretary had the authority to

interpret § 293.213(4) to permit her to act in concert with county election officials to allow for voting by mail in all precincts pursuant to § 293.247(4). *See* NRS § 293.247(4) ("providing that the Secretary "may provide interpretations and take other actions necessary for the effective administration of the statutes and regulations governing the conduct" of the state's elections). Section 293.247(3) also requires the Secretary to prescribe, among other things, "[s]uch other matters [i.e., forms, procedures, etc.,] as determined *necessary* by the Secretary of State." NRS § 293.247(3)(g).

The Court's conclusion regarding the Secretary's authority further applies to Plaintiffs' third claimed inconsistency. (ECF No. 2 at 4.) Plaintiffs' third assertion of inconsistency also relies on NRS §§ 293.205 and .206 and similarly contends that these sections "indicate[] the [Nevada] Legislatures' intent for such precincts for in-person voting, not that the whole election be subsumed under an exception allowing mailing districts in certain circumstances." (*Id.*) Again, this argument in no way undermines the Secretary's implementation of all-mail voting in light of the authority the Nevada Legislature has vested with the Secretary to, for example, act *as she determines necessary. See* NRS § 293.247(3)(g), (4). Nor does Plaintiffs' follow-on claim that the noted NRS sections reflect the Nevada Legislature's intent "to have *regular* in-person voting and actual absentee-ballot as the controlling model" renders the Plan inconsistent. (*Id.* at 4–5.) This latter argument is beside the point. Implementation of the Plan is a one-off situation triggered by a pandemic. It therefore would not contravene the legislature's intent "as [to] the controlling model." What is evident is that the Secretary's challenged action here also comports with the legislature's intent. Plaintiffs' third argument of inconsistency therefore fails.

Finally, Plaintiffs contend in briefing, without citing to any particular provision, that where mailing precincts are created, "county clerk[s] shall, at least 14 days before establishing or designating a precinct as a mailing precinct . . . cause notice of such action to be: (a) Posted [as prescribed] . . . ; and (b) Mailed to each Assemblyman, [etc. as prescribed]" and argue that the Plan "supplant[s]" this requirement. (*Id.* at 5.) The Court

1  nonetheless confirmed that the applicable provision is NRS § 293.213(5). Plaintiffs'

2  argument, as written, does not in fact contend that this provision is "inconsistent" with the

3  legislature's prescribed manner, but rather that the Plan displaces the requirement.

4  Nonetheless, the Washoe Registrar has declared under penalty of perjury that she

5  provided notice as required under NRS § 293.213(5). (ECF No. 50.)[16] The argument is

6  therefore a moot point—though standing alone it would not likely amount to a constitutional

7  violation.

8      In sum, the Court finds that Plaintiffs' various arguments that the Plan's all-mail

9  election provisions are inconsistent with Nevada's election laws and thereby violate the

10  U.S. Constitution all fail. The Court turns to Plaintiffs' fifth claim.

11          **3.     Plaintiffs' Fifth Claim**

12      Plaintiffs' fifth claim essentially extends from Plaintiffs' second and fourth

13  arguments. In this claim, Plaintiffs argue that the Plan violates the right to a republican

14  form of government under the United States Constitution, U.S. Const., Article IV, § 4

15  (Guarantee Clause). (ECF No. 2 at 18–20.) More specifically, Plaintiffs argue that the Plan

16  violates "the very foundational rights of the [Plaintiffs] to a republican form of government

17  and to vote in [a] manner established under a republican form of government." (*Id.* at 18–

18  19.) Plaintiffs nevertheless concede that this issue may be deemed a nonjusticiable

19  political question that this Court should not reach. (*See* ECF No. 2 at 19; ECF No. 43 at

20  8.) That alone is reason for this Court not to consider this claim. In any event, as a logical

21  extension of the Court's conclusions *supra*, the Court disagrees that the Plan is repugnant

22  to a republican form of government. Therefore, this claim fails even accepting *arguendo*

23  that it is a cognizable claim.

24  ///

25  ///

26  ///

27  ———————————

28      [16]The Court inquired about NRS § 293.213(5) at the Hearing and the Washoe Registrar represented that the section was complied with. The Court then permitted the Washoe Registrar to submit a declaration attesting to her representation.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 4.    Plaintiffs' Third Claim

Plaintiffs' third claim is that the Plan violates the right to vote under the *Purcell* principle. (ECF No. 2 at 16–17.) It is not clear that this is even a cognizable claim, though Plaintiffs' contention contains other defects that render the purported claim meritless, which the Court discusses.

In *Purcell*, the Supreme Court vacated an order of the Court of Appeals for the Ninth Circuit enjoining operation of Arizona voter identification procedures. 549 U.S. at 2.  The Supreme Court's ultimate ruling to vacate the Ninth Circuit's order resulted in the subject Arizona election proceeding "without an injunction." *Id.* at 6.

The ruling district court had denied the plaintiffs' request for an injunction to enjoin Arizona's voter identification requirements. *Id.* at 3. In ruling, the district court did not issue findings of facts or conclusions of law. *Id.*[17] The plaintiffs appealed and the Ninth Circuit set forth a briefing schedule that would have closed two weeks after the election. *Id.* The circuit court ultimately issued a four-panel order, about a month before the election, enjoining the enforcement of the Arizona requirement pending disposition after full briefing. *Id.* The court "offered no explanation or justification" for its decision in the order or upon a subsequent reconsideration. *Id.*

The Supreme Court's decision to vacate the Ninth Circuit's order emphasized the "imminence of the election and the inadequate time to resolve the factual disputes" as well as the possibility that a court's order, or conflicting orders concerning election provisions, may result in voter confusion. *Id.* at 4–6.[18] The Court underscored that such possibility

///

///

---

[17] The Court noted that "[t]hese findings were important because resolution of legal questions in the Court of Appeals required evaluation of underlying factual issues." *Purcell*, 549 U.S. at 3.

[18] In vacating the circuit court's decision, the Court concluded that the Ninth Circuit failed to necessarily give deference to the district court, although recognizing that the district court had not yet made factual findings. *Purcell*, 549 U.S. at 5. The Court also found that the circuit court's decision failed to show that the "ruling and findings of the District Court [were] incorrect." *Id.*

1  should caution courts in deciding whether to grant or deny an injunction as an election

2  draws closer. *Id.*

3          This Court finds, as argued by Defendants (ECF No. 25 at 21–23, ECF No. 28 at

4  11), Plaintiffs' reliance on *Purcell* is wholly inapposite to Plaintiffs' position and ultimate

5  goal here—for the Court to issue an injunction.[19] To be sure, *Purcell* does not appear to

6  support the Court deciding the PI Motion. Nonetheless, the Court considers and rejects

7  Plaintiffs' specific contention that, as to courts, *Purcell* "applies to state and local election

8  administrators" because "election-alerting actions pose the same risk" as to both. (*Id.* at

9  16; *see also id.* at 17.) Plaintiffs provide no support for treating courts and states the same

10  under *Purcell.* Clearly, courts and states serve very different functions in our system of

11  governance, including in relation to prescribing the rules that govern an election. It is

12  obvious in this regard that the states ordinarily do what the courts cannot—prescribe voting

13  regulations. The Secretary, acting on behalf of the State of Nevada, has done so here,

14  and the Court finds the contention that *Purcell* prohibits the state doing so meritless.

15  Accordingly, Plaintiffs' third claim fails.

16          In sum, the Court finds that Plaintiffs have not established the merits of any of their

17  five claims raised in the Verified Complaint.

18          **C.     Balancing of the Equities**

19          The Court further finds that a balancing of the equities favors Defendants and

20  Intervenor-Defendants.

21          "To determine which way the balance of the hardships tips, a court must identify

22  the possible harm caused by the preliminary injunction against the possibility of the harm

23  caused by not issuing it." *Univ. of Haw. Prof'l Assembly v. Cayetano*, 183 F.3d 1096, 1108

24  ///

---

25          [19]Plaintiffs also reference the recent Supreme Court decision in *Republican Nat'l
26  Comm. v. Democratic Nat'l Comm.* ("*RNC*"), No. 19A1016, 2020 WL 1672702 (U.S. Apr.
6, 2020). (ECF No. 2 at 16–17.) In RNC, the Supreme Court relevantly stated: "This Court
27  has repeatedly emphasized that lower federal courts should ordinarily not alter the election
rules on the eve of an election." *Id.* at *1 (citing *Purcell*; *Frank v. Walker*, 574 U.S. 929
28  (2014); and *Veasey v. Perry*, 574 U. S. __, 135 S. Ct. 9 (2014)). Thus, *RNC* is equally
unsupportive of Plaintiffs' ultimate request for an injunction.

1   (9th Cir. 1999). The Court must then weigh "the hardships of each party against one
2   another." *Id.*

3        As indicated above, even accepting Plaintiffs' purported harm to them of being
4   disenfranchised due to vote dilution, such disenfranchisement could be, even more
5   concretely, claimed in the absence of the Plan (and additionally by confusion that may
6   result by the Court enjoining the Plan, and appeal—which would surely follow). The Court
7   therefore concludes that, at minimum, the Plan's all-mail election implementation to
8   protect the public during a public health crisis tips the scale of equity in favor of Defendants
9   and Intervenor-Defendants (i.e., against the issuance of an injunction).

10       **D.     The Public Interest**

11       "In exercising their sound discretion, courts of equity should pay particular regard
12   for the public consequences in employing the extraordinary remedy of injunction." *Winter*,
13   555 U.S. at 24. It is clear that as triggered by the uncertainties of COVID-19, the public's
14   interests align with the Plan's all-mail election provisions. As provided above, an injunction
15   precluding Defendants' use of mail ballots in the June 9, 2020 Primary would put
16   Nevadans at risk and may result in the very type of confusion that *Purcell* cautions against.

17       In short, the Court finds that Plaintiffs have not proven that they are entitled to have
18   this Court enjoin the Plan's challenged provisions.

19   **V.     CONCLUSION**

20       The Court notes that the parties made several arguments and cited to several cases
21   not discussed above. The Court has reviewed these arguments and cases and determines
22   that they do not warrant discussion as they do not affect the outcome of the issues before
23   the Court.

24   ///
25   ///
26   ///
27   ///
28   ///

It is therefore ordered that Plaintiffs' motion for preliminary injunction (ECF No. 2) is denied for the reasons provided herein.

DATED THIS 30th day of April 2020.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE