1  David O'Mara (Nev. bar #8599)
   The O'Mara Law Firm, P.C.
2  311 E. Liberty Street
   Reno, NV 89501
3  Telephone: 775/323-1321
   David@omaralaw.net
4  *Local Counsel for Plaintiffs*
   James Bopp, Jr. (Ind. bar #2838-84)*
5       jboppjr@aol.com
   Richard E. Coleson (Ind. bar #11527-70)*
6       rcoleson@bopplaww.com
   Corrine L. Youngs (Ind. bar #32725-49)*
7       cyoungs@bopplaw.com
   Amanda L. Narog (Ind. bar #35118-84)*
8       anarog@bopplaw.com
   True the Vote, Inc.
9    Voters' Rights Initiative
   The Bopp Law Firm, PC
10 1 South Sixth St.
   Terre Haute, IN 47807–3510
11 Telephone: 812/877-4745
   *Appearing Pro hac vice
12 *Lead Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

**Stanley William Paher**, **Terresa Monroe-Hamilton**, and **Garry Hamilton**, **Daryl Byron DeShaw**, **Jeff Ecker**, **Gary Gladwill**, **Linda Barnett**, and **Nevada Right to Life**, *Plaintiffs*

*v.*

**Barbara Cegavske,** in her official capacity as Nevada Secretary of State, **Deanna Spikula**, in her official capacity as Registrar of Voters for Washoe County, and **Joseph P. Gloria**, in his official capacity as Registrar of Voters for Clark County, *Defendants*

Case No.: 3:20-cv-00243

**Plaintiffs' Second Preliminary-Injunction Motion**

Based on their Amended Complaint, Plaintiffs move for a preliminary injunction on four claims. (I) Violation of their right to vote by *direct* disenfranchisement; (II) violation of their right to vote by *vote-dilution* disenfranchisement; (III) violation of their right to vote in, and have, an election in a manner prescribed by the legislature, U.S. Const. art. I, § 4, cl.1; and (IV) violation by Clark County of right to vote and equal protection under the one-person-one-vote mandate of the First and Fourteenth Amendments. Fed. R. Civ. P. 65(a).

At issue are the State Plan (implemented by Washoe County) and the Clark County Plan. Under the *State Plan*, the Nevada Secretary of State ("Secretary") and Nevada county clerks and registrars of voters ("County Administrators") intend to conduct the June 9, 2020, Nevada pri-

1

mary election under an "all-mail election" plan ("State Plan").[1] Under the State Plan, the Secretary and County Administrators intend to mail unrequested absentee ballots (herein "mail-in ballots") to *active* registered voters, but qualified voters who are not active must request an absentee ballot. The *Clark County Plan* enhances the voting power of Clark County voters over voters in other counties. *See* Am. Compl. ¶¶ 33-47.

As the issues involve fundamental First Amendment rights, Plaintiffs ask the Court to waive security, Fed. R. Civ. P. 65(c), or require $1 to the Clerk. This Motion is based on the following Memorandum, pleadings and papers on record herein, and argument at the hearing on this matter. Expedition is requested due to the nearness of the June 9 primary and the need for the plans to be enjoined well before then to allow the Secretary and County Administrators to do what they lawfully may under the controlling statutes enacted by the Legislature.

May 13, 2020                                    Respectfully submitted,

                                                /s/ Amanda L. Narog
                                                Amanda L. Narog (Ind. bar #35118-84)*
                                                *Lead Counsel for Plaintiffs*
                                                *Appearing Pro Hac Vice

## Memorandum of Points and Authorities

## Factual Background

**A.  COVID-10 risk is subsiding**

Amid COVID-19 concerns, policymakers adopted measures to protect public health. Those are being adjusted as old models predicting a high death rate and massive deaths proved inaccurate. Public officials are beginning to "re-open" the country as concerns decrease. Individuals remain free to engage in "essential activities," including governmental activities like in-person voting, subject to recommended safeguards to protect their health. As one may go to a grocery store, one may go vote in person following recommended safeguards.

These measures have been effective. The curve is flattening, the spread is being controlled, testing is increasing, the calculated death rate is lowering as tests show more people had mild

---

[1] *See* https://www.nvsos.gov/sos/Home/Components/News/News/2823/23 (Am. Compl. Ex. K); https://www.nvsos.gov/sos/elections/voters/absentee-voting (Am. Compl. Ex. J). All links herein were last checked on May 13, 2020.

cases, and total deaths are lower than originally projected.[2] So states are relaxing stay-at-home orders, reopening (inter alia) retail businesses, restaurants, gyms, beaches, and salons and restarting elective medical procedures.[3] Many states not yet re-opening plan to do so in May. *Id.* Social distancing and good hygiene are effective ways to stop transmission of the virus.[4] Social distancing means "deliberately increasing the physical space between people to avoid spreading illness. Staying at least six feet away from other people lessens [the] chances of catching COVID-19."[5]

These recommended safeguards are effective to prevent the spread of the virus for in-person voting.[6] No causal link connects in-person voting and a spike in COVID-19, as shown in the Wisconsin in-person election where COVID-19 cases did not spike.[7]

**B.   The Plans' noncompliance with the legislature's prescribed manner**

As noted in the Motion, the State Plan is to send mail-in ballots to all *active* registered voters, while Clark County plans to give Clark County voters advantages over other-county voters by mailing ballots to inactive voters and allowing harvesters to collect ballots. *See* Am. Compl.

---

[2] *See This is where all 50 states stand on reopening*, CNN.com, https://www.cnn.com/interactive/2020/us/states-reopen-coronavirus-trnd/; *see also Provisional Death Counts for Coronavirus Disease (COVID-19)*, Center for Disease Control and Prevention ("CDC"), https://www.cdc.gov/nchs/nvss/vsrr/covid19/index.htm; *COVIDView*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/; Y. Saplakoglu *Coronavirus death rate may be lower than previously thought*, LiveScience.com, Mar. 31, 2020, https://www.livescience.com/death-rate-lower-than-estimates.html(death rate is around .66%).

[3] *See This is where all 50 states stand on reopening*, CNN.com,  https://www.cnn.com/interactive/2020/us/states-reopen-coronavirus-trnd/.

[4] *See Coronavirus disease (COVID-19) advice for the public*, World Health Organization, https://www.who.int/emergencies/diseases/novel-coronavirus-2019/advice-for-public; *Stop the Spread of Germs*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/downloads/stop-the-spread-of-germs.pdf .

[5] *Coronavirus, Social and Physical Distancing and Self-Quarantine*, John Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/ coronavirus/coronavirus-social-distancing-and-self-quarantine.

[6] *See* AP, *Tennessee Official: Fear of Virus Not Reason to Vote by Mail*, May 20, 2020, https://www.nytimes.com/aponline/2020/05/12/us/ap-us-virus-voting-tennessee.html?smid=tw-share (listing safeguards for in-person voting; increased absentee ballots will be a challenge).

[7] D. Chen & J. Diedrich, *Two weeks after election, COVID-19 cases have not spiked in Wisconsin but experts urge caution about conclusions*, Milwaukee J. Sentinel, Apr. 22, 2020, https://www.jsonline.com/story/news/2020/04/22/covid-19-hasnt-spiked-after-wisconsin-election-experts-urge-caution/2997394001/

¶¶ 20-26; 33-47. These are not the legislature's balancing and prescribed manner as required.

First and foremost, the legislature nowhere created or authorized an all-mail or primarily all-mail election system for this primary with federal candidates. It allowed creation of mail-in precincts in counties with low votes and provided some authority for others, but only in a scheme where the exception would not swallow the rule. And to create new mailing precincts, the legislature mandated legal requirements for "establishing" or "designating" such a precinct:

(1)  The deadline to "establish[] election precincts" and "designate precincts" is "by on or before the third Wednesday in March of every even-numbered year"—March 18, 2020. § 205(1).[8]

(2)  Notice must be "posted in the manner prescribed for a regular meeting of the board of county commissioners" and mailed to many public officials, § 213 (5) (a) and (b), 14 days prior to "establishing or designating a precinct as a mailing precinct"—March 4, 2020. § 213 (5).

(3)  Prior approval from the Secretary to "establish a mailing precinct" must be obtained before the notices required by § 213(5)(a) and (b) are sent out—before March 4, 2020. § 213(4).

(4)  The county clerk shall notify the Secretary and Legislative Counsel of boundaries of all election precincts by March 31, 206, after they are established and designated. § 205(1). It is unknown if or when the Washoe Registrar did this a second time after redesignating all precincts as mailing precincts.

(5)  Section 343 et seq. establishes the procedures for mailing precincts, "whenever the county clerk has designated a precinct as a mailing precinct." § 343(2)

So the deadline for establishing and designating a precinct as a mailing precinct was March 18 and the process needed to begin before March 4 with the approval of the Secretary.

The Washoe County Registrar did not comply with the legislature's prescribed manner:

(1)  Washoe County timely designated its precincts as in-person by notice to the Secretary on March 10, 2020, and Legislative Counsel on March 20, which was due March 31. Am. Compl. Exs. A, B. § 206.

(2)  Washoe County received approval from the Secretary to designate its precincts as mailing precincts on March 30. Am. Compl. Ex. C. Under the statutory deadlines, this had to be

---

[8] All section references to state law herein are to sections of NRS Chapter 293 ("Elections").

1    done before March 4. § 213(5).

2  (3)  Washoe County mailed public official notice of its proposed designation of all precincts as

3        mailing precincts on March 31, Am. Compl. Ex. D, and requested a notice to be published

4        also on March 31, Am. Compl. Ex. E. § 213 (5)(a) and (b). Under the statutory deadlines,

5        this needed to be done on or before March 4. § 206. 213(5).

6  (4)  On April 8 and thereafter, Washoe County published a notice designating all precincts as

7        mailing precincts as required by § 213(5)(a). Am. Compl. Ex. F.

8  (5)  The Washoe County Registrar claims that "the actual designation by my office of the mail

9        precincts occurred on April 20, 2020." ECF No. 50 at ¶ 4. Plaintiffs have requested a copy of

10       this "actual designation," but the notice was first published on April 8, so the "actual designa-

11       tion" was before expiration of the 14 day prior notice period required by § 213(5), i.e., April

12       22. Under the statutory deadlines, this needed to be done by March 18. § 205(1).

13  (6)  Plaintiffs have also requested a copy of any subsequent notice to the Secretary and Legisla-

14       tive Counsel of this actual designation on April 20 as required by § 206. The statutory dead-

15       line was March 31. § 206.

16  So instead of designating all the precincts as mailing precincts by March 18, the Washoe Regis-

17  trar designated them as mailing precincts on April 8, which is after the deadline. § 205(1).

18       The Clark County Registrar did not comply with the legislature's prescribed manner:

19  (1)  Clark County timely designated its precincts as in person by notice to the Secretary and Leg-

20       islative Counsel on March 30. Am. Compl. Ex. G. § 206.

21  (2)  Clark County requested approval from the Secretary to designate its precincts as mailing pre-

22       cincts on March 18, A. Compl. Ex. R, and received approval from the Secretary at some un-

23       known date thereafter. Under the statutory deadlines, this needed to be done before March 4.

24       § 213(5).

25  (3)  Clark County mailed public officials notice of its proposed designation of all precincts as

26       mailing precincts on March 30. § 213(5)(b). Am. Compl. Ex. S. Under the statutory dead-

27       lines, this needed to be done on or before March 4. § 206, 213(5).

28  (4)  On April 9, Clark County published a notice designating all of its precincts as mailing pre-

5

cincts required by § 213(5)(a). Am. Compl. Ex. H. Under the statutory deadlines, this needed to be done on or before March 4. § 206, 213(5).

(5)  Beginning on April 2, the Clark County Registrar provided public notice of that all precincts in Clark County would be mailing precincts and designated certain paces as "drop off locations" for mail ballots. Am. Compl. Ex. I. But this notice was first published on April 2 before the 14 day prior notice period required by § 213(5) began, since that notice, Am. Compl. Ex. H, wasn't published until April 9. Under the statutory deadlines, this needed to be done on or before March 18. § 205(1).

(6)  Plaintiffs have also requested a copy of any subsequent notice to the Secretary and Legislative Counsel of this actual designation of the mailing precincts, as required by § 206. The statutory deadline was March 31. § 206.

So instead of designating all the precincts as mailing precincts by March 18, Clark designated them as mailing precincts on or about April 2, which is after the deadline. § 205(1).

**C.   Mail-in-ballot fraud risk**

Vote buying, coercion, and fraud occur with mail-in voting, as courts have recognized, making this a cognizable issue and interest for balancing that need not be proven. *See, e.g.*, *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191-97 (2008); *Griffin v. Roupas*, 385 F.3d 1128, 1130-31 (7th Cir. 2004). Nonetheless, examples abound. *See, e.g.*, M. Fernandez, *Texas Vote-Buying Case Casts Glare on Tradition of Election Day Goods*, N.Y. Times, Jan. 12, 2014, https://www.nytimes.com/2014/01/13/us/politics/texas-vote-buying-case-casts-glare-on-tradition-of-election-day-goads.html; P. Elliott, *Why North Carolina's Election Fraud Hurts American Democracy*, Time USA Mag., Feb. 22, 2019, https://time.com/5535292/northcarolina-election-fraud/. In *U.S. v. Brown,* mail-in ballots were required to be notarized and notaries were sent to steal ballots from mailboxes and fill them out fraudulently, largely targeting impoverished minorities. 494 F. Supp. 2d 440, 457 (2007). *See also* R. Gonzales, *North Carolina GOP Operative Faces New Felony Charges That Allege Ballot Fraud*, NPR, July 30, 2019, https://www.npr.org/2019/07/30/746800630/north-carolina-gop-operative-faces-new-felo-nycharges-that-allege-ballot-fraud; F. Lucas, *15 Election Results That Were Tossed Over Fraudu-*

*lent Mail-In Ballots,* Daily Sig. (2020), https://www.dailysignal.com/2020/04/21/15-election-results-that-were-thrown-out-because-of-fraudulent-mail-in-ballots/. Absentee ballots can be filled out in private by someone other than the voter or by voters subject to undue influence. An Oregon survey found 5% of voters admitted someone else filled out their ballot. *A 'Modern' Democracy That Can't Count Votes*, L.A. Times, Dec. 11, 2000, https://www.latimes.com/archives/la-xpm-2000-dec-11-mn-64090-story.html. The benefits of the secret ballot are lost where people living together fill out ballots with others near. Absentee ballots have been filled out fraudulently for ineligible, false, impersonated, or duplicate voter registrations. *See, e.g., U.S. Has 3.5 Million More Registered Voters Than Live Adults—A Red Flag For Electoral Fraud*, Investor's Bus. Daily, Aug. 16, 2017, https://www.investors.com/politics/editorials/u-s-has-3-5-million-more-registered-voters-than-live-adults-a-red-flag-for-electoral-fraud/ https://www.investors.com/politics/editorials/u-s-has-3-5-million-more-registered-voters-than-live-adults-a-redflag-for-electoral-fraud/; *Oregon AG gets guilty plea voter fraud case*, Oregon Catalyst, Sept. 18, 2010, https://oregoncatalyst.com/3510-oregon-ag-gets-guilty-plea-voter-fraud-case.html.

So it is unsurprising that The Heritage Foundation has been able to compile *A Sampling of Recent Election Fraud Cases from Across the United States* with 1,285 cases of documented voter fraud in recent years. *See* https://www.heritage.org/voterfraud. *See also* K. Samalis-Aldrich & H. von Spakovsky, *Database Swells to 1,285 Proven Cases of Voter Fraud in America*, Daily Signal, May 9, 2020, https://www.dailysignal.com/2020/05/09/databaseswells-to-1285-proven-cases-of-voter-fraud-in-america/; The Heritage Foundation, *Standards for Absentee Ballots and All-Mail Elections: Doing It Right ... and Doing It Wrong*, https://www.heritage.org/sites/default/files/2020-05/FS_188_NEW.pdf; H. von Spakovsky & J. Adams, *COVID-19 and Ebola: What We Can Learn from Prior Elections*, https://www.heritage.org/election-integrity/report/covid-19-and-ebola-what-we-can-learn-prior-elections (how Wisconsin and Liberia held safe elections in pandemics); H. Spakovsky, Potential for Fraud Is Why Mail-In Elections Should Be Dead Letter, Apr. 10, 2020, https://www.heritage.org/election-integrity/commentary/poten-

tial-fraud-why-mail-elections-should-be-dead-letter.[9]

**D.   Problems with a sudden flood of mailed ballots**

With a sudden flood of mail-in ballot requests, many are unlikely to receive a ballot. *See RNC v. DNC*, 206 L. Ed. 2d 452, 457; 2020 U.S. LEXIS 2195; 140 S. Ct. 1205(2020) (Ginsberg, J. dissenting) (the "surge in absentee-ballot requests has overwhelmed election officials, who face a huge backlog in sending ballots"). According to the Wisconsin Election Commission Administrator, several bins containing numerous ballots were found by state officials undelivered after the election, either "on their way to voters or already filled out and on their way back to clerks."[10] It was reported that over 9000 voters requesting a mail-in ballot never received one.[11] Similar problems occurred in Ohio.[12] The USPS would require a massive overhaul in operations to avoid a repeat of the Wisconsin events. The USPS has requested additional federal funding as they have been stretched thin to the brink of breakdown.[13] There are yet no funding appropriations for USPS operations in response to the surge in mail-in voting, and even when funding ar-

---

[9] Given the costs involved, mail-in voting is more expensive and complicated than the primarily in-person voting. The Brennan Center estimated costs of "maintaining in-person voting" nationally as $271.4 million. The estimated national cost for an all "vote by mail option" was $982 million – $1.4 billion. Lawrence Norden et al., *Report: Estimated Costs of Covid-19 Election Resiliency Measures*, Brennan Center for Justice (2020), https://www.brennancenter.org/our-work/research-reports/estimated-costs-covid-19-election-resiliency-measures .

[10] P. Marley, A. Dirr & M. Spicuzza, *Wisconsin is discovering problems with absentee ballots, including hundreds that were never delivered*, Milwaukee J. Sentinel, April 8, 2020, https://www.jsonline.com/story/news/elections/2020/04/08/wisconsi -election-3-tubs-ballots-found-mail-processing-center/2971078001/ .

[11] N. Corasaniti & S. Saul, *Inside Wisconsin's Election Mess: Thousands of Missing or Nullified Ballots*, N.Y. Times, Apr. 9, 2020, https://www.nytimes.com/2020/04/09/us/po-litics/wisconsin-election- absentee-coronavirus.html.

[12] The Center for Public Integrity, *Ohio's Mail-in Ballot Brouhaha: A Sign of Coming Trouble?*, Public Integrity, Apr. 28, 2020, https://publicintegrity.org/politics/elections/ohios-mail-in-ballot-brouhaha-a-sign-of-coming-trouble/. *See also* Meg Cunningham, *'More time would have been helpful': Ohio election officials face ballot issues due to postal service delays*, ABC News, https://abcnews.go.com/Politics/time-helpful-ohio-election-officials-face-ballot-issues/story?id=70333752

[13] Fandos & Tankersly, *Coronavirus Is Threatening One of Gov.'s Steadiest Services: The Mail*, N.Y. Times, 2020, https://www.nytimes.com/2020/04/09/us/politics/coronavirus-is-threatening-one-of-governments-steadiest-services-the-mail.html .

rives, improving staffing and capacity will take time. Mail-in ballots impact minorities nega-tively.[14] The fact that Nevada is sending mail-in ballots without request to active voters (and in-active in Clark County) does not evade the problems in Wisconsin and Ohio. The mail system in Nevada will still have to deliver and return the ballots. There will still be incorrect addresses. Election officials will still have to process the unusual flood. And inactive voters must request, receive, and return ballots, and are more likely to vote absentee given Defendants' push for all-mail voting and reduction of traditional polling places. Nevada is included in a list of states whose "infrastructure capabilities ... are similarly situated to Wisconsin."[15] Moreover, problems are happening now with similar mail-in ballot plans. News from New Jersey's third largest city reports that 800 mail-in ballots, about 6%, have been set aside because they were bundled—300 hundred bundled in one mailbox alone—and accusations of ballot fraud are flying while the pub-lic doubts election integrity. J. Dienst, *Voter Fraud Claims in Paterson*, May 12, 2020, NBC News N.Y., https://www.nbcnewyork.com/news/local/hundreds-of-mail-in-votes-already-set-aside-due-to-paterson-voter-fraud-claims/2414171/. "'There's people stealing them out of mail-boxes. I am getting phone calls from people who say they never received them,' Paterson City Council candidate Frank Filipelli said." *Id.* "There have been reports of postal workers leaving stacks of ballots in building lobbies because voting rolls have outdated addresses listed." *Id.* And "local council elections in Paterson have been decided by just dozens of votes. The hundreds of potentially fraudulent ballots have the potential to sway the outcome ...." *Id.* Similar problems are already happening in Nevada as verified by Daniel D. Virgilio, who reports that he found his own ballot outside his mailbox, discarded in part of a bundle of ballots. Am. Compl. Ex. O.

**E.   Injuries and irreparable harm to Plaintiffs**

Plaintiffs include registered, eligible voters who intend to vote in the upcoming primary of

---

[14] Tierney Sneed, *Vote-By-Mail, Critical In Pandemic, Poses Risks For Voters Of Color*, Talking Points Memo, Apr. 22, 2020. https://talkingpointsmemo.com/news/vote-by-mail-covid-19-minority-voters-obstacles.

[15] D. Root, Center for American Progress, *Wisconsin Primary Shows Why States Must Pre-pare Their Elections for the Coronavirus*, Apr. 27, 2020, https://www.americanprogress.org/is-sues/democracy/news/2020/04/27/484013/wisconsin-primary-shows-states-must-prepare-elections-coronavirus/.

the political party of their choice. Am. Compl.  ¶¶ 8-14. All will be disenfranchised in the pri-

mary if the Plans remain in place. First, the flood of ballots that will be beyond the abilities of

USPS and election workers (who were all expecting and preparing for the normal number of ab-

sentee ballots) to adequately handle, will result in ballots not sent, lost ballots, and tardy ballots,

resulting in direct disenfranchisement. Second, the flood of ballots will be beyond the abilities of

election workers to adequately process and monitor, resulting in more illegal ballots and

vote-dilution disenfranchisement. Third, there will not be a Manner-Clause-compliant election.

Fourth, Plaintiffs living outside Clark County will suffer a violation of their one-person-one-vote

rights under the Clark County Plan. The harms are irreparable; elections lack do-overs. Plaintiff

Gary Gladwill is a local candidate, who has already mailed in his ballot, but has the same risk of

direct and vote-dilution disenfranchisement, along with the added interest that he is likely to lose

ballots cast for him from voters suffering such disenfranchisement. Am. Compl. ¶ 13. Plaintiff

Nevada Right to Life ("NVRTL") asserts the interests of its members, who include registered,

eligible Nevada voters who intend to vote in the coming primary but fear disenfranchisement as

outlined herein. It is a central mission of NVRTL to educate and motivate prolife voters to sup-

port prolife candidates and to assist them to do so as needed. Am. Compl. ¶ 15.

## Argument

The Ninth Circuit uses a sliding-scale preliminary-injunction test:

> Plaintiffs ... must establish that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The Ninth Circuit weighs these factors on a sliding scale, such that where there are only "serious questions going to the merits"—that is, less than a "likelihood of success" on the merits—a preliminary injunction may still issue so long as "the balance of hardships tips *sharply* in the plaintiff's favor" and the other two factors are satisfied.

*Short v. Brown*, 893 F.3d 671, 675 (9th Cir. 2018) (citations omitted) (emphasis in original). On

the merits-success prong, "the burdens at the preliminary injunction stage track the burdens at

trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006).

**I.**

**Plaintiffs are likely to prevail on the merits because the U.S. Constitutional Amendments I and XIV and Article I, § 4, cl.1, require Nevada to follow the legislative mandate.**

Plaintiffs are likely to prevail on the merits because (**A**) only the legislature may lawfully balance ballot access and ballot fraud and prescribe the election manner, and it nowhere authorized all-mail-in-ballot voting, but rather in-person voting with modest mail-in voting. Based on what the legislature decided, the State and Clark County Plans will cause (**B**) *direct* disenfranchisement and (**C**) *vote-dilution* disenfranchisement. The Plans (**D**) are inconsistent with Article I, § 4, cl. 1. And (**E**) the Clark County Plan violates the Equal Protection Clause by treating counties differently in violation of the one-person-one-vote mandate.

**A.   Only the legislature may lawfully balance ballot access with election integrity, so its legislative mandate must be followed and its balancing establishes as a matter of law the presence of disenfranchisement risks.**

The U.S. Constitution "confers on states broad authority to regulate the conduct of elections, including federal ones." *Griffin*, 385 F.3d at 1130 (citing U.S. Const. art I, § 4, cl.1). "[S]triking ... the balance between discouraging fraud and other abuses and encouraging turnout is quintessentially a *legislative* judgment . . . ." *Id.* at 1131 (emphasis added). There is no right to vote absentee and absentee ballots pose special fraud risks, so only the legislature has the authority and is equipped to balance access and integrity in the absentee-ballot context. *Id.* at 1130-31.

The legislative judgment cannot be gainsaid based on what other states do because only *this* state's legislature has authority to balance and mandate what is needed in *this* state, including prescribing a manner that allows only a modest amount of absentee voting, which curtails the risk posed by mail-in ballots by keeping them to a modest percentage of all votes. "[S]tates that have more liberal positions for absentee voting may well have different political cultures ..., cultures less hospitable to election fraud." *Id.* So "[o]ne size need not fit all." *Id.*

Nor can the legislative judgment be gainsaid on the notion that a particular safeguard isn't needed because the legislature provided others. The legislature thought they *all* were required in its balancing. Specifically, as *Griffin* and *Crawford*, 553 U.S. at 193-96, recognize there is a known and greater risk of ballot fraud with absentee ballots than in-person voting. Knowing that risk, the legislature tightens or loosens absentee-ballot access to control the approximate percent-

age of absentee ballots on the basis of perceived risk. If the risk is deemed high, reducing the number of absentee ballots reduces the impact of absent-ballot vote fraud. And controlling the approximate percentage of mailed ballots is essential to prevent direct disenfranchisement because the U.S. Postal Service ("USPS") and election workers are overwhelmed by a sudden flood of mailed ballots for which they were unable to plan, resulting in lost and tardy ballots and vote-dilution because overwhelmed screeners are unable to do as careful a job of screening out illegal ballots. Defendants decision vitiates the legislature's balancing by throwing access wide open, which poses serious risks of direct and vote-dilution disenfranchisement. Other safeguards cannot repair the lost legislative balancing.

Maintaining the legislature's vital balance of absentee ballot access and election integrity is essential because "confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy" and "[v]oter fraud drives honest citizens out of the democratic process and breeds distrust of our government." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). The Seventh Circuit recently stayed an injunction by the U.S. District Court for the Western District of Wisconsin because it had given inadequate attention to the interest in preventing voter fraud by eliminating a witness requirement for absentee-ballot signatures: "This court is concerned with the overbreadth of the district court's order, which categorically eliminates the witness requirement applicable to absentee ballots and gives no effect to the state's substantial interest in combating voter fraud." *Democratic National Committee v. Bostelmann*, slip op. 3, Nos. 20-1538, 20-1539, 20-1545 & 20-1546 (7th Cir. Apr. 3, 2020) (citing *Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004)), *available at* https://moritzlaw.osu.edu/electionlaw/litigation/documents/DNC_v_Bost_BL-30.pdf. Defendants here have likewise made absentee-ballot access overbroad and given inadequate effect to the legislature's balancing to avoid fraud.

**B.   Discarding the legislature's balance of in-person and mail-in voting and throwing mail-in voting open to all violates the right to vote by causing numerous voters to suffer *direct* disenfranchisement.**

The Nevada Legislature exercised its exclusive balancing and manner authority and enacted detailed legislation (the "legislative mandate") governing how elections are to be conducted in NRS Title 24, Chapter 293 (titled "Elections"). The legislature did *not* prescribe an all-mail elec-

12

tion or even a predominantly by-mail election, but rather an in-person election with limited mail-vote exceptions. By not prescribing such a mail-in-ballot voting scheme, the legislature exercised its balancing and manner authority to decide *not* to impose the overwhelming flood of a mail-in ballot system on the USPS and election workers—*especially* not suddenly as here.[16]   Yet under the State Plan, Defendants intend to conduct the primary by sending mail-in ballots to all *active* voters, so there is a sudden surge of mailed ballots that will be difficult to account for and process, and because of limited in-person voting there will be a surge of absentee ballot requests from those who did not get a mailed ballot. The Clark County Plan will send mail-in ballots to *both* active and inactive voters. But the legislative mandate cannot be gainsaid. The rule of law may not be ignored, even amidst diminishing COVID-19 concerns. To the extent measures need to be taken to protect public health, those may not *alter* the legislative mandate. Rather, safety measures must be taken *within* what the legislative mandate by employing safety measures recommended for essential activities to in-person voting.

A "state election law" is reviewed under *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). But the legislative mandate is not being challenged. Rather the Plans replace it and Plaintiffs defend it. The Plans fail the *Burdick* test, which requires "weighing 'the character and magnitude of the asserted injury to the rights . . . that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,'" considering "'the

---

[16] In *Purcell*, 549 U.S. 1 (2006), the Supreme Court recognized that voting-rule changes near an election *themselves* "result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase," *id.* at 4-5. So near-election changes are discouraged. Because that principle is anchored in the right to vote, its logic applies to Defendants who changed the rules near an election because their actions pose that risk. Of course this court can *repair* near-election changes that violate constitutional rights, as the Supreme Court recently did in *Republican National Committee v. Democratic National Committee*, No. 19A1016, 2020 U.S. LEXIS 2195 (U.S. Apr. 6, 2020) (per curiam), though *RNC* said "courts should *ordinarily* not alter the election rules on the eve of an election." 2020 U.S. LEXIS 2195, at **2-3 (emphasis added). But *RNC* stayed an order allowing voters to mail absentee ballots after election day. *RNC* recited various problems that the lower-court order posed and said they "underscore[] the wisdom of the *Purcell* principle." *Id.* at **3. A crucial point was that the lower-court order "fundamentally alters the nature of the election." *Id.* Here, Defendants have fundamentally altered the nature of absentee-ballot voting and that near-election harm should be repaired here. *RNC* shows that Defendants cannot do a *Purcell* principle violation and then assert that principle to avoid judicial review to protect fundamental rights.

extent to which those interests make it necessary to burden the plaintiff's rights.'" *Id.* at 434 (citation omitted). Strict scrutiny applies to "'severe' restrictions," but "reasonable, nondiscriminatory restrictions" only get rational-basis review and typically survive, *id.* at 434. As disenfranchisement is a severe burden, *see, e.g.*, *LWV of N.C. v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014); *Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580, 597 (6th Cir. 2012), Defendants must prove the Plan narrowly tailored to a compelling governmental interest.

**1.   A sudden increase in mailed-in ballots contrary to the legislative mandate will cause numerous voters to suffer direct disenfranchisement.**

As established in *Burdick*, once a voter challenges a provision, the justification of that provision requires examining the impact on all voters. Mr. Burdick wanted to do banned write-in voting, but the Court held "[i]t is critical to understand that [his] case is not an isolated example," and "at least some voters would cast write-in votes for other candidates if given the option. 504 U.S. at 442-43. Based on that analysis, the impact on all voters must be considered here.

As shown in the Factual Background, Facts(D), recent experience with large surges in the number of mail-in ballots has caused numerous voters to suffer direct disenfranchisement. For example, while there was no sudden spike in COVID-19 cases after Wisconsin's *in-person* primary, *supra* at 3 & n.7, that *absentee-ballot* experience disenfranchised many voters, *supra* Facts(D). A sudden surge of mail-in ballots is guaranteed here because the Plans are sending them out, including for inactive voters in the Clark County Plan, and absentee-ballot requests will also surge because of the limited in-person opportunities and Defendants' promotion of a mail-in election. Experience elsewhere indicates that the resulting large surge in mailed ballots will result in disenfranchisement from lost or tardy ballots coming and going through the USPS from to election workers, with postal and election workers overwhelmed by the flood. Moreover, those who don't get a mailed ballot must jump through extra hoops to get one, and might not get one due to the same sudden-flood problems, and with limited in-person voting options they may be unable to vote, either due to the distance to the polling place or the overwhelming numbers who try to vote at the same place. Though the foregoing suffices to establish that numerous voters will be disenfranchised, it is vital to note that the *legislature* found its own limit to the usual percentage of absentee ballots to be necessary as expressed in the fact that it nowhere

prescribes an all-mail or primarily all-mail election. That establishes the disenfranchisement harm as a matter of law. In sum, the sudden flood of mail-in ballots poses a substantial risk that Plaintiffs and many other voters who use the mail-in ballots will not have them counted. That violates their right to vote by direct disenfranchisement.

**2.   In-person voting is an essential activity that may be safely pursued following recommended safeguards for those engaging in other essential activities and is no greater burden than that held "reasonable" in *Crawford*.**

In-person voting is essential activity, like going to the grocery. The recommended safeguards for shopping apply to in-person voting. Those safeguards (social distancing, sanitizing, masks, etc.) are designed specifically to keep people safe while doing essential activities. Wisconsin had an in-person election, with such safeguards, including plexiglass shields between election-board workers and voters, and there was no resulting spike in COVID-19. *See supra* at 3 & n.7. Defendants' Plans are based on speculation of great risk based on models since shown to be flawed. But harms and risks associated with COVID-19 are receding and society is reopening, *see supra* Facts (A), which undercuts the purported justification for the Plans in balancing.

A benchmark for a reasonable burden that readily survives a *Burdick* balancing is in *Crawford*, 553 U.S. 181, which held it not unreasonable to require those lacking photo identification to vote to bear "the inconvenience of going to the Bureau of Motor Vehicles, gathering required documents, and posing for a photograph" to get a free ID card because that did "not qualify as a substantial burden on most voters' right to vote ...," *id.* at 198 (Stevens, J., joined by Roberts, C.J., and Kennedy, J.) (controlling op.). And that burden was mitigated by the fact that voters could vote a provisional ballot and then "travel to the circuit court clerk's office within 10 days to execute the required affidavit." *Id.* at199. And that burden "is unlikely ... [to] pose a constitutional problem ...." *Id.* "And even assuming that the burden may not be justified as to a few voters, that conclusion is by no means sufficient to establish" the facial relief sought. *Id.* at 199-00. These reasonable burdens were closely related to legitimate state interests in "election modernization" (including cleaning up voter roles recognized to contain unqualified voters), preventing "voter fraud," and "safeguarding voter confidence." *Id.* at 192-97. *Crawford* recognized that vote fraud exists and is more associated with absentee ballots than in-person voting. *Id.* at 194-96.

Since the burden of required travel and inconvenience in *Crawford* was reasonable and justified for the voter-identification requirement despite some possible harm to some persons, Defendants must prove any burden here is substantially greater and not similarly a reasonable requirement for most people. But practicing the recommended safeguards for engaging in essential activities is no greater burden than the burden found reasonable in *Crawford*, so it is a reasonable, nondiscriminatory restriction that is readily justified in balancing by state interests in election integrity. And even if the legislative mandate might be a problem for a small number, that in no way justifies the facial replacement of the legislative mandate with the Plans. *Id.* at 199-200.

### 3.  Applicable balancing establishes that the Plans violate the right to vote by *direct disenfranchisement.*

In balancing interests, recall that the legislature already *did* the controlling balancing here in its legislative mandate and Plaintiffs simply defend what the *legislature* authoritatively decided is required for this state to avoid direct and vote-dilution disenfranchisement. That should control. So considering the legislature's balancing in a *Burdick* balancing provides a foundation for *Burdick* balancing of the Plans. The legislature's decision *not* to prescribe statewide mail-in voting is a "reasonable, nondiscriminatory restriction" under *Burdick*. Compared to *Crawford*'s benchmark, primarily state-wide in-person voting under recommended safeguards for doing essential activities is no less reasonable than burdens in *Crawford*. So the well-established state interests in preventing direct and vote-dilution disenfranchisement resulting from a sudden flood of absentee-ballot voting readily justify the original legislative mandate.

Given that the legislative mandate readily survives *Burdick* balancing, Defendants must justify supplanting it with their Plans. Given that disenfranchisement is a severe burden, they must prove their Plans narrowly tailored to a compelling state interest. Preliminarily, note that the Plans are a facial remedy, not one applied to those specially at risk, Defendants essentially held the legislative mandate unconstitutional facially. So they must satisfy the test in *United States v. Salerno*, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid"). So at a minimum, the remedy the Plans impose should have been as applied to those specially at risk. Instead, Defendants replaced the

16

legislative mandate with overbroad mail-in-ballot Plans. That overbreadth alone dooms the Plans under *Burdick*. As the Supreme Court said when applying *Burdick* and *Salerno* in *Crawford*, one ought not invalidate the whole provision.

> A facial challenge must fail where the statute has plainly legitimate sweep. When we consider the statute's broad application to all Indiana voters, we conclude that it imposes only a limited burden on voters' rights. The precise interests are advanced by the State are therefore sufficient to defeat petitioners' facial challenge. ... [P]etitioners have not demonstrated that the proper remedy—even assuming an unjustified burden on some voters—would be to invalidate the entire statute.

553 U.S. at 202-03 (quotation marks and citations omitted). *See also Bostelmann*, slip op. 3,[17] (lower court facial remedy "categorically eliminates the witness requirement applicable to absentee ballots and gives no effect to the state's substantial interest in combating voter fraud"). This tailoring analyses proves Defendants cannot meet their burden to prove that their facial remedy is narrowly tailored to a compelling state interest. Regarding interests, Defendants will say COVID-19 made the Plans necessary because the legislative mandate would have caused disenfranchisement. But that fails for at least three reasons.

First, for disenfranchisement to compel a change to the legislative mandate, there must have been state action. But no state action would have caused the disenfranchisement, rather any disenfranchisement would result from COVID-19 concerns and personal choices as to how to react to them. Civil-rights claims require state action. But COVID-19 and resulting problems "are not impediments created by the State." *Bethea v. Deal*, 2016 WL 6123241, at *2 (S.D. Ga. Oct 19, 2016). Defendants believe the state has passive liability for not *changing* its law in the face of issues not of its making, which is not the sort of claims *Burdick* balances. *Bethea, id.* at *2-3 (no "precedent that would constitutionally or statutorily mandate that Defendants provide an extension in the absence of any actual government action that burdens an individual's right to vote"). So the legislative mandate did not, could not, cause disenfranchisement.

Second, even if cognizable as state action (it is not) the idea that the legislative mandate might cause elective, self-disenfranchisement due to COVID-19 is built on speculation likely based on early, badly flawed models of COVID-19 with an erroneously high fatality rate and exorbitant numbers of predicted death. Those models proved wrong. Unlike early predictions, hos-

---

[17] *See* https://moritzlaw.osu.edu/electionlaw/litigation/documents/DNC_v_Bost_BL-30.pdf.

pitals are not being overwhelmed, ventilators are at a surplus for the extremely rare patient who needs one, treatments have been developed and more are coming, deaths have declined dramatically, increased testing shows that large numbers of individuals had COVID-19 with mild or no symptoms (so the calculated fatality rate of COVID-19 is dropping dramatically), testing is becoming widespread to better detect who has antibodies[18] and who has active disease (so they can be isolated), and society is reopening as a result of all these improvements. These are things of which this court can and should take judicial notice. There is no reason most people can't vote under recommended safeguards to protect those engaged in such essential services. Wisconsin's recent primary shows that in-person voting could be held even earlier in the COVID-19 outbreak with the usual safeguards for essential activities without a resulting spike in COVID-19 caused by voting. *See supra* at 3 & n.7. So the notion that individuals must choose between voting and their health is overblown and overbroad. If there were ever any validity to the notion that "government action" by *inaction* was disenfranchising persons because some thought they had to choose voting or their health, that notion is now invalid for most people. So there is no justification for the Plans' facial remedy.

Third, we now know from experience with Wisconsin and other recent elections, that the sudden flood of mailed ballots, which Defendants are causing, *itself* causes disenfranchisement. *See supra* Facts(D). So numerous state voters will be disenfranchised by the Plans.

So Defendants cannot prove the Plans narrowly tailored or supported by compelling interests in displacing the legislative mandate and causing widespread *direct* disenfranchisement.

**C. Discarding the legislature's determination that voting should be primarily in person, and mailing absentee ballots without request violates the right to vote by causing numerous voters to suffer *vote-dilution* disenfranchisement.**

The legislature determined (by its sole balancing authority and expertise) that most voters should vote with the statutory safeguards that accompany in-person voting and *by-request* absentee ballots.[19] The Plans flood the state with unrequested absentee ballots, even to inactive voters in Clark County. That means that, there will be ballots left for persons who have moved or whose

---

[18] As herd immunity to viruses typically develops as more people get the virus and recover, Defendants would have to prove that this would not be the case with this virus.

[19] These include the statutory procedures for in-person and absentee-ballot voting.

address has otherwise changed, laying open the risk of absentee ballots being readily available for absentee-ballot fraud. And unrequested ballots will arrive at addresses where people are not expecting them and are liable to be ignored, discarded, put in a pile to allow any viruses to die, etc., increasing the risk of the ballots not being cast or of being cast by others.  But the legislature determined that, given the known risk of absentee-ballot fraud, the percentage of absentee votes must be limited to a typical percentage and not be transformed into all-mail voting by having the exception become the rule, and without request. That balancing and judgment may not be gain-said. As a result of the forbidden increase in absentee votes and resulting increase in illegal votes, legal votes will be diluted, and vote dilution is a form of forbidden disenfranchisement.

The fundamental right to vote is well-established: "Undeniably the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections" and to have that vote counted. *Reynolds*, 377 U.S. at 554. "[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Id.* at 555. As the Plans will flood the state with absentee votes beyond what the legislature determined to be a safe percentage for this election to prevent absent-ballot fraud, numerous voters will have their votes diluted by illegal votes.

Under *Burdick*, Defendants must prove their Plans narrowly tailored to compelling interests. As just established, the Plans aren't narrowly tailored, their purported interest is not compelling, and the Plans actually *causes* disenfranchisement. That applies here too.

If Defendants argue that Plaintiffs lack standing because their vote-dilution claim is a generalized grievance, that argument fails for two distinct reasons arising form the generalized-grievance test in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992). Note *Lujan*'s two formulations:

- "a plaintiff raising only a generally available grievance about government—claiming only harm to his and *every citizens*'s interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy," *id.* at 560-61 (emphasis added), and

- "an injury amounting only to the alleged violation of a right to have the Government act in accordance with law [is] not judicially cognizable . . . [and] cannot alone satisfy the require-

1    ments of Art. III ....," *id.* at 575-76 (internal quotation marks and citation omitted).

2    So there are two questions: (1) is the claimant just a *citizen* trying only to make the government

3    do its job without more? and (2) is the claim the same claim held by "every citizen"? Because the

4    first of these questions is more specific, it is the core of the analysis. "[T]he proper inquiry is

5    whether the plaintiffs sue solely as *citizens* who insist that the government follows the law."

6    *Andrade v. NAACP of Austin*, 345 S.W.3d 1, (Tex. 2011) (citing E. Chemerinsky, *Constitutional*

7    *Law: Principles and Policies* 91 (3d ed. 2006)) (emphasis added). "[N]either *citizens* nor taxpay-

8    ers can appear before a court simply to insist that the government and its officials adhere to the

9    requirements of law." C.A. Wright et al., *Federal Practice & Procedure* § 3531.10 (3d ed. 2008)

10   (emphasis added). So mere "citizen" standing is the issue, and the present challenge is not a gen-

11   eralized grievance under the first or second question.

12        First, Plaintiffs don't bring their vote-dilution claim under mere "citizen" standing. Rather,

13   they assert personal harms from the violation of their own fundamental right to vote that is pro-

14   tected by the First and Fourteenth Amendments. They assert a constitutionally protected right,

15   and given the Supremacy Clause, U.S. Const. art. IV, para. 2, state officials must obey constitu-

16   tional mandates. Plaintiffs claim is also particularized. They don't challenge anything not directly

17   bearing on their vote-dilution claim, so they are not just trying to make the government do its job

18   in some general way but rather challenge that which particularly violates their right to vote. So

19   they are not mere citizens just trying to make the government do its job.

20        Second, Plaintiffs assert a harm that is not the same as for every "citizen." "The bar is based

21   not on the number of people affected—a grievance is not generalized merely because it is suf-

22   fered by large numbers of people." *Andrade*, 345 S.W.3d at 7 (citing Chemerinsky, *Constitu-*

23   *tional Law* 91). "[D]enying standing to persons who are in fact injured simply because many oth-

24   ers are also injured, would mean that the most injurious and widespread Government actions

25   could be questioned by nobody." *United States v. SCRAP*, 412 U.S. 660, 686-68 (1973).

26   "[W]here a harm is concrete, though widely shared, the Court has found injury in fact." *FEC v.*

27   *Akins*, 524 U.S. 11, 24 (1998). Plaintiffs' claim of harm here is actually three levels of specificity

28   below any harm suffered by "citizens." (1) Within the class of citizens are *registered* voters; only

those registered could suffer vote dilution. (2) Within the class of registered voters are *eligible* voters; only the eligible have a right to vote that could suffer vote dilution. (3) Within the class of registered, eligible voters are those who *actually vote*; only those who actually vote can have that vote diluted by illegal votes. So Plaintiffs' vote-dilution claim is highly particularized and not even close to *Lujan*'s citizen-standing definition of a generalized grievance.

So the Plans directly harm Plaintiffs and large numbers of other registered, eligible voters who vote, because the will cause vote-dilution disenfranchisement, an outcome the legislature expressly rejected for this election in its legislative mandate, which the Plans displace.

**D.   Discarding the legislative mandate violates U.S. Constitution Article I, § 4, cl. 1, which mandates that the legislature prescribe the manner of election.**

The Plans violate Plaintiffs' right to have, and to vote in, a federal election where the "Manner" of election is "prescribed . . . by the Legislature." U.S. Const. art. I, § 4, cl. 1. As federal candidates are on the ballot, the primary must be conducted in the legislature's prescribed manner. The Plans are contrary to the legislative mandate. In *Bush v. Gore*, 531 U.S. 98 (2000), the Supreme Court listed a similar provision requiring that elections for presidential electors be conducted in the manner chosen by the legislature as an issue in the case, but decided that it need not reach it because what the Florida Supreme Court had done fell so woefully short of what was required under the vote-dilution ban that the manner-of-election issue need not be reached. *Id.* at 103 ("whether the Florida Supreme Court established new standards for resolving Presidential election contests, thereby violating Art. II, § 1, cl. 2, of the United States Constitution"). Similarly here, the parallel Manner Clause issue need not need be reached because the disenfranchisement claims can readily decide the case. But if the Court doesn't decide this case on vote-dilution or another claim, the Manner Clause issue should be decided.

**E.   The Clark County Plan to enhance its voters' voting violates the equal-protection and right-to-vote rights of voters in other counties under the one-person-one-vote doctrine.**

Clark County plans to send mail-in ballots to not only active voters, as with the State Plan, but also to *inactive* voters. And it intends to send county-approved ballot harvesters to collect ballots. Those things give Clark County voters greater voting power than other-county voters. They enhance the odds of voters in Clark County being able to vote and have their votes counted

(while violating the legislature's controlling balancing of access and fraud risk by increasing the odds of ballot fraud). As a result, proportionally more votes will be obtained from Clark County, Nevada's most populous county, than from other counties—the difference will not be accounted for by population differences. From a political perspective, mining extra votes from Clark County favors the dominant political party there at the expense of voters in more rural counties of a different political persuasion as happened in Florida in *Bush*. And the fact that the vote harvesters are supposed to be *bipartisan* and collect *sealed* ballots doesn't alter the facts that (i) mining for votes in areas of known political persuasion will get more votes of that political persuasion and (ii) Clark County voters are empowered over other voters.

But empowering voters in one county to the disadvantage of voters in other counties violates a long line of one-person-one-vote authority that requires that citizens in one county not be disadvantaged compared to voters in other counties—precisely what the Supreme Court held was an impermissible violation of the right to vote (by dilution of vote values in other counties) and the Equal Protection Clause of the Fourteenth Amendment as discussed in *Bush*, 531 U.S. 98.

As *Bush* noted, the voters of one county may not have "greater voting strength":

> An early case in our one-person, one-vote jurisprudence arose when a State accorded arbitrary and disparate treatment to voters in its different counties. *Gray v. Sanders*, 372 U.S. 368 (1963). The Court found a constitutional violation. We relied on these principles in the context of the Presidential selection process in *Moore v. Ogilvie*, 394 U.S. 814 (1969), where we invalidated a county-based procedure that diluted the influence of citizens in larger counties in the nominating process. There we observed that "[t]he idea that one group can be granted greater voting strength than another is hostile to the one man, one vote basis of our representative government." *Id.*, at 819.

*Id.* at 107. The same disparate treatment occurred in the 2020 Florida election, where the Florida Supreme Court's plan was to include totals from two counties though "each of the counties used varying standards to determine what was a legal vote. Broward County used a more forgiving standard than Palm Beach County, and uncovered almost three times as many new votes, a result markedly disproportionate to the difference in population between the counties." *Id.* Because of this and similar equal-protection violations causing and risking vote dilution, "[s]even Justices of the Court agree[d] that there [were] constitutional problems with the recount ordered by the Florida Supreme Court that demand[ed] a remedy." *Id.* at 111. The Florida Supreme Court should have implement eda system *without* greater voting strength for one group, just as the Ne-

vada Legislature was required to adopt such a neutral system. But the Clark County Plan violates that. Just as the Florida plan had to be enjoined, the Clark County Plan must be enjoined.

*   *   *

As Plaintiffs have a strong likelihood of success on their claims, other preliminary-injunction factors follow, particularly since the right to vote is based on the First and Fourteenth Amendments. At a minimum, "'the balance of hardships tips *sharply* in [Plaintiffs'] favor' and the other two factors are satisfied." *Short*, 893 F.3d at 675 (citation omitted).

## II.
### A preliminary injunction is necessary to prevent irreparable harm to Plaintiffs' constitutional rights.

Plaintiffs have irreparable harm for reasons tracking their claims. They have no remedy at law if the Plans proceed and the election is held in violation of Plaintiffs' constitutional rights. If the Plans proceed, their rights to vote, to equal protection, and to a federal election compliant with the Manner Clause will be violated. Because "the right of suffrage is a fundamental matter in a free and democratic society." *Reynolds*, 377 U.S. at 561–62 (1964), "[c]ourts routinely deem restrictions on fundamental voting rights irreparable injury," *League of Women Voters of N.C. v. North Carolina* ("*LWVNC*"), 769 F.3d 224, 247 (4th Cir. 2014) (collecting cases). "[O]nce the election occurs, there can be no do-over and no redress," making the injury to "voters ... real and completely irreparable if nothing is done to enjoin [the challenged] law." *LWVNC*, 769 F.3d at 247. "[T]here are no mulligans" where voters are disenfranchised by denial of requested relief. *Fla. Democratic Party v. Scott*, 215 F. Supp. 3d 1250, 1258 (N.D. Fla. 2016). And the harm is imminent because the election is June 9 and the Plans are already being implemented.

## III.
### The balance of equities and the public interest support injunctive relief.

Where as here, Plaintiffs and numerous other voters will be disenfranchised, it is in the public interest that their right to vote be protected. There is no harm to a state if likely unconstitutional actions are preliminarily enjoined. *See, e.g.*, *Giovani Carandola v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002). "[U]pholding constitutional rights surely serves the public interest." *Id.* While safeguarding the public health is a traditional police power, the exercise of that power as

1  the Plans do is unjustified by COVID-19 concerns because (i) no state action was disenfranchis-

2  ing voters, (ii) for most, recommended safeguards for essential activities such as in-person voting

3  will keep them safe, (iii) the Plans overbroadly and facially send mail-in ballots without limiting

4  the remedy (assuming *arguendo* it is authorized), so the balancing of harms and public interest

5  was impermissibly skewed by from the beginning, (iv) we know from the experience in Wiscon-

6  sin and elsewhere that the Plan itself will cause disenfranchisement due to the sudden flood of

7  ballots, and such disenfranchisement is not in the public interest, and (v) nothing justifies em-

8  powering Clark County voters over other-county voters. Vitally, following the legislature's own

9  balancing of access and integrity, i.e., following the rule of law as expressed in the legislative

10  mandate, is strongly in the public interest and should outweigh all because only the legislature is

11  authorized and equipped to balance such interests and prescribe the manner of the election. Vio-

12  lating the fundamental rule of law as the Plans do is decidedly not in the public interest. The bal-

13  ance of harms and public interest favor the requested relief.

## Conclusion

15      For the reasons shown, this Court should preliminarily enjoin the Plan and provide the relief

16  in the Amended Complaint's Prayer for Relief.

18  May 13, 2020                                    Respectfully submitted,

20  David O'Mara (Nev. bar #8599)          /s/ Amanda L. Narog
    The O'Mara Law Firm, P.C.              James Bopp, Jr. (Ind. bar #2838-84)*
21  311 E. Liberty Street                     jboppjr@aol.com
    Reno, NV 89501                         Richard E. Coleson (Ind. bar #11527-70)*
22  Telephone: 775/323-1321                   rcoleson@bopplaww.com
    David@omaralaw.net                     Corrine L. Youngs (Ind. bar #32725-49)*
23  *Local Counsel for Plaintiffs*            cyoungs@bopplaw.com
                                           Amanda L. Narog (Ind. bar #35118-84)*
24                                            anarog@bopplaw.com
                                           True the Vote, Inc.
25                                            Voters' Rights Initiative
                                           The Bopp Law Firm, PC
26                                         1 South Sixth St.
                                           Terre Haute, IN 47807‑3510
27                                         Telephone: 812/877-4745

                                           *Appearing Pro hac vice
28                                         *Counsel for Plaintiffs*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28