1    CHRISTOPHER J. HICKS
     Washoe County District Attorney
2    HERBERT B. KAPLAN
     Deputy District Attorney
3    Nevada State Bar Number 7395
     1 So. Sierra St.
4    Reno, NV  89501
     hkaplan@da.washoecounty.us
5    (775) 337-5700

6    ATTORNEYS FOR DEANNA SPIKULA,
     WASHOE COUNTY REGISTRAR OF VOTERS
7

8                    **UNITED STATES DISTRICT COURT**

9                         **DISTRICT OF NEVADA**

10                                * * *

11   STANLEY WILLIAM PAHER, TERRESA
     MONROE-HAMILTON, AND GARRY
12   HAMILTON, DARYL BYRON DESHAW,          Case No.  3:20-cv-00243- MMD-WGC
     JEFF ECKER, GARY GLADWILL, LINDA
13   BARNETT, and NEVADA RIGHT TO LIFE,
                                            **WASHOE COUNTY REGISTRAR OF**
14              Plaintiffs,                 **VOTERS' OPPOSITION TO SECOND**
                                            **MOTION FOR PRELIMINARY**
15          vs.                             **INJUNCTION (ECF #65)**

16   BARBARA CEGAVSKE, in her official
     capacity as Nevada Secretary of State,
17   DEANNA SPIKULA, in her official capacity
     as Registrar of Voters for Washoe County,
18   JOSEPH P. GLORIA, in his official capacity
     as Registrar of Voters for Clark County,
19
                Defendants.
20
     and
21
     NEVADA STATE DEMOCRATIC PARTY,
22   DNC SERVICES
     CORPORATION/DEMOCRATIC
23   NATIONAL COMMITTEE, DCCC,
     PRIORITIES USA, and JOHN SOLOMON,
24
                Intervenor-Defendants.
25

26

COMES NOW Defendant, Washoe County Registrar of Voters, Deanna Spikula, by and through her attorney of record, Christopher J. Hicks, Washoe County District Attorney, and Herbert B. Kaplan, Washoe County Deputy District Attorney, and hereby oppose the Second Motion for Preliminary Injunction (ECF #65) filed in this action. For the reasons that follow, the Court must deny the Second Motion for Preliminary Injunction without further consideration.

This Opposition is brought pursuant to the Federal Rules of Civil Procedure and is based on the following Memorandum of Points and Authorities, the exhibits attached hereto, and all the pleadings and papers on file herein.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Plaintiffs filed a Complaint (ECF #1) asserting that the all-mail primary election scheduled for June 9, 2020, is invalid.   Plaintiffs simultaneously filed a motion for preliminary injunction (ECF #2) in an attempt to prevent the Nevada Secretary of State and the Washoe County Registrar of Voters from conducting the June 9, 2020, primary election from proceeding under the "all-mail election" plan.

In the Complaint, Plaintiffs prayed for the following relief:

> 1.  Declare that the Plan violates the right to vote the First and Fourteenth Amendments of the U.S. Constitution and Nev. Const. art 2, § 1. Article 1, §§ 8 and 9 of the Nevada Constitution and strips safeguards against fraudulent votes that dilute legal votes;
> 2. Declare that the Plan violates the right to vote under the First and Fourteenth Amendments of the U.S. Constitution, as well as Article 2, § 1 of the Nevada Constitution, because the Secretary and County Administrators' Plan overrules and replaces the legislator's chosen manner of elections;
> 3. Declare that the Plan violates the right to vote under the Purcell Principle;
> 4. Declare that the Plan violates Article I, § 4 , cl. 1 of the U.S. Constitution;
> 5. Declare that the Plan violates the Voters' right to a republican form of government under Article IV, § 4 of the U.S. Constitution;
> 6. Preliminarily and permanently enjoin the Secretary and County Administrators from conducting the Plan in violation of the Voters' right to vote;
> 7. Preliminarily and permanently enjoin the Secretary and County Administrators to implement the primary election in the manner the Nevada Legislature prescribed.

Complaint at pp. 12-13.

1    Plaintiffs also filed a motion to consolidate hearing on motion for preliminary injunction

2    with hearing on the merits. (ECF # 4)  This Court granted that motion noting that "consolidation

3    will result in an expedited resolution of the case."  Minute Order (ECF #36).

4    The consolidated hearing was conducted on April 29, 2020.  By way of the Order entered

5    on April 30, 2020, the Court specifically denied the motion for preliminary injunction.

6    (ECF #57)  However, despite the fact that the hearing on the preliminary injunction was

7    consolidated with the hearing on the merits, the Court noted that "at the Hearing the Court

8    determined that a resolution on the merits of the case should be deferred given the Secretary's

9    position as to her right to assert Eleventh Amendment immunity. Such a deferral would not

10   affect the parties' ability to seek interlocutory appeal."  Order (ECF #57) at p. 6, n. 4.  On the

11   other hand, the Court did specifically find "Plaintiffs fail to establish the merits of each claim."

12   Id. at p. 10, l. 14. There was, in any event, a hearing on the merits of the original Complaint.

13   Now, having failed in their first attempt, Plaintiffs have filed an Amended Complaint

14   (ECF #64) and Second Motion for Preliminary Injunction (ECF #65) alleging the very same

15   things they did originally, but with some slight insignificant variation.  For instance, in the

16   Amended Complaint, they seek essentially the same relief as in the original complaint, but

17   additionally seek an order from this Court to

18       Order the Secretary of State and County Administrators, in coordination with city and
         county election officials, to conduct a public information campaign informing Nevada
19       voters that any mailed ballot not provided as an absent ballot upon written request of a
         registered voter meeting the statutory requirements of NRS 293.3165 will not be counted
20       as a lawful ballot for the primary election if returned. Each voter must either request an
         absentee ballot by the statutory deadline or appear in person on election day at a
21       designated polling location to cast a valid ballot in the primary election.

22   Amended Complaint at p. 26, ll. 17-23.

23   The vast majority of the relief sought in the second motion for preliminary injunction has

24   already been denied by the Court.  Plaintiffs have not sought reconsideration of those findings,

25   yet appear to challenge them again in the second motion.  They have not appealed those findings

26   either.  There are no authorized second bites at the apple.

Plaintiffs, simply put, have failed to overcome the flaws in their original complaint, which warrants denial of the second motion in itself. But now they have taken the assault a step further and seek to undo the election plan on the eve of the election, despite the fact that this Court in the April 30 Order found that the law under the *Purcell* Principle "does not appear to support the Court deciding the PI Motion." As time has passed, and actions have been taken toward executing the mail election, the primary election is imminent. The *Purcell* principle is even more applicable now than when the initial motion for preliminary injunction was heard.

For the reasons set forth herein, the Court must deny the Second Motion for Preliminary Injunction without further consideration.

## II.    FACTUAL BACKGROUND

For purposes of this Opposition, the following are the relevant facts.

### A.    COVID-19 GLOBAL PANDEMIC

These are extraordinary times in which we as a society find ourselves.

In February/March 2020, the United States, including the State of Nevada, began to see the impact of the COVID-19 virus. First, cases of individuals testing positive for the virus began to spring up. Then the increase in positive cases occurred fast and somewhat furiously. Next, major sporting and cultural events were cancelled or postponed worldwide. For instance, the NBA suspended its season after a player tested positive for coronavirus, and the International Olympic Committee has delayed the 2020 Summer Olympic Games until 2021. Disney parks closed indefinitely. The court system is also on hold, with the limited exception of essential cases, and even the essential cases are being conducted for the most part through technology rather than in-person appearances.

Considering the fast spreading of the potentially deadly COVID-19 virus, on March 12, 2020 Governor Steve Sisolak reacted with a declaration of emergency for the State of Nevada.[1]

---

[1] All of Governor Sisolak's COVID-19 declarations referenced herein can be found at http://gov.nv.gov/News/Emergency_Orders/Emergency_Orders/. The declarations are not the subject of any dispute

1    The following day, President Trump declared a nationwide emergency.[2]  The World Health

2    Organization and the United States Centers for Disease Control and Prevention advised that there

3    is a correlation between density of persons gathered and the risk of transmission of COVID-19.

4         Governor Sisolak's declaration of emergency was followed in somewhat fast succession

5    with a number of other declarations imposing restrictions, escalating in nature, in an effort to

6    stop the spread of the highly contagious, potentially deadly virus. In Nevada, as well as

7    throughout the United States, many employers were told to close their doors and were forced to

8    tell workers to stay home.  Religious services and schools were forced to close their doors too.

9    Individuals were told they should not gather in large groups and should exercise social distancing

10   and wear protective masks in public to combat the spread of the virus.

11        On April 21, 2020, Governor Sisolak stated that Nevada is in "phase zero" of its

12   economic rebound efforts.[3]  He also stated that schools would not be reopening for the remainder

13   of the 2019-2020 school year, and that the remainder of the school year would be through

14   distance learning.[4]

15        While the restrictions currently in place are loosening, Nevada, and the entire United

16   States, continues to see new COVID-19 cases and deaths.

17        In Washoe County, there has been limited testing of individuals for the virus.  However,

18   new cases continue to be discovered on a daily and consistent basis.  For instance, on May 15,

19   2020, there were an additional 36 new cases identified and May 17 saw an additional 54 new

20   //

21   //

22   _____

23   in this matter to the best of counsel's knowledge.  However, the Court can take judicial notice of those declarations
     if necessary.

24   [2] See Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19)

25   Outbreak, which can be found at https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-
     emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

26   [3] See Reno Gazette Journal, April 21, 2020,   https://www.rgj.com/story/news/2020/04/21/covid-19-nevada-
     governor-details-plan-reopen-nevada-economy/3001396001/ .
     [4] Id.

1  cases.[5] More deaths accompany those continuing cases.[6]  While the stay-at-home and social

2  distancing restrictions have curtailed some of the spread of the virus, it remains to be seen how

3  even the limited re-opening impacts the spread.

4  The emergency situation continues, with no end in sight. There is no way to know what

5  the status of social distancing restrictions might be on May 23, 2020 when early voting is

6  scheduled to begin, or for the June 9, 2020 primary election. What is known is that COVID-19

7  continues to be a life-threatening, global pandemic.

8  Nobody envisioned this scenario manifesting.  Nevada has reacted to the situation out of

9  necessity and imposed what some consider to be extreme restrictions to combat the spread of the

10  virus.  Certainly nobody envisioned those restrictions being extended for such a long period of

11  time—but it was done out of necessity to protect the health and safety of Nevadans.

12  **B.     The Primary Election Process**

13  At issue in this case is the primary election.  A primary election is an election to select

14  candidates to run for public office at the general election to be conducted in November.  In

15  Nevada, primaries are closed, meaning that only declared party members are allowed to vote for

16  candidates in the partisan contests.  In short, voters decide their designated party's candidates

17  that will go on to the general election.  To that end, separate primary ballots for each major

18  political party are required.  NRS 293.257(1).  "A registered voter may cast a primary ballot for a

19  major political party at a primary election only if the registered voter designated on his or her

20  application to register to vote an affiliation with that major political party."  NRS 293.257(3).

21  In Nevada, the primary election "must be held on the second Tuesday in June of each

22  even-numbered year."  NRS 293.175.  This year's primary election is scheduled to occur on June

23  9, 2020.  Early voting is scheduled to begin May 23 and continue through June 5.

24

25  _____

26  [5] See https://gis.washoecounty.us/COVID19.

Pursuant to NRS 293.124, the Secretary of State is the Chief Officer of Elections for the State of Nevada, and in that capacity "is responsible for the execution and enforcement of the provisions of title 24 of NRS and all other provisions of state and federal law relating to elections in this State." NRS 293.124. The Secretary of State is authorized to "provide interpretations and take other actions necessary for the effective administration of the statutes and regulations governing the conduct of primary, general, special and district elections in this State." NRS 293.247(4).

The county clerks, or where there is authorized an appointed Registrar of Voters, [7] are the local election officials. NRS 293.213 authorizes the designation of mailing precincts under certain conditions; however, a local election official is also authorized, aside from the express circumstances set forth in subsections 1, 2 or 3 or NRS 293.213, to "establish a mailing precinct or an absent ballot mailing precinct . . . if the county clerk obtains prior approval from the Secretary of State." NRS 293.213(4).

NRS 293.3072 authorizes the registrar of voters to "establish one or more polling places in the county where any person entitled to vote in the county by personal appearance may do so on the day of the primary election or general election." This is left to the discretion of the election officials.

The election statutes, Title 24 of the Nevada Revised Statutes, is required to be construed liberally to ensure that all electors have an opportunity to participate in the election and to cast their votes. NRS 293.127(1). That liberal interpretation is intended to ensure that the "real will of the electors is not defeated by any informality or by failure substantially to comply with the provisions of this title with respect to the giving of any notice or the conducting of an election or certifying the results thereof." NRS 293.127(1)(c).   In other words, the goal is to allow and

---

[7] The statutory scheme refers to the county clerk as the local election officer. In some counties, including Washoe County, a registrar of voters has been named to act in the place and stead of the county clerk for election purposes only. Since the Washoe County Registrar of Voters is the only local official named as a defendant in this matter, the term "Registrar of Voters" will be used herein.

encourage people to vote so the will of the electors prevails—even under the unique circumstances presented by COVID-19.

In an effort to combat voter fraud, a multitude of voter fraud safeguards are in place to avoid invalid votes being counted. Those safeguards remain in place for the primary election plan.

With regard to the safeguards for the mailed ballots, ballots are being mailed to the mailing address on file for each active registered voter. Ballots mailed may not be forwarded to any other address. If a registered voter has moved and failed to update their address, the ballot will be returned to the office of the local election official.

It is the responsibility of the voter to ensure that their address with the election officials office is current. Registering or updating that information can be accomplished in-person at the office of the election official, online, through the Department of Motor Vehicles, or through the mail. The deadline to update voter registration online and still receive a ballot by mail is May 21, 2020. Those voters complying with that deadline will be able to be provided the ballot based on their new address and may still vote by mail. After May 21, and continuing through June 4, 2020, voters may still update their registration online, but will then be required to appear in person to vote and provide a current and valid Nevada driver's license or identification card and proof of residency. On June 5, 2020 through June 9, 2020, voters who need to register or update their current registration will be required to do so in person and provide a current and valid Nevada driver's license or identification card and proof of residency.

The normal restrictions and safeguards for absent ballots and mail-in ballots remain in place for the primary election plan. Specifically, only the actual voter may complete their ballot. The ballot must be returned in the envelope, postage prepaid, provided, as each ballot issued is associated with the return envelope provided. The voter is required to sign the return envelope and seal the envelope. The voter is required to return the ballot, in the sealed, signed envelope, by placing the same in the United States mail, having it postmarked no later than June 9, 2020, or

by returning the envelope in person to the office of the election official or to the polling location if that is different.  Voters may authorize a family member to place the ballot in the mail or deliver the ballot.  However, no other individual may be authorized to do so.  As a result, the ballot should not be in the hands of anyone other than the voter, a family member if authorized by the voter, the U.S. Postal Service, and the election official personnel.

For those individuals who must request an absent ballot because they have failed to update their registrations and did not receive the mail ballot, or for those individuals who choose to request an absent ballot, every such request must be made available for public inspection by the election official.  NRS 293.315. The election official must determine before issuing the absent ballot that the person who requested the absent ballot is a registered voter in the proper county.  NRS 293.320.

Upon receipt of an absent or mail-in ballot, the election official must verify the signature on the return envelope against all signatures of the voter available in the records of the election official.  NRS 293.325.  If at least two employees in the office of the election official believe there is a reasonable question of fact as to whether the signature on the absent ballot matches the signature of the voter, the election official must then contact the voter and ask the voter to confirm whether the signature on the absent ballot belongs to the voter.  NRS 293.325(1).  With regard to the Washoe County Registrar, her office will contact the individual by mail, or by phone or e-mail if possible, or if not possible, only by mail, to attempt to verify that the ballot is submitted by the identified voter and can be counted.  This is called a cure process.  It affords the voter the opportunity to confirm that they actually voted the ballot.  Ballots that are questioned based on signature and not cured through the process set forth in NRS 293.325(1) are not counted.

Moreover, it remains "unlawful for a person fraudulently to request an absent ballot in the name of another person or to induce or coerce another person fraudulently to request an

//

absent ballot in the name of another person. A person who violates this subsection is guilty of a category E felony and shall be punished as provided in NRS 193.130."  NRS  293.313.

In addition, a voter is prohibited from (a)  receiving a ballot from any person other than an election board officer, (b) delivering to an election board or to any member thereof any ballot other than the one received, or (c)  placing any mark upon his or her ballot by which it may afterward be identified as the one voted by the person.  NRS 293.730(2).  Violation of those provisions is a category E felony and shall be punished as provided in NRS 193.130.  NRS 293.730(3).

NRS  293.775 makes it a category D felony, punishable as provided in NRS 193.130, for any "person who is not a qualified elector and who votes or attempts to vote knowing that he or she is not a qualified elector," or for any "person who votes or attempts to vote using the name of another person."

In addition to the criminal penalties for voter fraud, NRS 293.840 provides for a civil penalty, not to exceed $20,000 for each violation of Title 24, NRS Chapter 293.

NRS 293.272 requires certain individuals to vote in person, including individuals who registered by mail or computer to vote shall, for the first election in which the person votes at which that registration is valid, vote in person unless he or she has previously voted in the county in which he or she is registered to vote.  NRS 293.272(1).  That requirement does not apply to certain designated individuals.  See NRS 293.272(2).   The overall purpose of the requirement to vote in person for the first time they vote in the jurisdiction is to ensure that the voter is actually who they hold themselves out to be and that each individual voting is entitled to vote in the specific election—it is one of the many protections against voter fraud built into the system. NRS 293.2725 provides further clarification, setting forth the requirements for election officials to determine the validity of an individual's registration prior to allowing a vote.  Those safeguards remain in place and are accommodated by the in-person polling locations.

Those same safeguards remain in place for the 2020 Nevada primary election.

### C.    Election Officials' Response to the State of Emergency Restrictions

Shortly after the imposition of the significant restrictions on conducting any and all business in the State of Nevada, concerned about the effect of those restrictions on the rapidly approaching primary election, discussions were conducted between all of the local election officials and the Secretary of State's Office.  As a result, on March 24, 2020, the Secretary of State's Office issued a press release advising that the primary election will be conducted as an all-mail election "[i]n order to maintain a high level of access to the ballot, while protecting the safety of voters and poll workers."  See Press Release attached to Amended Complaint as Exhibit J.  It advised all voters in Nevada that

> "All active registered voters in Nevada will be mailed an absentee ballot for the primary election.  No action or steps, such as submitting an absentee ballot request application, will be required by individual voters in order to receive a ballot in the mail.  Voters will be able to mark their ballot at home and then return it by mail using a postage-prepaid envelope or by dropping it off in person at a designated county location."

The press release went on to reassure voters that their "health and safety while participating in voting is paramount to state and local election officials."  Id.  The release further advised that "training of thousands of poll workers who support Nevada's large in-person voter effort was scheduled to begin next week (the first week of April)" and that the majority of those poll workers "belong to groups at high risk of severe illness from COVID-19."  Id.

The release also noted that there will be available at least one in-person polling location in each county for the June 9, 2020 primary election, and advising that "in-person voting opportunities will be extremely limited for the primary election," encouraging all voters to register to vote, or update their existing voter record, and not rely on the limited polling locations.  Id.

Over the next few weeks, local election officials began working hard to facilitate the election plan.  Sample ballots were sent to all active registered voters.  Included in each of those sample ballots was another announcement of the primary election being conducted as an all-mail election and the process to follow in voting.  Washoe County's notice and sample ballots, a copy

of an example of which is attached as Exhibit M to the Amended Complaint in this matter, were mailed prior to the initiation of the current lawsuit.

Moreover, hundreds of thousands of mail-in ballots were printed and mailed in the end of April to registered voters at great expense. Included in the ballot mailing were return, postage paid envelopes for each of those ballots, at additional expense. According to the Secretary of State's Office, approximately $2.4 million was spent statewide for the printing and outbound postage for the ballots already printed and mailed. *See* Declaration of Wayne Thorley, at ¶9(c), filed in Corona v. Cegavske, First Judicial District Court of Nevada, Case No. 20-OC-00064 1B, a true and correct copy of which is attached hereto as **Exhibit "A."** Another $235,000 was estimated for the return postage on the envelopes in an effort to avoid ballots being returned to voters due to lack of return postage. Id. at ¶9(d).

The expectation of Nevada voters is that they will vote their ballot by mail due to restrictions in place and continuing concerns over the spread of COVID-19.

In Washoe County, "The Office of the Washoe County Registrar of Voters will be the only polling location for in-person voting, updates to registration, and same-day registration during Early Voting (May 23-June 5, 2020) and on Election Day (June 9, 2020)." See page 3 of Washoe County's notice and sample ballot, a copy of an example of which is attached as Exhibit M to the Amended Complaint in this matter.

After the Court rejected the initial motion for preliminary injunction, many other actions have taken place in the execution of the election.

First, and foremost, many voters have already returned their completed ballots. See Declaration of Deanna Spikula attached hereto as **Exhibit "B,"** at ¶18.

On April 30, Wayne Thorley, Deputy of Elections for the Nevada Secretary of State, testified before the Interim Finance Committee of the Nevada Legislature regarding the availability of federal grant funds to assist with the administration of the 2020 primary election. As a result, the Secretary of State's Office has received Interim Finance Committee approval to

1    allocate expenditures to execute the mail election.  **Exhibit A,** Thorley Declaration, at ¶7.  More

2    than $1 million was to be used to procure additional voting equipment needed to process the

3    increase in mail ballots and for other non-voting equipment necessary.  Id. at ¶9(a-b).  Included

4    in that allotment is nearly $800,000 with which the SOS contracted with a Reno-based marketing

5    firm to inform the public/voters in Nevada of the mail election. Id. at ¶9(f).

6          The media information effort has begun and includes TV and radio ads, digital ads for

7    social media, direct mail marketing, and a website dedicated specifically for providing

8    information about the primary election.   See for example the video on YouTube at

9    https://www.youtube.com/watch?v=RczGj12zxbc; "Make sure you sign your ballot in correct

10    spot and other tips to vote in Nevada's primary," Las Vegas Sun, May 17, 2020, a true and

11    correct copy of which is attached hereto as **Exhibit "C."[8]**

12          The SOS website has the following message posted:

13          Nevada plans to conduct an all-mail election for the June 9, 2020 primary election. All
      active registered voters in Nevada will be mailed an absentee ballot for the primary
14    election. No action or steps, such as submitting an absentee ballot request application,
      will be required by individual voters in order to receive a ballot in the mail.  Voters will
15    be able to mark their ballot at home and then return it by mail using a postage-prepaid
      envelope or by dropping it off in person at a designated county location. This
16    announcement applies only to the June 9, 2020 primary election.

17    https://www.nvsos.gov/sos/elections/2020-election

18          The website also provides specific guidance, explain that "For the safety of all Nevadans,

19    and as a temporary measure to help slow the spread of COVID-19, the 2020 Nevada primary

20    election will be conducted through mail-in ballots."  https://www.mailitinnevada.com/.  The SOS

21    website also provides a list of "2020 Ballot Drop Off & Polling Locations."

22          The primary election, being conducted predominantly by mail, is well under way, with

23    limited in-person early voting set to commence in days.

24    //

25    _____

26    [8] Electronic copy at  https://lasvegassun.com/news/2020/may/17/make-sure-sign-ballot-correct-spot-voting-tips/.

1       Other states have also altered the course of the primary election.  For instance, Wisconsin

2  was in the unenviable position of being forced to conduct its election on April 7, 2020, shortly

3  after COVID-19 being to have its fast-spreading impact.  In response to that, and with limited

4  time to do otherwise, many voters requested absent ballots.  With so little time to process those

5  unanticipated requests, many of those voters did not receive the ballots.  In addition, many

6  people were left with no alternative than to risk their lives in potentially contracting the

7  Coronavirus to vote in person.  The result was long lines, with some people not being able to cast

8  a vote due to time restrictions.

9       In addition, the Ohio primary election was postponed from March and was held on April

10  28 as an all-mail election, with very limited opportunity for in-person voting.[9]  While it is

11  acknowledged that that primary election was conducted as an absentee ballot election, it is

12  noteworthy that the nature of the election was modified.  Of equal note is the fact that many were

13  concerned with the fact that absentee ballots may not be received in time to actually be voted and

14  counted.

## III.    LEGAL ANALYSIS

16       For the following reasons, this preliminary injunction requested by Plaintiffs must be

17  denied.

### A.    Standard for Preliminary Injunction

19       Federal Rule of Civil Procedure 65 governs preliminary injunctions.  "'An injunction is a

20  matter of equitable discretion' and is 'an extraordinary remedy that may only be awarded upon a

21  clear showing that the plaintiff is entitled to such relief.'" *Earth Island Inst. v. Carlton*, 626 F.3d

22  462, 469 (9th Cir. 2010) (*quoting Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22, 32 (2008)).

23  *//*

24

25

26  [9] See "All eyes on Ohio's election: Nation will learn from Ohio's success or failure on Tuesday," The (Cincinnati) Enquirer Online, at https://www.cincinnati.com/story/news/2020/04/25/ohio-primary-coronavirus-caused-ohio-go-all-mail-primary-work/5165457002/.

1    This relief is "never awarded as of right." *Alliance for the Wild Rockies v. Cottrell*, 623

2    F.3d 1127, 1131 (9th Cir. 2011).

3    To qualify for a preliminary injunction, a plaintiff must satisfy four requirements: (1) a

4    likelihood of success on the merits; (2) a likelihood of irreparable harm; (3) that the balance of

5    equities favors the plaintiff; and (4) that the injunction is in the public interest. *See Winter,* 555

6    U.S. at 20. In terms of the alleged harm, it is not enough to show a possible harm.  Plaintiffs

7    seeking preliminary relief must demonstrate that irreparable injury is *likely* in the absence of an

8    injunction. *Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983); *Granny Goose Foods, Inc. v.*

9    *Teamsters*, 415 U.S. 423, 441 (1974); *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974); see also

10   11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948.1, p. 139

11   (2d ed.1995) (applicant must demonstrate that in the absence of a preliminary injunction, "the

12   applicant is likely to suffer irreparable harm before a decision on the merits can be rendered").

13   Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent

14   with the United States Supreme Court's characterization of injunctive relief as an extraordinary

15   remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.

16   *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam).

17   A plaintiff may also satisfy the first and third prongs by showing serious questions going

18   to the merits of the case and that a balancing of hardships tips sharply in plaintiff's favor.

19   *Alliance*, 632 F.3d at 1135 (holding that the Ninth Circuit's "sliding scale" approach continues to

20   be valid following the *Winter* decision). On the merits-success prong, "the burdens at the

21   preliminary injunction stage track the burdens at trial." *Gonzales v. O Centro Espirita*

22   *Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006); *see also id*. at 428 (citing *Ashcroft v.*

23   *ACLU*, 542 U.S. 656, 666 (2004).

24   **B.    Plaintiffs cannot succeed on the merits.**

25   Plaintiffs' claims fail from the outset. First, Plaintiffs lack standing as they assert nothing

26   more than generalized, speculative interest in the application and execution of Nevada's election

1  laws.  In addition, this Court is barred by the Eleventh Amendment from enjoining state officials

2  based on purported violations of state election law.

3         **1.**     **Plaintiffs Lack Standing**

4         "Standing is perhaps the most important of the jurisdictional doctrines." *United States v.*

5  *Hays*, 515 U.S. 737, 742, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995) (internal marks omitted).

6  Federal courts are courts of limited jurisdiction, cabined by the authority granted to them by

7  Article III of the United States Constitution. Article III limits federal courts' jurisdiction to the

8  deciding of "Cases" and "Controversies." U.S. Const. art III, § 2; *see also Hein v. Freedom from*

9  *Religion Found., Inc.,* 551 U.S. 587 (2007) (" ' "No principle is more fundamental to the

10  judiciary's proper role in our system of government than the constitutional limitation of federal-

11  court jurisdiction to actual cases or controversies." ' ") (*quoting Raines v. Byrd,* 521 U.S. 811,

12  818 (1997) (*in turn quoting Simon v. E. Ky. Welfare Rights Org*., 426 U.S. 26, 37 (1976))).

13  "'One of the controlling elements in the definition of a case or controversy under Article III' is

14  standing." *Hein*, 551 U.S. at 588 (*quoting ASARCO Inc. v. Kadish*, 490 U.S. 605, 613 (1989)

15  (Kennedy, J., concurring)).

16         At a "'constitutional minimum,'" standing requires three elements: (1) injury in fact, (2)

17  causation, and (3) redressability. U.S. v. *Hays*, 515 U.S. 737, 742–43 (*quoting Lujan v.*

18  *Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992)). Injury in fact requires the party bringing

19  suit to have "a legally protected interest that is (a) concrete and particularized, and (b) actual or

20  imminent, not conjectural or hypothetical." *Id.* at 743 (internal marks omitted).

21         Article III's case and controversy prerequisite "requires the party who invokes the court's

22  authority to 'show that he personally has suffered some actual or threatened injury as a result of

23  the putatively illegal conduct of the defendant.'" *Valley Forge Christian Coll. v. Ams. United for*

24  *Separation of Church & State, Inc.,* 454 U.S. 464 (1982) (*quoting Gladstone Realtors v. Vill. of*

25  *Bellwood*, 441 U.S. 91, 99 (1979)). *See also Lujan*, 504 U.S. at 560 n. 1, 112 S.Ct. 2130

26  //

("By particularized, we mean that the injury must affect the plaintiff in a personal and individualized way.").

Each of the individual Plaintiffs, as well as all other qualified individuals in Nevada, will be afforded the right and ability to vote. Each of the Plaintiffs has suffered no injury in fact.

The Supreme Court has "consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573-74 (1992).

Here, the potential harm Plaintiffs claim by virtue of the potential for voter fraud and vote dilution has not occurred. They have suffered no harm as required for Article III standing. The purported potential injury is no different than that any other voter in Nevada might potentially suffer. It is a generalized potential injury that does not impact Plaintiffs any more than the public at large. It does not support standing.

In addition, Plaintiffs' alleged injury is speculative and conjectural. *Id.* at 560. Plaintiffs claim that the use of a predominantly mail election will lead to voter fraud. However, that assertion is not supported by any allegations of fact. It is speculative at best. Accordingly, Plaintiffs' lack Article III standing on that basis as well. *See Am. Civil Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 789 (W.D. Tex. 2015) ("[T]he risk of vote dilution[ is] speculative and, as such, [is] more akin to a generalized grievance about the government than an injury in fact."); *cf. United States v. Florida*, No. 4:12cv285-RH/CAS, 2012 WL 13034013, at *1 (N.D. Fla. Nov. 6, 2012) (rejecting True the Vote's motion to intervene under Rule 24 based on the same theory of vote dilution because its "asserted interests are the same . . . as for every other registered voter in the state").

As to the original Plaintiffs, Stanley William Paher, Terresa Monroe-Hamilton, and Garry Hamilton, the issue of lacking standing has already been adjudicated.

1    The newly named Plaintiffs fair no better for the same reasons as the original Plaintiffs.

2    All of the plaintiffs will be able to vote, either by mail or in person at either early voting or on

3    June 9 if they so choose.  They will be allowed to vote.  They have suffered no harm and the

4    only alleged harm is generalized and speculative.  They have no standing either.

5    Plaintiff Nevada Right to Life asserts that it "advocates for life in all of its stages and all

6    ages."  The Amended Complaint further asserts that it "achieves its mission by educating and

7    mobilizing voters to elect pro-life candidates and through lobby efforts in the Nevada

8    Legislature."  It is unclear how Nevada Right to Life will suffer any harm.  Certainly the mail

9    election will not impact their efforts.  However, they also assert that "the interests of its

10   members, who include registered, eligible Nevada voters who intend to vote in the coming

11   primary but fear disenfranchisement as outlined herein. It is a central mission of NVRTL to

12   educate and motivate prolife voters to support prolife candidates and to assist them to do so as

13   needed."  Nevada Right to Life will not be precluded from its efforts.  It is beyond imagination

14   as to how either Nevada Right to Life or "its members" would suffer any harm.  In reality, the

15   Amended Complaint makes it clear that they merely "fear disenfranchisement," which is

16   speculative at best, and have suffered no harm.

17   The alleged harm to all Plaintiffs is neither actual nor imminent, but is instead conjectural

18   and hypothetical.  As a result, Plaintiffs lack standing and this case must be dismissed in its

19   entirety.

20                    **2.      Eleventh Amendment Immunity**

21   Moreover, all defendants are entitled to immunity pursuant to the Eleventh Amendment.

22   Plaintiffs claim that the Nevada election officials are violating Nevada law and seek to

23   have this Court issue a preliminary injunction requiring compliance with Nevada law.

24   As the U.S. Supreme Court explained decades ago in *Pennhurst State School & Hospital*

25   *v. Halderman*, "the principles of federalism that underlie the Eleventh Amendment" prohibit a

26   //

1    federal court from granting "relief against state officials on the basis of state law, whether

2    prospective or retroactive." 465 U.S. 89, 106 (1984).

3           In *Pennhurst,* a class action was brought by mentally retarded citizens challenging the

4    fact and condition of confinement in a state institution.  They named as defendants various state

5    and local officials and institutions.  While county officials usually are not covered by Eleventh

6    Amendment immunity, the Court in *Pennhurst* found that "without the injunction against the

7    state institutions and officials in this case, an order entered on state-law grounds necessarily

8    would be limited."

9           *Pennhurst* announced a bright line rule that "The Eleventh Amendment prevents a federal

10    court from issuing an injunction against state officials solely to require them to adhere to state

11    law." *Thompson v. Alabama,* No. 2:16-CV-783-WKW, 2017 WL 3223915, at *8 (M.D. Ala. July

12    28, 2017)(emphasis added);  *see also Neuwirth v. La. State Bd. of Dentistry*, 845 F.2d 553, 557

13    (5th Cir. 1988) (The Eleventh Amendment "'allows federal courts to hear suits against state

14    officials if the suit seeks to force them to conform their conduct to federal law,' but does not

15    apply to 'suits which would seek to have federal judges order state officials to conform their

16    conduct to state law.'" (*quoting Ronald A. Rotunda et al., Constitutional Law: Substance and

17    Procedure* § 2:12 (1986)); *Lelsz v. Kavanagh*, 815 F.2d 1034, 1034 (5th Cir. 1987) (per curiam)

18    ("*Pennhurst* prohibits a federal court from ordering a state to follow state law.").

19           Here Ms. Spikula is acting as an arm of the State in executing the primary election plan.

20    The Secretary of State is the Chief Officer of Elections for the State of Nevada, and in that

21    capacity "is responsible for the execution and enforcement of the provisions of title 24 of NRS

22    and all other provisions of state and federal law relating to elections in this State."  NRS 293.124.

23    Ms. Spikula is a local election official, specifically as the Registrar of Voters for Washoe

24    County, and in that capacity is responsible for implementing the election laws in Washoe

25    County.  The statutory scheme in connection with elections clearly anticipates that the same will

26    be implemented by state and local election officials jointly.  As such, Ms. Spikula merely acts as

1  an arm of the state in her capacity and is entitled to immunity under the Eleventh Amendment

2  here.

3        Indeed, any relief granted against Ms. Spikula would be partial and incomplete at best. It

4  would potentially result in one set of rules being applied for the primary election in Washoe

5  County, and another in the remaining counties.  This would result in an "ineffective enforcement

6  of state law" that "would not appear to serve the purposes of efficiency, convenience, and

7  fairness." *Pennhurst*, 465 U.S. at 124.

8        Plaintiffs' only claim is that Ms. Spikula, in conjunction with the Secretary of State, is

9  not following state law by virtue of the primary election plan.   The only relief Plaintiffs request

10 with regard to Ms. Spikula is to permanently enjoin her "from conducting the Plan in violation of

11 the Voters' right to vote" and to permanently enjoin Ms. Spikula to "implement the primary

12 election in the manner the Nevada Legislature prescribed." The only relief they seek is for this

13 Court to require Ms. Spikula to follow Nevada law. Consequently, the Eleventh Amendment bars

14 their suit, rendering it impossible for Plaintiffs to succeed on the merits.

15        **C.      Plaintiffs' Claims fail on the merits.**

16        As set forth herein, the Court has already found that the Plaintiffs failed to establish the

17 merits of each claim and also found that a preliminary injunction was not warranted.  The issues

18 here are similar, and mostly the same.   Now, Plaintiffs claim that the COVID "curve is

19 flattening" and voters can vote in person because there has been "no established causal link

20 between in-person voting and the contracting of COVID."

21        Plaintiffs simplistic argument misses the point and is based on faulty assumptions.

22        First, the curve is flattening **as a result of the social distancing/stay-at-home**

23 **restrictions.**  Nobody knows what is going to happen once those restrictions are lifted.

24 Moreover, those restrictions remain in place in large part.  Applying Plaintiffs' simplistic, flawed

25 argument, baseball games should be played with fans in attendance, because there have not been

26 //

cases of COVID-19 linked to attending a baseball game.  Likewise with reopening movie theaters.  The logic is flawed.

Moreover, many people believe no social distancing is necessary and refuse to wear personal protective masks or gloves and refuse to recognize any danger to themselves or to others.  In many places, there have been protests that mimic the types of arguments made by Plaintiffs.   For example, there were protests in Michigan, Ohio, Pennsylvania and Nevada recently against the stay at home orders.[10]   During those protests, many people ignored entirely social distancing requirements and most had no personal protective masks.

A trip to the grocery store shows that many are not interested in social distancing or taking any measures to protect the health and welfare of others.

While it may sound good to require social distancing and personal protective measures for voters while voting, it is not something that can be required or enforced.  What happens to the voter who appears to vote and gets in line behind someone who is not social distancing?  That individual then has to weigh their options to determine whether or not they want to risk their health in order to vote.  Moreover, if a voter appears without protective gear, or refuses to exercise social distancing, can they be denied the right to remain and to vote?  Of course not— election officials have no power of that nature.

Urging social distancing and protective gear while voting is not the answer.

More important, however, Plaintiffs fail to understand that executing a safe, reliable election does not allow for severe changes of course so close to the election.  Certainly, Ms.

---

[10] "Hundreds protest stay-at-home order outside Michigan Capitol," Boston Globe, May 14, 2020, https://www.bostonglobe.com/2020/05/14/nation/hundreds-protest-stay-at-home-order-outside-michigan-capitol/; "Statewide protests over Stay at Home orders in Ohio," May 9, 2020, https://www.wkyc.com/article/news/local/ohio/statewide-protests-over-stay-at-home-orders/95-c7996c3d-bb63-413f-93bf-cc1c31da0f5e;  "Conservative groups boost anti-stay-at-home protests," CNN Politics, April 20, 2020, https://www.cnn.com/2020/04/20/politics/stay-at-home-protests-conservative-groups-support/index.html; "Protesters march again to fight Gov. Sisolak's stay-at-home order in Nevada," CarsonNOW.org, April 26, 2020, https://www.carsonnow.org/story/04/26/2020/protesters-march-again-fight-gov-sisolaks-stay-home-order-nevada.

1    Spikula wishes it was that simple.  It is not.  As outlined in more detail herein, such a change is

2    not feasible at this late date for many reasons.  Voting machines need to be prepared.  Polling

3    locations need to be secured.  Volunteers to staff those locations would need to be secured and

4    properly trained.  Accomplishing these things in such a short period of time cannot be

5    accomplished without placing in question the security and integrity of the primary election.  And

6    that does not even consider the suggested impossible task of undoing the predominantly mail

7    election that is well under way.

8                    **1.    First Claim**

9        Plaintiffs claim that the Legislature did not provide for an all mail election.  That claim

10   fails to recognize, out of necessity, that this Court has already found that the interpretation

11   allowing an all mail election was appropriate.  See April 30, 2020 Order (ECF #57)

12       Plaintiffs misread NRS 293.205 and NRS 293.206.  This Court has already appropriately

13   found that those statutes govern only the physical boundaries of precincts and not the manner of

14   elections conducted therein. See April 30, 2020 Order (ECF #57) at 17–18.  Precincts were

15   appropriately and timely created.  The designation of mailing precincts differs from that required

16   by NRS 293.205 and NRS 293.206.

17       Plaintiffs further claim, without support, that "[d]ue to the sudden surge in Mail-in ballots

18   that will result from the Plans, many voters will be disenfranchised because requested ballots

19   never arrive or arrive too late and filled-out ballots get lost or are delayed in the return process."

20       This is speculative at best.  In fact, Washoe County has mailed its ballots out as of April

21   30, 2020.  This allows for ample time in which for voters to receive their ballot, vote it, and

22   return it without facing the possibility that their ballot will not be counted.  As for the claim that

23   voters will not receive their ballots, there is currently a public information campaign as outlined

24   herein that advises of the mail election.  Voters should be aware that ballots are on their way, if

25   not already delivered.  If they do not receive their ballots, there is ample time in which they can

26   //

-22-

request, receive and vote a replacement ballot.  The Plan addresses the very concerns raised by Plaintiffs—again.

More glaring is the fact that none of the Plaintiffs claim that they have not received their mail ballot or do not have adequate time in which to obtain a ballot in the event they have not. Nor have any indicated that they will be denied the opportunity to vote in person if they choose to do so.  They have no standing to assert this claim, as discussed herein.

### 2.    Second Claim—Fraud/Vote Dilution

The Plaintiffs' second claim is almost word for word the same as the second claim in the original complaint--it asserts voter fraud and resulting vote dilution.

There can be no question that that claim was rejected by the Court in the April 30 Order. Again, the same voter fraud protections exist as in any election.  Again, the same alleged disenfranchisement due to speculative vote dilution could be claimed in the absence of the all mail election plan. Adding a declaration of Mr. Virgilio, which was electronically signed, with no indication that Mr. Virgilio is even aware of the declaration, claiming that he saw "4 or 5 ballots discarded a day," does not lead to the conclusion that there will be voter fraud.  The flawed declaration is unclear exactly where these ballots were viewed, and the circumstances surrounding the same.  Moreover, Mr. Virgilio claims that all you need to vote the allegedly discarded ballots is "the name, address, and signature of the voter.  All of this information is apparent to any person who picked up the ballot."  This raises the question as to whether these were completed ballots, as only the completed ballots would have a voter's signature.  Further, if Mr. Virgilio is concerned about voter fraud, why does his declaration fail to say what he did with those "discarded ballots?"  What Mr. Virgilio describes is merely an isolated incident that leaves many questions.

Regardless, this claim is unsupported, just as it was 3 weeks ago when this Court denied the same.  There is no evidence of actual voter fraud.  Moreover, there is nothing to suggest that any alleged potential voter fraud is the result of the predominantly mail primary election, as

every election offers some form of mail ballots.  Indeed, the same unsupported assertion can be made in connection with any form of election.  There is simply no causal link between the predominantly mail election and the claim for potential, future voter fraud.

Moreover, the claim ignores the fact that there are protections against voter fraud in place.  Ballots need to be completed and returned in a specific manner.  Signatures are then checked to ensure that it is actually the voter who is submitting the ballot.  The actions feared by Plaintiffs in perpetrating voter fraud is a felony.

There is no basis to reassert this already-rejected claim.  The claim failed once and must fail again.

### 3.    Third Claim—Violates Manner

This claim is the same as Count IV of the original Complaint.  That argument was already soundly rejected by the Court by virtue of the April 30, 2020 Order.

Plaintiffs now appear to be claiming that there were technical violations in the execution of designating the primary election as predominantly mail-in.  Their reading of the law is incorrect.  However, even assuming technical failures, it does not support the claim.  NRS 293.127 specifically provides that the Title 24 of the Nevada Revised Statutes "must be liberally construed to the end that: . . .(c) The real will of the electors is not defeated by any informality or by failure substantially to comply with the provisions of this title with respect to the giving of any notice or the conducting of an election or certifying the results thereof."  NRS 293.127(1).  As set forth in great detail, voters have been advised of and are expecting the predominantly mail primary election.  Many voters have already submitted their mail ballots.  Invalidating the mail in election at this point would cause great confusion and would likely result in many voters not having their votes count.  The real will of the electors would be defeated.

Again, this claim has already been adjudicated and there is no basis to consider it again.

### 4.    Fourth Claim—Violates Equal Protection

The fourth claim asserts that Clark County's plan to mail ballots to all registered voters,

1    and allow assistance in returning ballots will make it easier to vote in Clark County than any

2    other county.  This claim is actually a new claim, but not a viable one.

3        This claim fails based on the opinion rendered by the Ninth Circuit Court of Appeals in

4    *Short v. Brown*, 893 F.3d 671 (9th Cir. 2018).  In that case, California's Voter's Choice Act

5    (hereinafter "VCA") was challenged claiming it violated the Equal Protection Clause because it

6    permitted voters in some counties to receive a mail ballot automatically, while voters in other

7    counties had to apply for a mail ballot. *Id*. at 677–79. There, the challenge claimed that counties

8    that required voters to request a ballot, rather than have one automatically, diluted the vote in

9    those 'disfavored' counties in which voters had to request ballots.  *Id.* at 677.  The Ninth Circuit

10   soundly rejected that claim, finding that there was no evidence to demonstrate that the "VCA

11   [would] prevent anyone from voting." *Id.* The Court noted that the parties challenging the VCA

12   had failed to "cite[] any authority explaining how a law that makes it easier to vote would violate

13   the Constitution." *Id.* at 677-78.

14       Similar to *Short*, Plaintiffs here fail to allege any facts that claim the Clark County plan

15   makes it harder for anyone to vote.  They also fail to cite any legal authority for the proposition

16   that the United States Constitution prohibits local election officials' from making it easier for

17   voters to vote.  In fact, the argument made by Plaintiffs here flies directly in the face of the

18   holding and findings in *Short*.

19       Plaintiffs at least deserve credit for bringing an actual new claim.  However, that is where

20   it ends.  The Equal Protection claim is no more viable than the other claims and must be denied.

21   The request for preliminary injunction to require Clark County to make it harder for their voters

22   to vote must be rejected without further consideration.

23       **5.    No Chance of Success on the Merits**

24       Even if the Court were to examine the actual merits of Plaintiffs' claims despite the

25   jurisdictional issues set forth above, Plaintiffs' motion for a preliminary injunction must be

26   denied because they have no chance of success on the merits.

First, Plaintiffs misinterpret Nevada law.  This issue has already been adjudicated and clarified by this Court in its April 30 Order as follows:

> the Court finds that the Secretary has authority based on the plain reading of NRS §§ 293.213(4) and 293.247 to prescribe regulations, like the Plan here, to allow for voting by mail. Particularly, § 293.213(4) gives the Secretary authority to approve mailing precincts. As noted supra, Plaintiffs merely claim that NRS § 293.213(4) was not intended to apply to the whole state. (ECF No. 2 at 4 n.5.) But § 293.213(4) does not suggest such a reading because it effectively operates as an exception to the preceding sections—e.g., subsections (1) and (3), which permits mailing precincts if fewer than 20 registered voters reside in a precinct, or fewer than 200 ballots were cast in the precinct in the last general election, respectively. At minimum, the Secretary had the authority to interpret § 293.213(4) to permit her to act in concert with county election officials to allow for voting by mail in all precincts pursuant to § 293.247(4). See NRS § 293.247(4) ("providing that the Secretary "may provide interpretations and take other actions necessary for the effective administration of the statutes and regulations governing the conduct" of the state's elections). Section 293.247(3) also requires the Secretary to prescribe, among other things, "[s]uch other matters [i.e., forms, procedures, etc.,] as determined necessary by the Secretary of State." NRS § 293.247(3)(g).

Order (ECF #57) at pp. 18-19.

As the Court has already found, the decision to provide all mail ballots to voters in Nevada is consistent with Nevada law and within the authority of the SOS.  The second motion for preliminary injunction must therefore be denied.

In addition, Plaintiffs claims fail under the *Anderson-Burdick* balancing test, which applies to these types of challenges to elections laws.  Plaintiffs' claim of vote dilution based on the potential for voter fraud is legally and factually unfounded, and outweighed by the State's compelling interest in expanding access to mail voting in the midst of a pandemic.

The Court, consistent with other courts when Plaintiffs raise claims that an election law or policy allegedly violates their right to vote, already determined in this case that the appropriate test to apply is that found in the *Anderson-Burdick*[11] balancing test/line of cases.  Order (ECF #57); *Short v. Brown*, 893 F.3d 671, 676–77 (9th Cir. 2018) (applying *Anderson-Burdick* to vote dilution challenge to vote by mail law); *see also Ohio State Conference of NAACP v. Husted*,

---

[11] This test comes from *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992).

768 F.3d 524, 538 (6th Cir. 2014), vacated as moot, 2014 WL 10384647 (Oct. 1, 2014) (applying *Anderson-Burdick* to equal protection challenge to Secretary of State directive).

This is not a case in which laws are crafted to structurally devalue one community's or group of people's votes over another's. Instead, as is the case here, "[w]hen a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Burdick*, 504 U.S. at 434 (*quoting Anderson*, 460 U.S. at 788; see *Crawford*, 553 U.S. at 189–90 (internal quotation and citations omitted) ("[E]venhanded restrictions that protect the integrity and reliability of the electoral process itself are not invidious.").

Here, there are at least two interests that justify the burdens that the Plan imposes on voters and potential voters like Plaintiffs: 1) to protect the health and safety of Nevada's voters and poll workers, and, 2) to safeguard the voting franchise. These are indisputably compelling and longstanding interests. On the other hand, Plaintiffs cannot demonstrate an actual burden upon their voting rights, only an imposition upon their preference for in-person voting. Further, Plaintiffs' overarching theory that having widespread mail-in votes makes the Nevada election more susceptible to voter fraud seems unlikely where the Plan essentially maintains the material safeguards to preserve election integrity.

In light of the COVID-19 pandemic, the decision to mail ballots to registered voters is critically important to serving the State's compelling interest in allowing voters to vote safely. Nevada election officials have an interest in facilitating voting by mail not only as a matter of public health, but also to ensure that Nevadans are not disenfranchised. Nevada's interests far outweigh the burdens placed on Plaintiffs' right to vote.

**D.      The balance of the harms weighs strongly against requested injunction.**

As noted, altering the course of the election from the predominantly mail election already in progress to an in-person election would have a devastating impact on Nevadans' opportunities

1    to participate meaningfully in the June primary election.  The voters' and poll workers' health

2    and welfare due to the COVID-19 pandemic necessitated the mail election.

3        "It is clear that abridgement of the right to vote constitutes an irreparable injury."

4    *Sanchez*, 214 F. Supp. 3d at 976; see also, e.g., *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th

5    Cir. 2012) ("A restriction on the fundamental right to vote [] constitutes irreparable injury.").

6    Depriving a voter of their opportunity to cast a ballot is not only a significant harm—"[t]o

7    disenfranchise a single voter is a matter for grave concern," *Serv. Emps. Int'l Union, Local 1 v.*

8    *Husted*, 906 F. Supp. 2d 745, 750 (S.D. Ohio 2012)—but an irreparable harm as well. *See*

9    *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) ("[O]nce

10   the election occurs, there can be no do-over and no redress."); Fla. Democratic Party v. Scott,

11   215 F. Supp. 3d 1250, 1258 (N.D. Fla. 2016) ("This isn't golf: there are no mulligans.").

12       While some of the social distancing restrictions have been loosened, many Nevadans will

13   continue to exercise social distancing and remain sheltered in their homes for the foreseeable

14   future, thus necessitating the ability to vote by mail. Without the ability to cast mail ballots,

15   voters may be placed in the position of choosing between their health and safety or voting.  Other

16   voters, having already cast their mail ballots, will be confused by the need to go through another,

17   different process to have their votes counted, and may not vote as a result.

18       If this Court were to change the character of this election now, after many people have

19   already voted by mail, countless eligible Nevadans will suffer disenfranchisement because they

20   will be unable to vote in any other way or will not understand why the vote they have already

21   cast will not be counted.

22       On the other hand, the only harm identified by Plaintiffs is speculative and could be

23   arguably raised in any election, regardless of it being a predominantly mail election.  Each of the

24   Plaintiffs will be able to vote—in fact, there is no allegation to the contrary.  Nevada Right to

25   Life will not be impeded from pursuing their goals.  Issuing the requested preliminary injunction

26   //

will not prevent any harms to Plaintiffs, but will indisputably disenfranchise Nevada voters who are unable, due to the pandemic and myriad other issues, to cast a ballot in the June Primary.

As a result, the balance of the harms weighs strongly against issuing the requested preliminary injunction.

**E.    The public interest weighs heavily against the requested injunction.**

The preliminary injunction requested serves no public interest.  It will disenfranchise countless Nevada voters.

"By definition, '[t]he public interest . . . favors permitting as many qualified voters to vote as possible.'" *League of Women Voters*, 769 F.3d at 247 (alterations in original) (quoting Husted, 697 F.3d at 437); *see also, e.g., Wash. Ass'n of Churches v. Reed*, 492 F. Supp. 2d 1264, 1271 (W.D. Wash. 2006).  This concept is also supported by the idea that NRS  293.127 requires a liberal construction of the election chapter of the Nevada Revised Statutes, to ensure that all electors "have an opportunity to participate in elections" and that the "real will of the electors is not defeated by any informality or by failure substantially to comply with the provisions of this title with respect to the giving of any notice or the conducting of an election or certifying the results thereof."  NRS 293.127.

All eligible Nevadans who would risk disenfranchisement if the Court grants the requested injunctive relief. *See League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014) ("The public interest inquiry primarily addresses impact on non-parties rather than parties." (*quoting Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002))). By contrast, the public interest would most assuredly be ill-served if voters' constitutional rights were violated to safeguard against nonexistence instances voter fraud. *See, e.g., Common Cause/Ga. v. Billups*, 439 F. Supp. 2d 1294, 1359–60 (N.D. Ga. 2006).

Accordingly, it is clear that the public interest weighs heavily against the requested preliminary injunction being issued.

**F.    The *Purcell* Principle mandates against issuing the requested injunction.**

Finally, the principle set forth in *Purcell v. Gonzalez*, 549 U.S. 1 (2006) requires this Court to avoid intervening to alter the election rules on the eve of the primary election.

The *Purcell* principle provides that near-election court orders themselves risk debasement and dilution of the right to vote because "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." 549 U.S. at 4-5. The "possibility that qualified voters might be turned away from the polls," *id.* 4, violates their right to vote.

Moreover, the Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election.  *See Purcell v. Gonzalez*, 549 U. S. 1 (2006) (per curiam); *Frank v. Walker*, 574 U. S. 929 (2014); *Veasey v. Perry*, 574 U. S. __ (2014)."  *Republican National Committee v. Democratic National Committee*, No. 19A1016, 2020 U.S. LEXIS 2195 (U.S. Apr. 6, 2020) (per curiam), slip op. available at https://www.supremecourt.gov/opinions/19pdf/19a1016_o759.pdf.

Here, the Court already found, over 2 weeks ago, that the *Purcell* principle did not support the court deciding the first preliminary injunction motion.  In the intervening weeks, much has occurred toward executing the mail election plan that mandates exercising judicial discretion not to interfere with the impending primary election.

First, ballots have been mailed to all active voters at the expense of over $2.5 million. Another $1 million was used to procure additional voting equipment needed to process the increase in mail ballots and for other non-voting equipment necessary.

Nearly $800,000 was used for a media campaign to inform the public/voters in Nevada of the mail election.  That effort has begun and includes TV and radio ads, digital ads for social media, direct mail marketing, and a website dedicated specifically for providing information about the primary election.

*//*

-30-

1    The SOS website has the following message posted:

2    Nevada plans to conduct an all-mail election for the June 9, 2020 primary election. All
     active registered voters in Nevada will be mailed an absentee ballot for the primary
3    election. No action or steps, such as submitting an absentee ballot request application,
     will be required by individual voters in order to receive a ballot in the mail.  Voters will
4    be able to mark their ballot at home and then return it by mail using a postage-prepaid
     envelope or by dropping it off in person at a designated county location. This
5    announcement applies only to the June 9, 2020 primary election.

6    https://www.nvsos.gov/sos/elections/2020-election.

7        The website also provides specific guidance, explain that "For the safety of all Nevadans,

8    and as a temporary measure to help slow the spread of COVID-19, the 2020 Nevada primary

9    election will be conducted through mail-in ballots."  https://www.mailitinnevada.com/.  The SOS

10   website also provides a list of "2020 Ballot Drop Off & Polling Locations."  Id.

11       The mail-in primary election plan is in full swing, with early voting set to commence in

12   less than a week and the actual primary election day just a few weeks away.

13       Many voters, including the undersigned, have already completed their ballots and

14   returned the same via mail or by dropping them off at the clerk/registrar's office.  Unlike the

15   undersigned, however, most other voters do not have inside information about the conduct of the

16   fast-approaching primary election.   Those voters may not receive information regarding a last-

17   minute change of the character of the election, and the need to vote in a manner other than what

18   election officials have been advising for the past month and a half, in time to vote—or in the case

19   of those who have already submitted the mail ballots, to vote again.

20       What the Plaintiffs ask this Court to do is change the rules of the election on the virtual

21   eve of the primary election, which flies directly in the face of the *Purcell* principle and the urging

22   of the Supreme Court not to intervene to alter the election rules on the eve of an election.

23       Indeed, even Plaintiffs acknowledge that the grant of the relief would require Nevada

24   election officials "to conduct a public information campaign informing Nevada voters that any

25   mailed ballot not provided as an absent ballot upon written request of a registered voter meeting

26   the statutory requirements of NRS 293.3165 will not be counted as a lawful ballot for the

1   primary election if returned. Each voter must either request an absentee ballot by the statutory

2   deadline or appear in person on election day at a designated polling location to cast a valid ballot

3   in the primary election."  Amended Complaint (ECF #64) at p. 26, ll. 17-23.

4        In making this request, Plaintiffs acknowledge and recognize that changing the rules on

5   the eve of the election would cause confusion amongst voters, especially those who have already

6   voted.  Plaintiffs cavalier attitude towards attempting to remedy the proposed confusion is

7   inadequate.  This change in character of the election cannot be accomplished at the snap of a

8   finger without grave consequences.

9        Voters who relied on the information and instruction provided by election officials will

10  believe that they have voted.  There will be confusion on the part of the voters, with not all

11  understanding that they need to take further action. There are numerous voters who would prefer

12  to avoid the social contact required by voting in person.  They may wish to avoid that contact by

13  voting an absent ballot.  Again, confusion abound.  There is great potential that those voters will

14  not understand that they will now need to request an absent ballot for their vote to be counted.

15  Those voters worried about risks to their health or unsure about how to obtain an absentee ballot

16  may very well be discouraged from exercising the right to vote altogether.  If the preliminary

17  injunction is granted, some voters will inevitably be denied the right or ability to vote as a direct

18  consequence of the proposed change at the last minute.

19       Moreover, it is not as simple as Plaintiffs suggest to execute a viable primary election in

20  which the public can have confidence.  In-person locations would have to be arranged and

21  provided consistent with this last-minute shift to an in-person election.  If the preliminary

22  injunction is granted, election officials throughout Nevada will have to scramble to provide

23  adequate in-person polling locations.  Early voting, which also would require the same vast

24  expansion of polling locations, begins in just a few days.  Locations willing and able to house

25  polling locations would have to be secured.  Poll workers to staff those locations would have to

26  be located and trained.  As stated in the March 24, 2020 press release, that training ordinarily

1   occurs in the very first part of April to adequately ensure proper training. Also stated was the

2   fact that the majority of Nevada's poll workers belong to groups that are at high-risk for severe

3   illness from COVID-19. With the potential for the spread of COVID-19 still very real, as new

4   cases continue to arise even with the restrictions in place, use of those at-risk poll workers is

5   unrealistic. The result will be many brand new poll workers, assuming an adequate number of

6   poll workers can be secured. Having a majority of brand new, questionably-trained poll workers

7   will necessarily place into question the integrity of the primary election.

8          Based on the late timing in bringing this matter to the court, there is no viable manner in

9   which to alter the all-mail election process that the registered voters, if not all citizens, in the

10  State of Nevada, expect, without placing into question the integrity of that primary election.

11  Accordingly, the Court must heed the advice of the Supreme Court and exercise its discretion to

12  refrain from interfering with the imminent primary election.

13  **IV.    CONCLUSION**

14         For the reasons set forth herein, Ms. Spikula urges the Court to deny the second motion

15  for preliminary injunction filed in this case, dismiss the case, and grant such grant such other

16  relief as it deems appropriate in the premises.

17         Dated this 20th day of May, 2020.

18                                         CHRISTOPHER J. HICKS
                                           District Attorney
19
                                           By      /s/ Herbert B. Kaplan
20                                             HERBERT B. KAPLAN
                                               Deputy District Attorney
21                                             One South Sierra St.
                                               Reno, NV  89501
22                                             (775) 337-5700
                                               hkaplan@da.washoecounty.us
23
                                           ATTORNEYS FOR WASHOE COUNTY
24                                         REGISTRAR OF VOTERS, DEANNA SPIKULA

25

26

## **CERTIFICATE OF SERVICE**

Pursuant to FRCP 5(b), I certify that on this date, the foregoing was electronically filed with the Second Judicial District Court by using the ECF System.  Electronic service of the foregoing document shall be made in accordance with the Master Service List as follows:

James Bopp, Jr.,

Henry Brewster, Esq.

Daniel Bravo, Esq.

Richard E. Coleson Esq.

Courtney Elgart, Esq.

Marc Elias, Esq.

Jonathan Hawley, Esq.

Abha Khanna, Esq.

Mary Anne Miller, Esq.

Amanda L. Narong, Esq.

Craig A. Newby, Esq.

David C. O'Mara, Esq.

Bradley Schrager, Esq.

Corrine L. Youngs, Esq.

Gregory Louis Zunino, Esq

Dated this 20th day of May, 2020.

_____/s/ M. Coin_____
M. Coin

## EXHIBIT INDEX

                                                                  No. of Pages

EXHIBIT A     Declaration of Wayne Thorley                         5 Pages

EXHIBIT B     Declaration of Deanna Spikula                        11 Pages

EXHIBIT C     Las Vegas Sun Article May 17, 2020                   2 Pages

EXHIBIT D     Declaration of Herbert Kaplan                        2 Pages

EXHIBIT INDEX