David O'Mara (Nev. bar #8599)
The O'Mara Law Firm, P.C.
311 E. Liberty Street
Reno, NV 89501
Telephone: 775/323-1321
David@omaralaw.net
*Local Counsel for Plaintiffs*

James Bopp, Jr. (Ind. bar #2838-84)*
    jboppjr@aol.com
Richard E. Coleson (Ind. bar #11527-70)*
    rcoleson@bopplaww.com
Corrine L. Youngs (Ind. bar #32725-49)*
    cyoungs@bopplaw.com
Amanda L. Narog (Ind. bar #35118-84)*
    anarog@bopplaw.com
True the Vote, Inc.
 Voters' Rights Initiative
The Bopp Law Firm, PC
1 South Sixth St.
Terre Haute, IN 47807–3510
Telephone: 812/877-4745
*Appearing Pro hac vice
*Lead Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

**Stanley William Paher**, **Terresa Monroe-Hamilton**, and **Garry Hamilton**, **Daryl Byron DeShaw**, **Jeff Ecker**, **Gary Gladwill**, **Linda Barnett**, and **Nevada Right to Life**, *Plaintiffs*

*v.*

**Barbara Cegavske**, in her official capacity as Nevada Secretary of State, **Deanna Spikula**, in her official capacity as Registrar of Voters for Washoe County, and **Joseph P. Gloria**, in his official capacity as Registrar of Voters for Clark County, *Defendants*

Case No.: 3:20-cv-00243

**Plaintiffs' Second Preliminary-Injunction Reply**

## Introduction[1]

In the Factual Background, Plaintiffs established (inter alia) the unassailable facts that (i) across the nation states are reopening from the COVID-19 lockdown and (ii) even during the lockdown people were permitted to do essential activities—such as grocery shopping and in-person voting—with recommended safeguards. The Wisconsin experience showed that in-person

---

[1] Nomenclature: Established abbreviations and terms in ECF No. 65, e.g., "State Plan," "Clark County Plan," and "legislative mandate," are retained; official-capacity defendants and intervenor-defendants are collectively "Defendants" unless context requires otherwise.

 Defendants filed four briefs with overlapping arguments, and ECF no. 33 was 33 pages. Given that volume and those overlapping arguments, along with the current page limit, Plaintiffs respond generally to some arguments and deal with referenced, particular arguments as needed.

voting with recommended safeguards would not spike COVID-19 cases. To the extent some threat is ongoing now or by election day, for the vast majority, in-person voting with recommended safeguards is no less reasonable a burden than burdens held reasonable in *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181 (2008). So the untailored, overbroad remedy of a mostly mail-in election is unwarranted and creates the substantial risks of direct and vote-dilution disenfranchisement from the court-recognized risks of absentee-ballot fraud and a sudden flood of mailed ballots. Only the legislature has the authority and expertise to balance access and election integrity issues, and its balancing nowhere created a mostly-mail system, only one that is primarily in-person voting with absentee voting at a usual percentage deemed safe in this state in view of the recognized absent-ballot-fraud and mass-mailing problems.[2] Inverting that scheme means that both of those harms are now beyond what the legislature found to be safe in this state and so puts them at issue as substantial risks make the Plans unconstitutional.

**I.**

**Plaintiffs are likely to prevail on the merits because the U.S. Constitutional Amendments I and XIV and Article I, § 4, cl.1, require Nevada to follow the legislative mandate.**

**A.   Only the legislature may lawfully balance ballot access with election integrity, so its legislative mandate must be followed and its balancing establishes as a matter of law the presence of disenfranchisement risks.**

In I.A, Plaintiffs established key, controlling fundamentals. Only the legislature has the authority and expertise to balance ballot access with the known, court-recognized,[3] substantial risk of illegal voting posed by mail-in ballots and prescribe the manner of an election. The legislature's balancing, expressed in its "legislative mandate," is that for *this* state at *this* time that balancing *requires* that the election be predominantly in-person voting with only modest mail-in voting. That prescribed model establishes an approximate percentage of votes that will be mail-in

---

[2] That the legislature's binding balancing was correct continues to be born out by evidence. *See, e.g.*, J. Dienst, *Close Results In Paterson Vote Plagued By Fraud Claims; Over 3K Ballots Seemingly Set Aside*, NBC NY, May 20, 2020, www.nbcnewyork.com/news/local/close-results-in-paterson-vote-plagued-by-fraud-claims-over-3k-ballots-seemingly-set-aside/2425813/ ("'There is a genuine absentee ballot fraud scandal going on in Paterson,' said election law expert and University of California-Irvine School of Law professor Rick Hasen.").

[3] *See* ECF No. 65 at 6 (citing court recognition that mail-in ballots pose a substantial risk of illegal votes "making this a cognizable issue and interest for balancing that need not be proven").

ballots and reflects the legislature's judgment that this *usual* percentage poses a tolerable risk of ballot fraud and mailing problems. Thus, the risk of mail-in ballot fraud and mailing problems are *recognized* in the legislative mandate and *accounted for* in the balancing. So going from a modest amount of mail-in ballots to mostly mail-in ballots makes the risk of ballot fraud and mailing problems substantial as a matter of legislative finding inherent in its balancing. Making access overbroad gives inadequate effect to the substantial interests the legislature balanced.

Defendants ignore these controlling fundamentals. None could show that the legislature *established* a mostly mail-in-voting system. The best they could argue was that the legislature *allowed* the creation of some mailing precincts. But by using the exception to swallow the rule, the Secretary and County Administrators turned the legislature's balancing of ballot access with mail-in-ballot-fraud and sudden-mailing problems on its head. When Defendants argue that mail-in-ballot fraud and mailing problems are speculative, they ignore that these substantial risks were already recognized by (i) courts and (ii) the legislature in its balancing that created a mostly in-person system with moderate mail-in voting. Recognition of the substantial risks are baked in, not speculative.

Defendants miss the irony of their saying that the well-established and substantial risks posed by mail-in- vote fraud and a sudden flood of mail-in ballots is speculative when the foundation of the overbroad Plans was speculative, i.e., that most voters would self-disenfranchise out of fear that the same recommended safeguards that were used for in-person voting without spiking COVID-19 in Wisconsin *might not* work for doing essential activity in Nevada so that voters *might* get COVID-19, which *might* be traceable to voting with safeguards, and *might* be more than a mild case as most seem to get. Such speculation did not justify the overbroad remedy of sending mail-in ballots to all active registered voters, let alone inactive ones as in Clark County. No defendant established that large numbers of voters will self-disenfranchise if they must vote in person, and recent Wisconsin evidence shows the contrary. "While the COVID-19 pandemic produced an exceptional shift to vote-by-mail [by requested absentee ballots], it is not clear that the crisis influenced overall participation. The total ballots cast in the Spring Election and Presidential Preference Vote were not markedly different from previous spring elections." Wisc.

Elec'n Comm'n, *April 7, 2020: Absentee Voting Report* at 4, (May 15, 2020), [elec-tions.wi.gov/sites/elections.wi.gov/files/2020-05/April%202020%20Absentee%20Vot-ing%20Report.pdf](elections.wi.gov/sites/elections.wi.gov/files/2020-05/April%202020%20Absentee%20Voting%20Report.pdf) (documenting problems with the sudden flood of mailed ballots[4]). That means that the many who voted in person did not self-disenfranchise but relied on the recommended safeguards used for all essential activities. So the speculation on which the Plans was founded was unfounded and the overbroad remedy was unjustified.

Because the legislature has authoritatively balanced ballot access and ballot fraud, the legislative mandate must be followed.[5] If it is upended as in the Plans, the significant mail-in-ballot fraud and mailing-problem risks are a substantial, given concern because they are what the legislative mandate authoritatively removed as cognizable concerns through balancing. So it matters whether the legislative mandate is followed. And it was not followed generally, because the legislature nowhere created a mostly mail-in voting plan, or specifically, because the legislature required certain steps to even create mailing districts that were not followed, ECF No. 65 at Facts(B). In *Kelly v. Murphy*, 79 Nev. 1, 377 P.2d 177 (Nev. 1963), the Nevada Supreme Court held that phone directions from the Secretary did not constitute making regulations in compliance with NRS 293.247, so a recount was without legal authorization and a futile act. Following the legislative mandate requires doing what the legislature requires to make a regulation.

There is no Eleventh Amendment problem because Plaintiffs are not just trying to enforce state law in federal courts. Rather, failure to follow the legislative mandate established that mail-in-ballot fraud and mailing problems are cognizable here and so the disenfranchisement risks

---

[4] "At a local level, the extraordinary volume placed enormous stress on election officials, elections systems, and the [USPS]." *Id.* at 3. "With nearly six times more ballots in circulation, the number of complaints and concerns increased by a similar amount. Some voters also reported not receiving their absentee ballots while others reported that their completed ballots were not returned to the clerk in a timely fashion." *Id.* at 12. Yet by-request ballots comprised 61.8%, 12.6% voted early in person, and 25.6% voted in person on election day. *Id.* at 6. The Report confirmed the reported "three tubs" of undelivered absentee ballots found by the USPS. *Id.* at 16.

[5] The legislative mandate must *also* be followed because the Elections Clause, U.S. Const. art. I, § 4, cl.1, requires it as federal candidates are on the ballot. But wholly *apart* from that, it must be followed because inherent within it is the restriction of mail-in-ballot fraud to the approximate percentage that the legislature deemed safe for *this* state in *this* election, as is the legislature's determination of what is safe regarding mail problems.

flow from that as a matter of law given the legislative balancing. There is no Eleventh Amend-

ment issue where Plaintiffs seek to have the legislative mandate followed because not doing so

violates their fundamental right to vote protected by the First and Fourteenth Amendments. The

Eleventh Amendment provides no shield for state officials acting in their official capacities when

plaintiffs request prospective injunctive relief to vindicate such rights. *See, e.g.*, *Doe v. Lawrence

Livermore Nat'l Lab*, 131 F.3d 836, 839 (9th Cir. 1997); *Ex parte Young*, 209 U.S. 123 (1908).

Plaintiffs established that what *other* states do and what *other* safeguards exist don't justify

the inversion of the legislature's balancing because only the legislature has the authority and ex-

pertise to balance ballot access and election integrity. Its balancing governs what is required and

safe for *this* state, so *all* that the legislature mandated is essential. One cannot properly say that,

because other safeguards exist, election administrators may invert the balancing.

Consequently, the Secretary and County Administrators were required to accommodate

COVID-19 concerns *within* the legislative mandate, like Wisconsin did, not invert that mandate.

**B.  Discarding the legislature's balance of in-person and mail-in voting and throwing mail-in voting open to all violates the right to vote by causing numerous voters to suffer *direct* disenfranchisement.**

In I.B, Plaintiffs established that, based on the *legislature's balancing* of in-person and by-

request absentee-ballot voting in the legislative mandate, throwing mail-in voting open to all

would violate the right to vote by causing numerous voters to suffer direct disenfranchisement.

Again, Plaintiffs relied expressly on the legislature's balancing and not prescribing a mostly mail

election, ECF No. 65 at 12-15, which "establishes the disenfranchisement harm as a matter of

law," *id.* at 15. As established, *supra* at I.A, Defendants ignore the legislative balancing and man-

date and act as if the Secretary and County Administrators are free to ignore it in election admin-

istration. They are not. In *addition* to expressly relying on the legislature's balancing and man-

date, Plaintiffs provided evidence of disenfranchisement from a sudden increase in mail-in bal-

lots. So Plaintiffs have a non-speculative, substantial, personal risk of direct disenfranchisement,

which is a sufficient harm for standing,[6] and it is caused by the Plans, and a holding of likely suc-

---

[6] Intervenor-Defendants never established that voters *will* self-disenfranchise or *will* get COVID-19 from in-person voting (and the Wisconsin experience establishes otherwise)—only some risk of such. The same must apply to Plaintiffs, so a substantial likelihood suffices.

cess and a preliminary injunction will remedy the harm.[7]

Given standing, *Defendants* (not Plaintiffs) must justify the Plans under the test in *Burdick v. Takushi*, 504 U.S. 428 (1992), because the burdens here follow those at trial. And because disenfranchisement is a severe harm, Defendants must prove their broad remedy narrowly tailored to a compelling interest. But relying on standing arguments, Defendants didn't meet that burden. Plaintiffs established that in-person voting with recommended safeguards is similarly safe to other in-person essential activities with recommended safeguards, that Wisconsin in-person voting didn't spike COVID-19 levels, and that such burdens were no greater than the burdens held "reasonable" in *Crawford*, 553 U.S. 181. So for most people, there was no unreasonable burden and as a result the overbroad, facial remedy of mailing ballots to all active (let alone, inactive) registered voters was not narrowly tailored. To the extent there is an interest in protecting those specially at risk, the Plans failed to target them. So the Plans violate the right to vote by direct disenfranchisement and are unjustified under the *Burdick* balancing analysis.

**C. Discarding the legislature's determination that voting should be primarily in person, and mailing absentee ballots without request violates the right to vote by causing numerous voters to suffer *vote-dilution* disenfranchisement.**

In I.C. of the opening brief, Plaintiffs relied again on the *legislature's* balancing and determination that voting should be primarily in person and its requirement that absentee ballots be by request to establish the substantial risk of illegal votes as a matter of law based on that balancing and legislative mandate. And they relied on the fact that courts have recognized the substantial risk of absentee-ballot fraud. So they were not required to prove there is such a substantial risk, which was amplified many times by abandoning the percentage of such votes that the legislature found safe and offering mail-in ballots to all active (and inactive in Clark County) registered voters. Plaintiff supplemented that with some examples, but they were not required to because the problem is court-recognized and inherent in the legislature's balancing and mandate. This sub-

---

[7] The suggestion that County Administrators who were not sued would not abide by this Court's injunction fails. The Defendants fail to note that Plaintiffs have requested a declaration that the Secretary's approval of the County Administrators' mail-in balloting plan is unconstitutional. This declaration of unconstitutionality would void the Secretary's approval of all the counties' mail-in balloting plan. Anyway, Plaintiffs are from named-defendant counties so the relief would directly benefit them.

1  stantial risk is not speculative because it is court-recognized and legislature balanced, and as with

2  *direct* disenfranchisement, a substantial risk of vote-dilution suffices for standing (just as

3  Intervenors did not establish that in-person voters *will* self-disenfranchise or *will* get COVID-19).

4      Plaintiffs also established that theirs is clearly not a generalized grievance by a careful analy-

5  sis of the actual language and meaning of *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992).

6  They established that the issue is not *how many* have this grievance but whether they are merely

7  trying to make the government do its job, which they are not. They are seeking relief for viola-

8  tions of their fundamental rights. And they established that they are *not* at the general level of

9  mere "citizen" but are at three levels of specificity beyond that. citizens. They are among that

10  subset who can actually have their vote diluted. Defendants ignore this clear showing.

11      Two cited, non-controlling cases, don't alter this fact. ECF No. 74 at 17. *ACRU v. Martinez-*

12  *Rivera*, 166 F. Supp. 3d 779 (W.D. Tex. 2105), involved review of a magistrate's report, so un-

13  objected findings were reviewed only for clear error. ACRU did not object to the magistrate's

14  finding that "undermined voter confidence and potential vote dilution[] merely amount to gener-

15  alized grievances about the government, which do not give rise to associational standing" and the

16  court found no clear error. *Id.* at 787. But in that case the argument was *not* that the legislature

17  had already done a balancing concerning the risk of vote dilution, the abandonment of which nec-

18  essarily presented a substantial risk beyond what the legislature had decided was permissible, but

19  only that failure to purge voting rolls (under the National Voter Registration Act) might result in

20  vote dilution. That substantially differs in kind, and present Plaintiffs have a direct harm caused

21  by abandoning the legislative mandate where actual voting is occurring. And Plaintiffs *do* object

22  to, *not* acquiesce in, the assertion that theirs is a generalized grievance, which they have shown it

23  not to be in clear detail. So it would be clear error to find it here.

24      *United States v. Florida*, 2012 U.S. Dist. LEXIS 189624 (N.D. Fla. 2012), involved an effort

25  to intervene by "four individuals [who] sa[id] that if people are improperly registered to vote it

26  will dilute the votes of properly registered voters," *id.* at *4, and they (and members of Judicial

27  Watch) were held to have only the generalized interest of "every other registered voter in the

28  state," *id.* (True the Vote asserted a different interest—monitoring voter-registration lists—but as

there was no interference with that it was not allowed to intervene. *Id.* at *5-6.) As with *ACRU*, no actual voting was underway with an inversion of the legislature's balancing that of itself raises the dilution problem and makes it substantial because it is not within the bounds that the legislature deemed safe for this state. And neither case involved a sudden flood of mail-in votes.

**D.   Discarding the legislative mandate violates U.S. Constitution Article I, § 4, cl. 1, which mandates that the legislature prescribe the manner of election.**

In I.D, Plaintiffs established that as federal candidates are on the ballot, this election must be conducted in the legislature's prescribed manner. That manner was primarily in-person voting with a moderate percentage of by-request absentee-ballot voting—at the level the legislature determined the substantial, court-recognized risks from absentee-ballot fraud and a sudden flood of mail-in ballots were safe. By inverting that balancing, the Plans are not the manner the legislature prescribed, and Plaintiffs have further detailed the noncompliance with the legislative mandate. ECF No. 65 at 3-6.  Why following the legislative mandate is vital is based on the legislature's authority and expertise for balancing access and election integrity as explained in I.A, so whether there is a private cause of action for this claim does not matter to that controlling analysis. Defendants have cited no case holding there is not a private cause of action for this claim, and Plaintiffs believe it is properly assertable, just as a parallel manner clause was at issue in *Bush* but not decided because the case was decided on a one-person-one-vote equal-protection analysis.

**E.   The Clark County Plan to enhance its voters' strength violates the equal-protection and right-to-vote rights of voters in other counties under one-person-one-vote doctrine.**

In Count IV, Plaintiffs challenged the Clark County Plan under the one-person-one-vote doctrine for two things only: (1) mailing to inactive voters and (2) sending county approved ballot harvesters. ECF No. 64 at ¶ 126. Plaintiffs *nowhere* challenged the establishment of more polling places in Count IV, merely *mentioning* extra polling places in describing what Clark County had done. *Id.* at ¶ 39. The same is true of Plaintiffs' preliminary-injunction memo, which nowhere argues that the extra polling places are a violation of one-person-one-vote doctrine. ECF No. 65 at 21-23. Plaintiffs believe that in-person voting with recommended safeguards (along with by-request absentee ballots) was Nevada's proper response to COVID-19 concerns. That would be within the legislative mandate (instead of inverting the legislature's balancing) and more polling

places facilitate that. Plaintiffs noted that Clark County is the most populous county, ECF No. 65 at 22, so the fact that it would have proportionally more polling places would be expected. So arguments attacking a supposed challenge to extra polling places are strawman arguments. *See, e.g.*, ECF Nos. 75 at 2-3 and 77 at 3.

Plaintiffs established that giving one county greater voting strength than others violates the one-person-one-vote doctrine in violation of the Equal Protection Clause and the fundamental right to vote under the First and Fourteenth Amendments. ECF No. 65 at 21-23. And sending unrequested mail-in ballots to inactive voters and sending county-approved ballot harvesters will ensure that more ballots are collected from voters of Clark County (who largely have a certain political persuasion, which Defendants don't deny) than in other counties (largely of a different political persuasion)—with the difference not accounted for by population differences. *Id.*

The Clark County Registrar says there is no right to vote in a manner of one's choosing. ECF No. 75 at 4. But that is not the issue here. The issue generally is violation of the *legislature*'s *manner*, which balanced and protected against harms that are now at issue by the inversion of its manner. And specifically, the issue here is about giving voters in one county greater voting power than voters in other counties, though all have the same *manner* of voting, i.e., mostly mail-in voting with modest in-person voting. So this argument is beside the point.

The Secretary says "NRS § 293.345(1) is silent on whether ballots may be mailed to inactive voters" and so defers. ECF No. 78 at 7. But there *is* a relevant *regulation*, NAC 293.412:

> (4)(a) A city or county clerk (a): Is not required to send a sample ballot to an inactive voter. (b) Is required to send an absent ballot to an inactive voter if the inactive voter requests: (1) An absent ballot pursuant to the provisions of NRS 293.313 or 293C.310, as applicable; or (2) A military-overseas ballot pursuant to the provisions of chapter 293B of NRS."

That is not silent, deals with inactive voters, and nowhere authorizes absentee ballots for inactive voters without request. Conversely, it *requires* inactive voters to request absentee ballots. That must be followed absent a properly promulgated regulation replacing it. As held in *Kelly*, 79 Nev. 1, 377 P.2d 177, regulations must be made in compliance with NRS 293.247, and ad hoc, noncompliant actions in violation of existing regulations are "futile" acts "without legal authoriza-tion." This regulation speaks to the requirements for inactive registered voters getting an absentee

1   ballot and remain unchanged. So it should have been followed by the Secretary and Registrar.

2   Mailing absentee ballots to inactive registered voters was and is without legal authorization.

3       The Clark County Registrar tries to distinguish *Bush v. Gore*, 531 U.S. 98 (2000), on the

4   grounds that it involved a different situation. ECF No. 75 at 4. But most cases can be distin-

5   guished factually and that doesn't vitiate their controlling *analysis* in applicable circumstances,

6   such as this. Plaintiffs set out the applicable analysis that *Bush* summarized from *prior* cases to

7   the effect that the voters of one county may not be given "greater voting strength." ECF No. 65 at

8   22. Distinguishing *Bush* on superficial facts does not address that prior case line. *Bush* did say

9   that local entities could use "different technologies" or "systems" for voting, as the Clark County

10  Registrar notes, but that isn't the issue here. Nor is this like the cases the Registrar cites involv-

11  ing traceable ballots and changing voting days. And because the Secretary *defers* to the Registrar

12  about sending absentee ballots to inactive voters, this *is* like the statewide situation in *Bush*

13  where the central authority allowed different standards in different counties. Not only is the Clark

14  County Plan contrary to the Secretary's *own* regulation at NAC 293.412, it is contrary to the Sec-

15  retary's *own* Plan—presumably based on her own balancing that excludes sending ballots to in-

16  active registered voters, or it has no rational basis—yet the Secretary *permits* this difference in

17  voting power between different counties. So this case *is* like *Bush* and the prior cases it cited in

18  which there existed a difference in voting power between counties approved by a state-wide au-

19  thority. That extra power has real-world results. As Plaintiffs already established, extra mining of

20  mail-in ballots in the most populous county of a certain persuasion will garner many more votes

21  of the dominant political persuasion in that county, just like the effort to mine extra votes in cer-

22  tain counties in Florida in *Bush* targeted large counties of a preferred political persuasion. In

23  close elections, those extra votes change results. An the claimed *purpose* of mailing to inactive

24  registered voters and county-approved ballot harvesters is to *increase* the number of votes—if

25  not it fails for lack of a rational basis—and only Clark County has this extra voting power. That

26  clearly violates the equal-protection and right-to-vote rights of voters outside Clark County who

27  do not have the same voting power.

28      Notably, Intervenors don't challenge standing for this claim, ECF No. 72 at 11, recognizing

that standing to challenge vote-dilution harm is a given in equal-protection cases. Instead, they say this case is foreclosed by *Short v. Brown*, 893 F.3d 671 (9th Cir. 2018). ECF No. 72 at 11-12. But *Short* doesn't control for at least three reasons. First, Plaintiffs don't argue that the Clark County Plan makes it harder for them to vote, so quotes to the effect that it doesn't are beside the point. Second, because Plaintiffs don't challenge this Plan for making it harder to vote, the notion that rational-basis scrutiny applies because mail-in voting makes it easier to vote is beside the point. Third, the part of *Short* that Intervenors ignore is the part that controls. Note that *Short* only involved the phasing in of mail-in voting in California, *id.* at 674-75, and voters in non-all-mail counties claimed their vote was diluted by votes in all-mail counties because mail-in voting was easier. After rejecting that argument, which Plaintiffs don't make, the Ninth Circuit said this case is "nothing like" the line of cases that Plaintiffs cited from *Bush* that found an equal-protection violation where some counties are given greater voting strength, *id.* at 678-78. In those disparate-voting-strength cases, strict scrutiny applies because violation of equal protection and vote-dilution disenfranchisement are severe harms. And under strict scrutiny, it is the burden of Clark County, and of the Secretary who allowed the disparate voting strength in contravention of her own State Plan, to establish that it is narrowly tailored to a compelling interest, which they have made no effort to do. Nor could they because there is no justification, even amid COVID-19 concerns, to empower one county over another. The Clark County Plan must be enjoined as to the two parts actually challenged.

## II.
### A preliminary injunction is necessary to prevent irreparable harm to Plaintiffs' constitutional rights.

Plaintiff have irreparable harm for the reasons established in Part II of their opening brief. ECF No. 65. Violations of constitutional rights are irreparable harm. Arguments to the contrary focus on standing, but Plaintiffs have explained why their claims are not speculative and not generalized grievances, and for Count IV Intervenors don't dispute standing under equal protection.

## III.
### The balance of equities and the public interest support injunctive relief.

The balance of equities and the public interest support the injunctive relief Plaintiffs request

1    for reasons established in Part II of their opening brief. ECF No. 65.

2        The Washoe County Registrar adds a whole section based on *Purcell v. Gonzalez*, 549 U.S.

3    1 (2006). ECF NO. 74 at 30-33, claiming that the requested relief would require "election offi-

4    cials ... [to] have to scramble" to comply and that doing so would "plac[e] into question the in-

5    tegrity of the th[e] primary election." *Id.* at 32-33. But the *Plans* place into question the integrity

6    of the election as detailed above. The requested relief that (i) acknowledges that Plaintiffs are

7    substantially likely to succeed on their claims that the Plans violate the federal constitution and

8    (ii) corrects the unconstitutional Plans will *enhance* the integrity of the election. That is the point

9    of constitutional rights and the rule of law. If the problems identified are not corrected the elec-

10   tion will be of dubious integrity with no assurance that electoral outcomes are correct.

11       And what Defendants want is for the Secretary and County Administrators to be able *them-*

12   *selves* to make a late-breaking inversion of the legislature's balancing, and for Clark County to

13   do so even later, while those whose constitutional rights are violated by those late-breaking ac-

14   tions are shut out from the constitutional relief to which they would normally be entitled.

15                                      **Conclusion**

16       For the reasons shown, this Court should preliminarily enjoin the Plan and provide the relief

17   in the Amended Complaint's Prayer for Relief.

18   May 21, 2020                                    Respectfully submitted,

19   David O'Mara (Nev. bar #8599)                   /s/ Amanda L. Narog
     The O'Mara Law Firm, P.C.                       James Bopp, Jr. (Ind. bar #2838-84)*
20   311 E. Liberty Street                               jboppjr@aol.com
     Reno, NV 89501                                  Richard E. Coleson (Ind. bar #11527-70)*
21   Telephone: 775/323-1321                            rcoleson@bopplaww.com
     David@omaralaw.net                              Corrine L. Youngs (Ind. bar #32725-49)*
22   *Local Counsel for Plaintiffs*                     cyoungs@bopplaw.com
                                                     Amanda L. Narog (Ind. bar #35118-84)*
23                                                      anarog@bopplaw.com
                                                     True the Vote, Inc.
24                                                     Voters' Rights Initiative
                                                     The Bopp Law Firm, PC
25                                                   1 South Sixth St.
                                                     Terre Haute, IN 47807‒3510
26                                                   Telephone: 812/877-4745

27                                                   *Appearing Pro hac vice
                                                     *Counsel for Plaintiffs*

28

                                          12

1

**Certificate of Service**

2

3

    I hereby certify on May 21, 2020, I served a true and correct copy of the foregoing on the

4

following parties via this Court's CM/ECF electronic filing system to the addresses listed below.

5   Gregory Louis Zunino                    Bradley Scott Schrager
    Nevada State Attorney Generals Office   Wolf, Rifkin, Shapiro, Schulman & Rabkin
6   100 N Carson Street                     3556 E. Russell Rd
    Carson City, NV 89701                   Las Vegas, NV 89120
7   775-684-1137                            702-341-5200
    Fax: 775-684-1108                       Fax: 702-341-5300
8   Email: GZunino@ag.nv.gov                Email: bschrager@wrslawyers.com

9

10  Craig A. Newby                          Courtney A. Elgart
    Office of the Attorney General          Perkins Coie LLP
11  100 N. Carson Street                    700 Thirteenth St, NW
    Carson City, NV 89701                   Ste 800
12  (775) 684-1206                          Washington, DC 20005-3960
    Email: cnewby@ag.nv.gov                 202 654 6200
13                                          celgart@perkinscoie.com

14
    Herbert B. Kaplan
15  One South Sierra Street                 Daniel Bravo
    Reno, NV 89501                          Wolf, Rifkin, Shapiro, Schulman, & Rabkin, LLP
16  775-337-5700                            3556 E. Russell Road, 2nd Floor
    Fax: 775-337-5732                       Las Vegas, NV 89120-2234
17  Email: hkaplan@da.washoecounty.us       702-341-5200
                                            Fax: 702-341-5300
18                                          Email: dbravo@wrslawyers.com
    Abha Khanna
19  Perkins Coie LLP
    1201 Third Avenue                       Jonathan P. Hawley
20  Ste 4900                                Perkins Coie LLP
    Seattle, WA 98101-3099                  1201 Third Avenue
21  206 359 8000                            Ste 4900
    akhanna@perkinscoie.com                 Seattle, WA 98101-3099
22                                          206 359 8000
23                                          JHawley@perkinscoie.com

24  Henry J. Brewster
    Perkins Coie LLP
25  700 Thirteenth St, NW
    Ste 800
26  Washington, DC 2005-3960
    202 654 6200
27

28

                                          1

Marc Erik Elias
Perkins Coie LLP
700 13th Street, NW., Ste. 600
Washington, DC 20005
202-654-6200
Email: melias@perkinscoie.com

Mary-Anne Miller, County Counsel
500 S. Grand Central Parkway
Las Vegas, NV 89106
Mary-Anne.Miller@ClarkCountyDA.com

David O'Mara
311 E. Liberty Street
Reno, NV 89501
Telephone: 775/323-1321
David@omaralaw.net
*Local Counsel for Plaintiffs*

Respectfully submitted,

/s/Amanda Narog
James Bopp, Jr. (Ind. bar #2838-84)*
    jboppjr@aol.com
Richard E. Coleson (Ind. bar #11527-70)*
    rcoleson@bopplaww.com
Corrine L. Youngs (Ind. bar #32725-49)*
    cyoungs@bopplaw.com
Amanda L. Narog (Ind. bar #36118-84)*
    anarog@bopplaw.com
True the Vote, Inc.
  Voters' Rights Initiative
The Bopp Law Firm, PC
1 South Sixth St.
Terre Haute, IN 47807‑3510
Telephone: 812/877-4745

*Pro hac vice application pending

*Counsel for Plaintiffs*

2