1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

STANLEY WILLIAM PAHER, *et al.*,

                              Plaintiffs,

        v.

BARBARA CEGAVSKE, in her official capacity as Nevada Secretary of State, *et al.*,

                              Defendants.

Case No. 3:20-cv-00243-MMD-WGC

ORDER

## I.    SUMMARY

The Court has already ruled in this case. *See Paher. et al. v. Cegavske*, *et al.*, No. 3:20-cv-00243-MMD-WGC, __ F. Supp. 3d__, 2020 WL 2089813 (D. Nev. Apr. 30, 2020). But Plaintiffs then amended their complaint ("AC") (ECF No. 64) and brought a new motion for preliminary injunction (Second PI Motion") (ECF No. 65). The AC consists of four claims and materially rehashes the original complaint except for the addition of more Plaintiffs and a new claim against a new Defendant—Joseph P. Gloria in his official capacity as the Registrar of Voters for Clark County ("Clark Registrar"). (*Compare* ECF No. 1 *with* ECF No. 64.) The Second PI Motion is in gist largely a motion for reconsideration; albeit, it glaringly repackages old arguments to achieve a different disposition without necessary justification. Plaintiffs' decision to bring the AC at this late hour, as opposed to seeking expedited appellate review of the Court's order ("PI Order") regarding their original motion for preliminary injunction ("First PI Motion") (ECF No. 57), is confounding and contrary to their position that a quick disposition of this matter is needed due to the impending June 9, 2020 Nevada primary election ("June Primary") (*see* ECF Nos. 1, 2, 3, 4). Ultimately, Plaintiffs' second proverbial bite at the apple is no more fruitful than the first. And the new fourth claim challenging Clark County essentially making mail-in ballots more accessible

to registered voters is legally tenuous because Defendants are not constitutionally prohibited from making voting easier. The Court will deny the Second PI Motion for the reasons below.[1]

## II.   BACKGROUND

The facts of this case have been largely recited in the Court's PI Order (ECF No. 57). The Court will not repeat the facts as previously stated here. Additional facts are taken from the AC (ECF No. 64) and exhibits attached thereto as well as other evidence submitted concerning the Second PI Motion.

### A.   The Parties

As relevant to the Second PI Motion, the field of Plaintiffs and Defendants have expanded. As a reminder, the original Plaintiffs are William Paher, Gary Hamilton, and Terresa Monroe-Hamilton. They previously sued only Nevada's Secretary of State Barbara Cegavske (the "Secretary") and Deanna Spikula—Registrar of Voters for Washoe County ("Washoe Registrar").

The new individual plaintiffs are Daryl Byron DeShaw, Jeff Ecker, Gary Gladwill, and Linda Barnett. All are eligible-registered voters. DeShaw and Ecker intend to vote in person while Gladwill and Barnet have already voted by mail. Gladwill, who is a resident of Lyon County, is also a candidate for county commissioner in that county. In addition to the new individual plaintiffs, the entity Nevada Right to Life ("NVRTL") is also included as a plaintiff. NVRTL advocates "for life in all of its stages and all ages" and have members, who are eligible-registered voters "who intend to vote in the coming primary but fear disenfranchisement." (ECF No. 64 at 4.)

///

///

---

[1]In addition to the Second PI Motion, the Court has considered the various responses (ECF Nos. 72, 74, 75, 78) and Plaintiffs' reply (ECF No. 80). Plaintiff filed "Supplemental Authority" without seeking leave of court as required by LR 7-2(g). (ECF No. 243.) The document provides two references—a recent Sixth Circuit decision and a 1969 Supreme Court decision. While Plaintiffs' failure to cite to the former is apparent since the decision was issued on May 26, 2020, Plaintiffs' reference to the latter is clearly an attempt to improperly augment their arguments after briefing has completed. Regardless, the Court will strike the improper supplement.

2

1
2
3
4

These Plaintiffs collectively sue the Secretary, the Washoe Registrar and the Clark Registrar (collectively, "Defendants"). (*Id.* at 4–5.) Like the Washoe Registrar in Washoe County, the Clark Registrar is responsible for implementing the state's election laws in Clark County. (*Id.*)

5

### B.    Relevant Facts

6
7
8
9
10
11
12
13
14

As provided in the PI Order, the impetus for Plaintiffs' lawsuit is to enjoin the implementation of the all-mail election for the June Primary ("the Plan"). The Secretary developed the Plan in partnership with Nevada's 17 county election officials to diminish the spread of the novel coronavirus disease 2019 ("COVID-19") pandemic. In the PI Order, the Court summed up the original Plaintiffs' claims as largely contending that the Plan was inconsistent with Nevada law and violated the United States Constitution because it is not "chosen" by Nevada's Legislature, and that an all-mail election strips voter-fraud-prevention safeguards and unconstitutionally violates Plaintiffs' right to vote due to purported vote dilution resulting in disenfranchisement. (*See* ECF Nos. 1, 57.)

15
16
17
18
19
20
21
22
23
24

In the PI Order, the Court concluded as a threshold matter that Plaintiffs lacked standing because they had not established an injury particularized to them. (ECF No. 57 at 2, 8–10.) The Court additionally found that Plaintiffs were unlikely to succeed on the merits of any of their claims chiefly because: (1) Nevada's interests in protecting the health and safety of Nevada's voters and to safeguard the voting franchise are compelling and longstanding interests that outweighed what amounts to Plaintiffs' preference for in-person voting under the *Anderson-Burdick* balancing test[2]; and (2) the Plan is consistent with Nevada law because the Secretary has been vested with the authority to implement it. (*Id.* at 10–22.) The Court also concluded that a balancing of the equities and the public interest weigh against the granting of an injunction. (*Id.* at 22–24.)

25
26
27

In the AC, Plaintiffs assert the following four claims: (1) the Plan violates the fundamental right to vote by direct disenfranchisement in violation of the First and

///

28

[2]*Anderson v. Celebrezze*, 460 U.S. 780, 788–89 (1983) & *Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

3

Fourteenth Amendments of the United States Constitution; (2) the Plan violates the fundamental right to vote by vote-dilution disenfranchisement in violation of the same; (3) the Plan violates Article I, Section 4, Clause 1 of the Constitution; and (4) Clark County's plan to send mail-in ballots to all registered voters and to allow for the collection of ballots ("Clark County's Plan" or "CC Plan") violates the Fourteenth Amendment's Equal Protection Clause.[3] (ECF No. 64 at 20–25.) As to the CC Plan, Plaintiffs particularly highlight Clark County's plan to: (i) send absent ballots to inactive registered voters and, as reported, "allow a bipartisan group of deputized 'field registrars' to collect sealed ballots from voters"; and (ii) create more vote centers than other Nevada counties. (ECF No. 64 at 2.)

The AC and the Second PI Motion, particularly as to the first three claims, are brought under the theory that the threats surrounding the spread of COVID-19 have diminished and that current social distancing measures are adequate to respond to concerns about public health such that enjoining the Plan is now merited. (*See id.* at 14–17; ECF No. 65 at 2–3.) In so contending, Plaintiffs rely heavily on articles and/or information concerning other states—not Nevada—reopening, deciding not to allow vote by mail, and about COVID-19 cases allegedly having not spiked two weeks after the infamous Wisconsin primary.[4] (*Id.*)

But not much has changed in Nevada since the Court issued the PI Order. COVID-19 continues to present a threat to public health. It is undisputed that the state continues to grapple with protecting the public from COVID-19 and remains under a declaration of

///

///

_____

[3]The header of the fourth claim broadly asserts that the Plan violates the Equal Protection Clause, but the substance of the allegation is specifically concerned with Clark County and the CC Plan. (*See* ECF No. 64 at 24–25.)

[4]*See, e.g.*, D. Chen & J. Diedrich, *Two weeks after election, COVID-19 cases have not spiked in Wisconsin but experts urge caution about conclusions*, Milwaukee J. Sentinel, Apr. 22, 2020, https://www.jsonline.com/story/news/2020/04/22/covid-19-hasnt-spiked-after-wisconsinelection-experts-urge-caution/2997394001/

state emergency.[5] Nevada is still in the initial stage of reopening—phase one—with a recent announcement for phase two to start on May 29, 2020.[6] *See id.* Under Nevada's phase one guidelines, most business and entities remain closed and/or subject to significant restrictions and local government and businesses are empowered to take even stricter social distancing guidelines than the statewide standards.[7] Moreover, Nevada's Governor, Steve Sisolak, continues to direct and "strongly encourage[]" Nevadans to stay home "[r]ecognizing that COVID-19 is still present in Nevada and highly contagious."[8] "Nevadans are advised that they are safer at home and should avoid interpersonal contact with persons not residing in their households to the extent practicable."[9] Public gatherings of individuals not of the same household are limited to no more than ten, though the limit will be increased to 50 in phase two.[10] And Governor Sisolak has repeatedly cautioned that phased lifting of restrictions depends on Nevada achieving established virus containment benchmarks, the failure of which may lead to restrictions being imposed again as needed.

///

///

---

[5]*See* the Official State of Nevada Website, Emergency Orders and Regulations, http://gov.nv.gov/News/Emergency_Orders/Emergency_Orders/ (last visited May 25, 2020).

[6]*See id.*; James DeHaven*, May 29 marks start of Phase 2 in Nevada. Sisolak says 'we'll remain cautious.'*, Reno Gazette Journal, May 26, 2020, https://www.rgj.com/story/news/2020/05/26/sisolak-nevadas-phase-2-reopening-begin-friday-bars-gyms-more/5264546002/.

[7]Steve Sisolak, *Roadmap to Recovery for Nevada*, *Guidelines and Protocols for Individuals and Businesses*, http://gov.nv.gov/uploadedFiles/govnewnvgov/Content/News/Emergency_Orders/2020/018-Roadmap-to-Recovery-Phase-One-Initial-Guidance.pdf (last visited May 26, 2020).

[8]*See* the Official State of Nevada Website, *Emergency Orders and Regulations*, Declaration of Emergency Directive 018, http://gov.nv.gov/News/Emergency_Orders/2020/2020-05-07_-_COVID-19_Declaration_of_Emergency_Directive_018_-_Phase_One_Reopening_(Attachments)/ (last visited May 26, 2020).

[9]*Id.*

[10]*Id.*; DeHaven *supra*.

1    III.    **LEGAL STANDARD**

2          Federal Rule of Civil Procedure 65 governs preliminary injunctions. "'An injunction

3    is a matter of equitable discretion' and is 'an extraordinary remedy that may only be

4    awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Earth Island Inst.*

5    *v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010) (quoting *Winter v. Natural Res. Def. Council*,

6    555 U.S. 7, 22, 32 (2008)). This relief is "never awarded as of right." *Alliance for the Wild*

7    *Rockies v. Cottrell ("Alliance")*, 623 F.3d 1127, 1131 (9th Cir. 2011). To qualify for a

8    preliminary injunction, a plaintiff must satisfy four requirements: (1) a likelihood of success

9    on the merits; (2) a likelihood of irreparable harm; (3) that the balance of equities favors

10   the plaintiff; and (4) that the injunction is in the public interest. *See Winter*, 555 U.S. at 20.

11   A plaintiff may also satisfy the first and third prongs by showing serious questions going

12   to the merits of the case and that a balancing of hardships tips sharply in plaintiff's favor.

13   *Alliance*, 632 F.3d at 1135 (holding that the Ninth Circuit's "sliding scale" approach

14   continues to be valid following the *Winter* decision).

15         On the merits-success prong, "the burdens at the preliminary injunction stage track

16   the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546

17   U.S. 418, 429 (2006); *see also id.* at 428 (citing *Ashcroft v. ACLU*, 542 U.S. 656, 666

18   (2004)).

19   **IV.    DISCUSSION**

20         Beyond the merits of the AC, the Court will deny the Second PI Motion for three

21   reasons: (1) lack of standing; (2) based on laches; and (3) under the *Purcell*[11] principle.

22         **A.    Standing**

23         The Court finds that Plaintiffs have not remedied their lack of standing, which based

24   on the PI Order and the Court's conclusions *infra* most directly concerns the instant first

25   three claims. "[T]he irreducible constitutional minimum of standing contains three

26   elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "The plaintiff must have

27   ///

28         [11]*Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam).

6

1    (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the
2    defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo,*
3    *Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). The party invoking federal jurisdiction must
4    show that it has standing for each type of relief sought. *Summers v. Earth Island Inst.,* 555
5    U.S. 488, 493 (2009).

6         A party may cure a standing defect by adding parties, removing parties, or
7    supplementing the facts of a complaint under Fed. R. Civ. P. 15. *See, e.g.*, *Northstar Fin.*
8    *Advisors Inc. v. Schwab Invs.*, 779 F.3d 1036, 1044–48 (9th Cir. 2015), *as amended on*
9    *denial of reh'g and reh'g en banc* (Apr. 28, 2015), *In re Schugg*, 688 F. App'x 477, 479–80
10   (9th Cir. 2017); *cf. Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*, 402 F.3d 1198, 1202
11   n.3 (Fed. Cir. 2005) ("The initial standing of the original plaintiff is assessed at the time of
12   the original complaint, even if the complaint is later amended.") (citations omitted).
13   However, Plaintiffs' AC suffers from the same failure to establish standing as the original
14   complaint—Plaintiffs have again failed to allege a particularized injury.

15        As with the original complaint, the claims in the AC are materially grounded on
16   ostensible election fraud that may be conceivably raised *by any Nevada voter*. Thus,
17   Plaintiffs' claims amount to general grievances that cannot support a finding of
18   particularized injury as to Plaintiffs. *See, e.g.*, *Lujan*, 504 U.S. at 573–74 (explaining that
19   U.S. Supreme Court's case law has "consistently held that a plaintiff raising only a
20   generally available grievance about government—claiming only harm to his and every
21   citizen's interest in proper application of the Constitution and laws, and seeking relief that
22   no more directly and tangibly benefits him than it does the public at large—does not state
23   an Article III case or controversy").

24        Plaintiffs essentially seek to have the Court reconsider its finding as to standing,
25   arguing that they do not merely assert "citizen" standing and that harm is specific to them
26   as registered, eligible voters, who actually vote. (*See* ECF No. 65 at 19–21.) But even if
27   the Court were to find that Plaintiffs state a particularized injury, and even if they had
28   argued the reconsideration standard, Plaintiffs face an additional obstacle. As the Court

7

1    concluded in the PI Order, Plaintiffs fail to show a nexus between the alleged violations

2    and their claimed injury. (*See* ECF No. 57 at 10 n.7.) Here, Plaintiffs again fail to more

3    than speculatively connect the specific conduct they challenge—that mail-in ballots are

4    sent to Nevada voters without request for an absentee ballot—and the claimed injury—

5    direct voter disenfranchisement or disenfranchisement through vote dilution (in sum,

6    disenfranchisement).[12]

7        Accordingly, Plaintiffs have failed to overcome the Court's original finding that they

8    lack standing, thereby precluding them from seeking to enjoin the Plan—at least via the

9    first three claims.

10       **B.    Laches**

11       The Secretary argues that the doctrine of laches further bars Plaintiffs from

12   obtaining equitable relief after unreasonable delay in filing the AC and the Second PI

13   Motion. (ECF No. 78 at 8–9.) The Court agrees.

14       "Laches is an equitable defense." *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 950

15   (9th Cir. 2001). It precludes a plaintiff who, "with full knowledge of the facts, acquiesces in

16   a transaction and sleeps upon his rights." *Id.* at 950–51 (quotations and citations omitted).

17   A defendant is entitled to relief under the doctrine where the defendant proves "both an

18   unreasonable delay by the plaintiff and prejudice to itself." *Couveau v. Am. Airlines, Inc.*,

19   218 F.3d 1078, 1083 (9th Cir. 2000). The Court finds, as the Secretary argues, that both

20   factors are satisfied here.

21   ///

22   _____

23   [12]Plaintiffs rely on numerous articles and studies to support their contentions that voting by mail leads to voter fraud. (*See* ECF No. 65 at 6–8.) The articles and studies are simply insufficient to establish that sending mail-in ballots to Nevada voters will result in

24   voter fraud that particularly disenfranchises Plaintiffs as voters. Said differently, they do not meaningfully improve Plaintiffs' burden to concretely establish voter fraud that harms

25   them. Plaintiffs' contention that issues with mail delivery to and from voters will lead to disenfranchisement based on what allegedly happened in Ohio and Wisconsin (*id.* at 8–

26   9) is equally unpersuasive as to Nevada. As the Washoe Registrar notes, for example, the situation with respect to "timing and preparation" of the June Primary is quite different in

27   Nevada than it was for Wisconsin, (*See* ECF No. 74-2 at 5.) Moreover, as the Court noted in the PI Order, the material safeguards against voter fraud are maintained under the Plan.

28   (ECF No. 57 at 14; *see also* ECF No. 74-2 at 9 ("The all mail primary election provides all of the voter fraud safeguards that exist in statute.").)

1    With the following considerations, the Court agrees Plaintiffs have unreasonably
2    delayed seeking preliminary injunctive relief. Plaintiffs brought this case in its initial form
3    on April 21, 2020 (ECF No. 1). They requested and were granted expedited briefing and
4    an expedited hearing (ECF Nos. 3, 14). Recognizing the urgency with which Plaintiffs
5    indicated they brought this case and the finality that was needed, the Court issued its
6    decision on the First PI Motion—the PI Order—two days after extensive briefing closed,
7    on April 30, 2020. (*Compare* ECF No. 43 *with* ECF No. 57.) Plaintiffs waited 14 days after
8    the PI Order was issued and only 26 days before the June Primary to file the AC and bring
9    the Second PI Motion. (*See* ECF Nos. 64, 65.) In doing so, Plaintiffs again sought
10   expedited relief. (ECF No. 66.)

11   Except the specific claim based on the CC Plan, the AC materially asserts no claim
12   that could not have been raised—or that was not raised—the first time around. To be sure,
13   Plaintiffs did not seek reconsideration of the Court's PI Order. Nor did Plaintiffs file an
14   appeal. Moreover, the AC also indicates that Plaintiffs had notice of the CC Plan, upon
15   which the fourth claim is grounded, by at least May 4, 2020. (ECF No. 64 at 8.)  Therefore,
16   it is inexplicable that Plaintiffs would delay bringing the AC and Second PI Motion for
17   another nine days in light of their claimed urgency. Plaintiffs surely have not acted with the
18   alacrity that they claim this case necessitates.

19   Plaintiffs' failure to seek legal relief and finality has certainly prejudiced Defendants.
20   As noted, the June Primary was only 26 days away when Plaintiffs brought the AC and
21   Second PI Motion. Even with expedited briefing, Plaintiffs could have anticipated that any
22   foreseeable briefing schedule would result in a decision being issued, at minimum, several
23   days closer to the election. Notably, since this Court issued the PI Order, mail-in ballots
24   have been sent to Nevada voters and a substantial number of eligible voters, including
25   Plaintiffs Gladwill and Barnett, have already sent in their mail-in ballots. (*See, e.g.*, ECF
26   No. 74-2 at 5–6 ("By the end of April, the actual mail ballots were mailed to all active
27   registered voters in Washoe County. Upon information and belief, all ballots for all Nevada
28   voters have been mailed . . .."); *see also id.* at 7 ("The mail-in primary election plan is in

1  full swing . . . Many voters have already completed their ballots and returned the same via

2  mail or by dropping them off at my office."); ECF No. 64 at 9 ("Mail ballots to active,

3  registered voters went out on May 6, 2020.").) The state has also made significant

4  monetary investments and efforts to implement the Plan and on media and marketing

5  campaigns to inform Nevada voters of how to exercise their right to vote via mail (ECF No.

6  74-1 at 4–6, ECF No. 74-3).

7         The Court finds that Plaintiffs' second request for preliminary injunctive relief is

8  therefore unreasonable and inequitable in seeking to undo the votes already casted by

9  Nevadans and would result in squandering the state's investment for the sake of an

10 unestablished specter of voter fraud. This conclusion is particularly merited where the AC

11 and Second PI Motion are largely repetitive of the original complaint and motion. Even if

12 the additional claim—the fourth claim based on the CC Plan—was meritorious, it would

13 not entitle Plaintiffs to the wholesale relief of voiding the Plan, which is ultimately what

14 Plaintiffs seek here. Even if Plaintiffs' preliminary injunction request was on firmer grounds,

15 the Court cannot foresee any viable manner of undoing the Plan or stopping its further

16 implementation without increasing the risks to the health and safety of Nevadans and

17 putting the integrity of the election at risk—particularly without sufficient time to prepare

18 an adequate alternative. (*See, e.g.*, ECF No. 74-2 at 7–9 (discussing the adverse

19 consequences for Nevada in changing the method and processes of voting in the June

20 Primary at this juncture). For all these reasons, the Court finds that the doctrine of laches

21 bars Plaintiffs' second request for preliminary injunctive relief and the Court will likewise

22 deny the request on this additional basis.

23         **C.    *Purcell***

24         The *Purcell* principle is yet another barrier to the grant of preliminary injunctive relief

25 here. Of course Plaintiffs are no stranger to *Purcell*. They argued in the First PI Motion

26 that *Purcell* bars the implementation of the Plan so close to the June Primary. (ECF No. 2

27 at 16–17.) The irony of Plaintiffs' argument was not lost on the Court. The Court disagreed

28 with Plaintiffs' contention as to the state and noted that *Purcell* counseled against

considering the First PI Motion. The Secretary, Washoe Registrar and Intervenor-Defendants here argue that *Purcell* is ever more relevant now where Plaintiffs seek to change the state's Plan governing the June Primary because the election is days away and Nevadans are already exercising their right to vote. (*See* ECF No. 72 at 15–16; ECF No. 74 at 4, 30–33; ECF No. 78 at 2, 9.) The Court agrees.

The *Purcell* principle provides that near an impending election court orders themselves risk debasement and dilution of the right to vote because "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." 549 U.S. at 4–5. The Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.* ("*RNC*"), 140 S. Ct. 1205, 1207 (2020) (citing *Purcell*; *Frank v. Walker*, 574 U.S. 929 (2014); and *Veasey v. Perry*, 574 U. S. __, 135 S. Ct. 9 (2014)); *see also Republican Party of Pa. v. Cortés*, 218 F. Supp. 3d 396, 405 (E.D. Pa. 2016) ("Federal intervention at this late hour risks 'a disruption in the state electoral process [which] is not to be taken lightly.' 'This important equitable consideration goes to the heart of our notions of federalism.'") (alteration in original) (citation and quotation omitted). This principle is particularly pertinent where plaintiffs ask courts to "impose large-scale changes to the election process." *Bryan v. Fawkes*, 61 V.I. 416, 469 (2014) (collecting cases).

The Court will follow the *Purcell* principle and declines to take any action to alter the Plan at this late hour. The Court is reassured that such is the right course in light of the exceptional relief that Plaintiffs request in the AC, which would completely upend the June Primary. Among other things, Plaintiffs seek injunctive relief ordering Defendants to disregard the mail ballots that have already been sent to voters and to notify voters that their mailed in ballots will not be counted; to undertake a counter media public information campaign to notify "every registered voter" of the changes Plaintiffs seek; and to undo the CC Plan. (*See* ECF No. 64 at 25–26.) Going along with Plaintiffs' request would surely

1  cause great disruption and confusion for Nevada voters. Plaintiffs' request is therefore in

2  many ways more injurious to Nevada voters at this juncture than the very grounds

3  underlying the AC, particularly given the speculative claimed of voter disenfranchisement.

4  The Court therefore also denies a grant of preliminary injunctive relief based on *Purcell*.

5  **D.    Touching Upon the Merits**

6  Touching upon the merits, it is also clear that Plaintiffs' claims should be plainly

7  rejected.

8  Plaintiffs' second and third claims are foreclosed by the PI Order because they are

9  materially the same as the second and third claims alleged in the original complaint.

10  (*Compare* ECF No. 1 *with* ECF No. 64.) Plaintiffs effectively seek reconsideration of these

11  claims without establishing the requirements of Fed. R. Civ. P. 60, which governs a motion

12  for reconsideration. (*See generally* ECF No. 65 (providing no Rule 60 arguments).)[13] The

13  Court therefore adopts its rulings from the PI Order and likewise find that Plaintiffs are

14  unlikely to succeed on the merits of these claims.[14]

15  Plaintiffs' first claim, despite discretely alleging direct disenfranchisement, in many

16  ways echoes Plaintiffs' second and third claims. The crux of this claim is Plaintiffs'

17  ///

18

19  [13]A motion to reconsider must set forth "some valid reason why the court should reconsider its prior decision" and set "forth facts or law of a strongly convincing nature to

20  persuade the court to reverse its prior decision." *Frasure v. United States*, 256 F. Supp. 2d 1180, 1183 (D. Nev. 2003). "A motion for reconsideration is not an avenue to re-litigate

21  the same issues and arguments upon which the court already has ruled." *Brown v. Kinross Gold, U.S.A.*, 378 F. Supp. 2d 1280, 1288 (D. Nev. 2005). A district court may decline to

22  consider claims and issues that were not raised until a motion for reconsideration. *Hopkins v. Andaya*, 958 F.2d 881, 889 n.5 (9th Cir. 1992), *impliedly overruled on other grounds in*

23  *Federman v. County of Kern*, 61 F. App'x 438, 440 (9th Cir. 2003). It is not an abuse of discretion to refuse to consider new arguments in a reconsideration motion even though

24  "dire consequences" might result. *Schanen v. United States Dept. of Justice*, 762 F.2d

25  805, 807–08 (9th Cir. 1985).

26  [14]To the extent Plaintiffs challenge the Court's finding that the Washoe Register complied with the notice requirements (ECF No. 57 at 19–20; *see* ECF. No 65 at 4–6),

27  Plaintiffs fail to meaningfully contest the Court's conclusion that the notice issue does not arise to the level of a constitutional violation—necessary to void the Plan—even if

28  technically inconsistent with Nevada law.

1    assertion that "[d]ue to . . . widespread disenfranchisement caused by not abiding by the

2    legislature's law, the Plan violates the right to vote by direct disenfranchisement." (ECF

3    No. 64 at 22.) The first claim therefore also seeks to avoid the Court's ruling in the PI

4    Order, where the Court concluded that the Plan is consistent with Nevada law and within

5    the authority conferred upon the Secretary. (*See* ECF No. 57 at 16–20.) Moreover, as

6    already discussed here and in the PI Order, Plaintiffs' claims of voter disenfranchisement

7    are speculative at best. Accordingly, Plaintiffs are also unlikely to succeed on the merits

8    of this claim.

9         While Plaintiffs' fourth and last claim is entirely new, it is of no greater avail for

10   Plaintiffs even assuming Plaintiffs have standing.[15] This claim is in gist that Clark County's

11   plan to mail ballots to all registered voters, including inactive voters, and to allow for

12   assistance in returning ballots will result in more votes coming out of Clark County because

13   the CC Plan makes it easier to vote in Clark County than any other county, resulting in an

14   Equal Protection violation. (ECF No. 64 at 24–25.)  The Washoe and Clark Registrars and

15   Intervenor Defendants point out that this claim is undermined by the Ninth Circuit's

16   decision in *Short v. Brown*, 893 F.3d 671 (9th Cir. 2018). (ECF No. 72 at 11–12; ECF No.

17   74 at 24–25; ECF No. 75 at 4.) Plaintiffs reply that *Short* does not apply because Plaintiffs

18   allege that the violation is that Clark County will have greater voter strength in the June

19   ///

20
21        [15]The Secretary notes that she gave deference to the Clark Registrar regarding his
     decision to send ballots to inactive registered voters under the CC Plan because "NRS §
22   293.345(1) is silent on whether ballots may be mailed to inactive voters as well as active
     voters" (ECF No. 78 at 7).  *See* NRS § 293.345(1) (providing that "the county clerk shall
23   cause to be mailed to each *registered voter* in each mailing precinct and in each absent
     ballot mailing precinct an official mailing ballot, and accompanying supplies, as specified
24   in NRS 293.350") (emphasis added). Plaintiffs do not directly challenge the Secretary's
     statement. Instead, Plaintiffs for the first time in their reply argue NAC § 293.412(4) is a
25   relevant regulation barring sending ballots to inactive voters (ECF No. 80 at 9–10). Even
     if the Court agreed, the Court does not consider the newly raised argument/legal provision
26   asserted for the first time in Plaintiffs' reply. *See, e.g., Zamani v. Carnes*, 491 F.3d 990,
     997 (9th Cir. 2007) ("The district court need not consider arguments raised for
27   the first time in a reply brief."). Moreover, to the extent the Secretary deferred to Clark
     County in implementing the CC Plan, the discretion of the Secretary to do so would also
28   likely fall under the provisions cited in the PI Order as being the basis of the Secretary's
     authority in the electoral process. *See* NRS §§ 293.124, 293.213(4) and 293.247.

1    Primary in violation of the one person, one vote principle[16] (ECF No. 80 at 8–9; *see also*

2    ECF No. 65 at 21–23; ECF No. 64 at 24–25). The Court disagrees with Plaintiffs.

3        Plaintiffs essentially speculate that beyond the size of Clark County's voter base

4    relative to other counties, the CC Plan will ensure that Clark County voters' vote carry

5    greater weight solely because ballots are also mailed to inactive registered voters and

6    county deputized election workers are allowed to collect ballots. (*See id.*; *cf.* ECF No. 75

7    at 3, 12.) To be sure, Plaintiffs expressly disavow any challenge to the provisions of the

8    CC Plan allowing for more polling places in Clark County. (ECF No. 80 at 8–9.)

9        Further, Plaintiffs do not address the Clark Registrar's contention that it is

10   anticipated that "most" of the ballots sent to inactive voters "will come back undeliverable

11   because we had previously sent election notifications to those addresses and the

12   notifications were returned as undeliverable or we received notification by the USPS that

13   the voter had moved out of town." (ECF No. 75 at 12.) The Clark Registrar's unchallenged

14   contention accepted as true significantly diminishes Plaintiffs' contention that also sending

15   ballots to Clark County inactive voters will result in greater voting strength for voters in that

16   county. Plaintiffs' argument necessarily presupposes that inactive voters in Clark County

17   would not alternatively go to the polling sites to vote in the June Primary. (*See id.* (noting

18   the inactive voters are eligible to vote in the June Primary at a polling site).)[17]

19       Additionally, the Court is convinced that deputized staff members of the Clark

20   Registrar picking up ballots does not add to Plaintiffs' contention of Clark County voters

21   ///

22       [16]Plaintiffs rely on *Bush v. Gore*, 531 U.S. 98 (2000) as their basis for applying the
     doctrine to this case. (*E.g.*, ECF No. 64 at 24.) However, *Bush v. Gore*, is not directly on
23   point where the concern there was that the various Florida counties used different
     standards in a recount to assess what votes should be counted in a presidential election.
24   *See id.* at 107. The facts of Plaintiffs' Equal Protection claim here are completely different
     because Plaintiffs cannot support a claim that under the Plan or the CC Plan votes will be
25   counted differently, or what constitutes a valid vote would differ as among the counties.
     Moreover, in the context of the Equal Protection Clause, the one person, one vote principle
26   ordinarily concerns requiring states to design both congressional and state legislative
     districts with equal populations and must regularly reapportion districts to prevent
27   malapportionment. *See, e.g.*, *Evenwel v. Abbott*, 136 S. Ct. 1120, 1123–24 (2016).

28       [17]*See* NAC § 293.412(5) ("An inactive voter may vote in person at a polling place
     in the same manner as an active voter.").

1   having a greater voter strength than other counties. Plaintiffs do not challenge the Clark

2   Registrar's representation that this service is based upon request, that the county has not

3   received much requests for this service, and that it is provided as an alternative particularly

4   for those with disabilities who would rather not send their ballots by mail or deliver to a

5   drop-off site (*see* ECF No. 75 at 12). Notably, these individuals would have already voted.

6   (*Id.*) Therefore, it is unlikely that the mere act of the alternative of picking up an already

7   voted ballot, for which there is also an option to drop off or mail-in with postage provided

8   (*see id.*), would result in greater voting strength. For these reasons, the Court concludes

9   that Plaintiffs have not supported the contention that the CC Plan leads to greater voter

10  strength for Clark County voters.

11        It also appears to the Court that Plaintiffs' chief concern (if not purported harm) is

12  that the CC Plan will result "in the most populous county of a certain persuasion . . .

13  garner[ing] many more votes of the dominant political persuasion in that county." (*E.g.*,

14  ECF No. 80 at 10.) It is not clear to the Court why this concern is even relevant to the June

15  Primary. As the Washoe Registrar notes, Nevada is a closed primary, therefore only

16  members of a party can vote for candidates for that party (*see* ECF No. 74 at 6). *See* NRS

17  § 293.257(3) ("A registered voter may cast a primary ballot for a major political party at a

18  primary election only if the registered voter designated on his or her application to register

19  to vote an affiliation with that major political party."). Thus, Plaintiffs' concern of more

20  votes for a certain political persuasion appears reaching at best and materially does not

21  support their Equal Protection claim, if at all, particularly in the primary context.

22        The Court further concludes that the Equal Protection claim fails under *Short*, which

23  the Court finds applicable to the claim. In *Short*, the appellants challenged California's

24  Voter's Choice Act ("VCA"), claiming it violated the Equal Protection Clause because it

25  permitted voters in some counties to receive a mail ballot automatically while voters in

26  other counties had to apply for a mail ballot. *Id.* at 677–79. The Ninth Circuit Court of

27  Appeals concluded that there was no constitutional violation because there was no

28  evidence that "the VCA [would] prevent anyone from voting." *Id.* at 677. The appellate

15

1    court specifically noted that the appellants had failed to cite "any authority explaining how

2    a law that makes it easier to vote would violate the Constitution." *Id.* at 677–78.

3          As in *Short*, Clark County's Plan may make it easier or more convenient to vote in

4    Clark County, but does not have any adverse effects on the ability of voters in other

5    counties to vote. Plaintiffs are unlikely to succeed on their claim of an Equal Protection

6    violation where they provide no evidence—and cannot provide any—that the CC Plan

7    makes it harder for voters in other counties to vote. Nor is there any allegation that under

8    the CC Plan representation is differently allocated between Clark County and other

9    counties or that the CC Plan operates to discriminate based on a suspect classification. If

10   it did, it would be subject to heightened scrutiny requiring compelling justification under

11   the *Anderson-Burdick* test.[18] *See Id.* at 677–79. However, "[c]ounty of residence is not a

12   suspect classification warranting heightened scrutiny." *Id.* at 679. Applying a lesser level

13   of scrutiny, it cannot be contested that Clark County, which contains most of Nevada's

14   population—and likewise voters (69% of all registered voters (*see* ECF No. 75 at 12))—is

15   differently situated than other counties. Acknowledging this as a matter of generally known

16   (or judicially noticeable) fact and commonsense makes it more than rational for Clark

17   County to provide additional accommodations to assist eligible voters. Moreover, there is

18   no contention that under the Plan, other counties could not have similarly adopted further

19   accommodations for their residents. Thus, like their other claims, Plaintiffs' fourth claim of

20   an Equal Protection violation falls flat.

21          In sum, the Court finds that Plaintiffs are not likely to succeed on the merits of any

22   claim asserted in the AC. The Court also adopts its conclusion from the PI Order that a

23   balancing of the equities and the public interest weigh against granting an injunction to

24   Plaintiffs.

25   ///

26   ///

27

28                [18]The Court explains the relevant balancing under this test in the PI Order (ECF No. 57 at 12–13) and will not recite it here.

16

**V.    CONCLUSION**

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the issues before the Court.

It is therefore ordered that Plaintiffs' second motion for preliminary injunction (ECF No. 65) is denied for the reasons provided herein.

It is further ordered that Plaintiffs' motion to consolidate hearing on the second motion for preliminary injunction with a hearing on the merits (ECF No. 67) is denied as moot.

It is further ordered that Plaintiffs' supplemental brief (ECF No. 82) is stricken as improperly submitted without leave of court.

DATED THIS 27th day of May 2020.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE